MANDELBAUM SALSBURG, P.C.
3 Becker Farm Road
Roseland, NJ 07068
Ph.: 973-736-4600
Fax: 973-736-4670
Attorneys for Plaintiffs



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALEXANDER SALERNO, M.D., on behalf of himself and all other healthcare providers similarly situated, SALERNO MEDICAL ASSOCIATES, LLP, SENIOR HEALTHCARE OUTREACH PROGRAM, INC., SVETLANA SALERNO, M.D., AMANDA MARINO, M.D., DIANA LARREA, D.O., ANDREA FODOR, N.P., GUETTY GABAUD, N.P., BELA LASCHIVER, N.P, AIDA RAMOS, F.N.P., MARYELLEN ROBERTS, N.P., RAKESH K. SAHNI, M.D., ELIZABETH D. EVANS, D.O., KUANG-YIAO HSIEH, M.D., JOHN H. RUNDBACK, M.D., KEVIN HERMAN, M.D., ROEL P. GALOPE, D.O, VICTORIA A. HOWELL, N.P., MARIELA PABON, R.D., NILAY R. SHAH, M.D., SM MEDICAL LLC, RAMEZ W. SAMUEL, M.D., MOUNIR ABDELSHAHID, M.D., CATALINA DELACRUZ, M.D., PEDIATRICS AND ADOLESCENT SAINT MARY CLINIC, LLC, and INAS WASSEF, M.D., <br><br>               Plaintiffs, <br><br>v. <br><br>UNITEDHEALTHCARE GROUP, INC., UNITEDHEALTHCARE INSURANCE COMPANY, UNITED HEALTHCARE COMMUNITY PLAN, AMERICHOICE, INC., AMERICHOICE OF NEW JERSEY, INC., RIVERSIDE MEDICAL GROUP, OPTUM, INC., OPTUM CARE, INC. and JOHN DOES 1-20, <br><br>               Defendants. | CIVIL ACTION No. _____ <br><br><br><br><br><br><br><br><br><br><u>**VERIFIED CLASS ACTION COMPLAINT AND JURY DEMAND**</u> |

4846-1096-2585

Plaintiff Alexander Salerno, M.D. ("**Salerno**") on behalf of himself and a class of all other similarly situated physician providers ("**Physician-Providers**") and other healthcare providers (collectively, the "**Providers**" or the "**Plaintiffs**"), and Salerno Medical Associates, LLP, Senior Healthcare Outreach Program, Inc., Svetlana Salerno, M.D., Amanda Marino, M.D., Diana Larrea, D.O., Andrea Fodor, N.P., Guetty Gabaud, N.P., Bela Laschiver, N.P, Aida Ramos, F.N.P., Maryellen Roberts, N.P., Rakesh K. Sahni, M.D., Elizabeth D. Evans, D.O., Kuang-Yiao Hsieh, M.D., John H. Rundback, M.D., Kevin Herman, M.D., Roel P. Galope, D.O., Victoria A. Howell, N.P., Mariela Pabon, R.D. and Nilay R. Shah, M.D., all with offices at 570 and 613 Park Avenue, East Orange, New Jersey and/or 346 Roseville Avenue, Newark, New Jersey; SM Medical, LLC ("**SMM**"), Ramez W. Samuel, M.D., Mounir Abdelshahid, M.D. and Catalina Delacruz, M.D., all with offices located at 135 Bloomfield Avenue, Blooomfield, New Jersey; Pediatrics and Adolescent Saint Mary Clinic, LLC, and Inas Wassef, M.D., with offices located at 35 Journal Square, Suite 825, Jersey City, New Jersey; by way of Verified Complaint against Defendants UnitedHealthcare Group, Inc. ("**UHCG**"), UnitedHealthcare Insurance Company ("**UHC**"), UnitedHealthcare Community Plan ("**UHCP**" or the "**Plan**"), AmeriChoice of New Jersey, Inc.("**ACNJ**"), AmeriChoice Corp. ("**ACC**"), Riverside Medical Group ("**RMG**"), Optum, Inc. ("**Optum**"), Optum Care, Inc. ("**Optum Care**"), and Johns Doe 1-20, allege and say as follows:

## INTRODUCTION

1.     This class action lawsuit is brought by Salerno, on behalf of himself and all other similarly situated Providers, as well as other named Providers, all of whom participate in a Medicare Advantage ("**MA**") health insurance plan (an "**MA Plan**") known as the UHCP, administered by UHC, ACC and/or ACNJ, and who recently

learned, despite not being given any reason and in violation of, among other things, the MA regulations (the " **MA Regulations**") under the Social Security Act (the "**Act**"), as amended by the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("**MMA**"), the UHCP Provider manual (the "**Manual**") as well as their substantive and procedural due process rights, that their contracts with the MA Plan are not being renewed (the "**Class**").

2.      Should Defendants not be enjoined and restrained from terminating Providers from the Plan, Plaintiffs, all of whom are inner-city healthcare Providers catering to Medicare and/or Medicaid patients (the "**Patients**"), will suffer significant damage to their reputations and the good will of their medical practices and thousands of their patients, most of whom are elderly and economically disadvantaged, will have their medical care interrupted and their long-term physician-patient relationships severed.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this Complaint under the Act, as amended by the MMA, 42 U.S.C. 1305 et seq. and 42 U.S.C. 1395hh,, as well as the MA Regulations, 42 C.F.R. §422 et seq. In addition, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(d)(2)(A) in that the amount in controversy, exclusive of interest and costs, exceeds $5 million and this is a class action in which members of the class(es) of Plaintiffs are citizens of a State different from any defendant. Additionally, this Court has supplemental jurisdiction over state and/or common law claims pursuant to 28 U.S.C. §1367.

4.      Venue is proper pursuant to 28 U.S.C. §1391, as a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district and Defendants are subject to personal jurisdiction here.

## FIRST COUNT
### Identification of the Parties and Background

5.     UHCG, the largest healthcare company in the world, with 2018 revenues of over $226 billion and earnings of almost $12 billion, is a Minnesota holding company that owns UHC, a Connecticut entity, and UHCP, a Michigan entity (UHCG, UHC and UHCP collectively, the "**UHC Companies**").

6.     The UHC Companies' national network includes more than 700,000 physicians and healthcare professionals and over 5,300 hospitals, offering about 50 million people access to healthcare services.

7.     The UHC Companies maximize their market share by vigorously pursuing patients to join their plans, including meeting with potential patients at senior living facilities and offering CVS gift cards and other enticements.

8.     UHCG and/or UHC are MA organizations ("**MAOs**") which means they are approved by the Government to offer an MA Plan.

9.     To cover Medicare benefits, Medicare pays MAOs a fixed monthly dollar amount based on the number of "lives governed" (the number of their patients in an MA Plan) and the complexity of the cases, unlike traditional Medicare where the Government pays providers different amounts based upon the types of medical services rendered.

10.    To accommodate provider costs that may be associated with patients who require more than average care, Medicare pays MAOs a "risk adjusted" amount to reflect the age, gender and health status of each beneficiary, resulting in MAOs, such as UHC and/or UHCG, receiving higher payments for patients diagnosed with conditions that are expected to require greater care even though they may not actually receive that care.

11.    The Government determines the risk adjusted amounts it pays based in part upon the notes of healthcare providers, such as the Providers, participating in the Plan.

12.    If UHC and/or UHCG are able to demonstrate a higher complexity of patients based upon higher coded procedures and corresponding notes from the Providers, UHC and/or UHCG are able to charge the Government more money.

13.    The claims submitted by MAOs to the Government generally are not audited by third parties to confirm the accuracy of the coding or to ensure the veracity of the information and claims presented.

14.    Medicare has Part A that covers hospitalization, Part B that covers outpatient treatment, while MA Plans are known as Part C plans.

### The Plan and the Providers

15.    UHCP, a subsidiary of UHC, is a dual complete medical Plan that covers people entitled to Medicare and Medicaid.  It also includes Medicare Part D that covers prescription drugs.  Customers entitled to Medicare and Medicaid who have limited income and resources may also be eligible to have their health Plan premiums paid.

16.    The Plan has a Medicare contract with the Federal government and a contract with the State Medicaid Program in New Jersey and is available to anyone who has Medicare and medical assistance from the State (Medicaid).

17.    The Plan serves State programs (Medicaid) that care for the economically disadvantaged, the medically underserved and people without the benefit of employer-funded health care coverage, in exchange for a fixed monthly premium per member from the State program.

18.     The Plan includes a network of Physician-Providers that are under standard form contracts drafted by UHC ( the "**Physician Contracts**") and a network of other healthcare Providers that are under standard form participation contracts drafted by UHC (the "**Participation Contracts**") (Physician Contracts and Participation Contracts collectively the "**Contracts**") to deliver the benefits package approved by the Centers for Medicare & Medicaid Services ("**CMS**"), a federal agency within the United States Department of Health and Human Services that administers the Medicare Program and works in partnership with State governments to administer Medicaid and the Children's Health Insurance Program ("**CHIP**") (a program that provides health coverage for eligible children through Medicaid and separate programs administered by States according to federal requirements).

19.     CMS is the single largest payer for healthcare in the United States and nearly 90 million Americans rely on health care benefits through Medicare, Medicaid and CHIPS.

20.     Providers under the Plan treat Medicaid, CHIP and Dual Complete MA Patients.

21.     The Plan is approved by CMS to ensure that all applicable requirements for Patients are met, including access and availability to health care in their service areas, as well as quality and value of care.

22.     The Plan is not permitted to restrict Patients' choice among Providers that are lawfully authorized to provide services under the Plan and agree to accept the Plan's terms and conditions of payment.

23.     The Providers are all considered "in-network" under the Plan, as the Plan does not cover out-of network providers.  This means that if a Provider is terminated

from the Plan, that Provider's Patients must change to another Provider under the Plan or drop out of the Plan and continue to be treated by their Provider by paying for that care using their own funds (or by joining another plan that their Provider is affiliated with during an open enrollment period).

24.     If a Patient follows a terminated Provider to a different health plan, the Patient will likely be required to see different specialists covered by the new plan and be prescribed different medications depending upon which drugs are covered by the new plan.

25.     The other health plan will likely also have different deductibles and co-pays than what the Patient was obligated to pay under the Plan.

### RMG and its Relationship with the UHC Companies

26.     ACNJ, a subsidiary of ACC, is a New Jersey corporation and the administrator of the Plan, and John Does 1-20 ("John Does"), whose identities are currently unknown, are affiliates of ACNJ for certain products and/or medical services.

27.     RMG, a New Jersey entity, is one of the largest multi-practice medical groups in New Jersey, with approximately three hundred (300) doctors and more than eighty five (85) offices located here, and is an approved Provider under the Plan.

28.     RMG was purchased by Optum Care, a Delaware corporation, in or about 2016.

29.     Optum Care, a behemoth medical group with approximately 30,000 physicians, is owned by Optum, a Delaware corporation.

30.     UHC created the Optum brand in or about 2011 as UHC's health services business.

31.     UHC, therefore, owns the Plan as well as RMG, one of the Providers under the Plan.

32.     Such an arrangement can be rife with self-dealing because UHC controls both the claims submitted by RMG and the approval/appeal process for those claims.

33.     Moreover, in order to receive higher reimbursement from the Government, RMG can upcode certain procedures which UHC and/or UHCG can decide not to challenge because it increases their revenues.

34.     There have been a number of qui tam (false claims) lawsuits brought on behalf of the government against MAOs, including UHC.

35.     One such suit alleged that the UHC Companies submitted false certifications to the Government, claiming diagnostic codes submitted for risk adjustment payments were truthful when, in fact, they were based on biased retrospective medical record reviews designed to deliberately conceal unsupported diagnosis codes that allegedly caused CMS to make billions of dollars of risk adjusted payments to which they were not entitled.

## The Primary Care Providers

36.     The Providers include medical groups and individual healthcare Providers, including medical doctors, doctors of osteopathy and nurse practitioners, who are Medicaid and Medicare healthcare Providers under Contracts they entered into with UHC.

37.     Most medical groups are comprised of primary care doctors, family medicine physicians and/or pediatricians ("**Primary Care Providers**") and specialists.

38.     A Primary Care Provider, in essence, is like a quarterback calling the plays. The Primary Care Provider decides when to run the ball, hand it off or throw it

to a specialist. In fact, under the Plan, Primary Care Providers may only refer Patients to specialists who also are Providers in the Plan ("in network").

39.     The medical groups are generally located in inner cities and provide needed medical care for the elderly, the economically disadvantaged, the medically underserved community and people without employer-funded health coverage, including children.

40.     Plaintiff Salerno Medical Associates, LLP ("**SMA**") is a family-run, second generation, multi-discipline healthcare practice that has served East Orange and Newark, New Jersey, federally designated underserved areas, for over fifty (50) years.

41.     Plaintiff Senior Healthcare Outreach Program, Inc. ("**SHOP**") is a New Jersey corporation that provides geriatric healthcare, ambulatory services, regularly scheduled visits to bed-bound Patients, including high risk and psychiatric Patients, and is affiliated with SMA.

42.     These areas are so underserved that SMA and SHOP have approximately 2,500 Medicare and Medicaid Patients and treats eight (8) to ten (10) new Medicaid Patients each day, making SMA and SHOP some of the largest primary care medical groups in Essex County, New Jersey.

43.     SMA and SHOP deliver the highest quality medical care and services and, in October 2014, UHC recognized SMA in a full-page Star-Ledger article as a top healthcare metrics Provider for delivering consistent, innovative and pioneering healthcare outcomes.

44.     SMA recently had a twenty-eight percent (28%) increase in Medicaid Patients under the Plan, and UHC rewarded SMA based upon delivering great outcomes for its Patients by paying it a $130,000 bonus in early 2019.

45.     Plaintiff SM Medical, LLC ("**SMM**") has offices in Bloomfield, New Jersey and also focuses on providing medical care for the same types of Patients as SMA.

46.     Plaintiff Pediatrics and Adolescent Saint Mary Clinic, LLC ("**PASMC**"), with offices located at 35 Journal Square, Jersey City, New Jersey also focuses on similar Patients in an underserved area.

## UHC's Guiding Principles and Contracts

47.     In order to convince medical groups and individual physicians to join its network as Providers, UHC makes certain representations, including those contained in its written guiding principles (the "**Guiding Principles**") which are part of the Contracts.

48.     In the Guiding Principles, UHC claims to want to work together with America's best physicians and healthcare Providers to improve the healthcare experience of its customers.

49.     UHC further claims to respect and support physician/patient relationships while adhering to the contract of benefits it provides to its customers.

50.     UHC also represents, promises and assures to medical groups and physicians considering joining one of UHC's networks that "[f]airness and efficiency will govern the ways in which [the UHC Companies] administer our products."

51.     UHC entered into identical, written Physician Contracts with physicians and identical, written Participation Contracts with non-physician Providers.  A representative Physician Contract is annexed hereto and incorporated herein by reference as Exhibit "A" and a representative Practitioner Contract is annexed as

Exhibit "A" to the Certifications of Plaintiffs Aida Ramos, F.N.P., and Bela Laschiver, N.P., filed herewith.

52.    Providers need to be credentialed according to UHC's Credentialing Plan, and they must notify UHC about the services provided in accordance with its Provider Manual so that UHC can provide its customers with the services it has committed to provide.

53.    The Contracts indicate that, other than an applicable co-pay, coinsurance or deductible amount, Providers cannot charge UHC's customers anything for the services provided if those services are covered under the customers' benefit contract.

54.    The Contracts also obligates Providers to refer Patients only to other network Providers except as permitted under UHC's customers' benefit contracts or as authorized by UHC.

55.    Pursuant to the Contracts, UHC agrees to reimburse Providers for the services delivered that its customers' benefit contracts cover, and the amount paid is based on the lesser of the Provider's billed charges or UHC's fee schedule.

56.    There are various appendixes to the Contracts, including those related to benefit contract descriptions, locations of the Providers, payment terms for different medical procedures, regulatory requirements, New Jersey Medicaid, New Jersey Family Care Programs and New Jersey Medicaid Long Term Support Services Contract Requirements and individual Provider information.

57.    Buried on the bottom of page five and onto page six of the Contracts is an arbitration provision under the section labeled "What If We Do Not Agree."

58.    The arbitration clause is not highlighted in any way, and is not in different size type or bolded.

59.     The arbitration clause also does not reference any statutory or regulatory claims that must be arbitrated and does not indicate that arbitration is in lieu of filing a lawsuit in court.

60.     Moreover, the arbitration clause does not reference whether it applies to equitable and/or injunctive relief.

61.     The arbitration clause also attempts to reduce the statute of limitations on Providers' claims to one year.

## Termination Provisions in the Contracts

62.     Assuming a Provider is credentialed by UHC, and the parties execute the Contract, the Contract continues until UHC or the Provider terminates it.

63.     The Contract provides that UHC can amend it or any of the appendixes on ninety (90) days written or electronic notice by sending a copy of the amendment, and if the Provider does not wish to continue to participate in UHC's network as changed by an amendment not required by law or regulation, but that includes a material adverse change to the Contract, the Provider may terminate the Contract on sixty (60) days written notice to UHC so long as the termination is sent within thirty (30) days of receipt of the amendment.

64.     The Contract further provides that either UHC or a healthcare provider can terminate the Contract at any time if the other party has materially breached the agreement by providing sixty (60) days written notice, except if the breach is cured before the Contract ends, the agreement will continue.

65.     The Contract also provides that either party can terminate it, effective on an anniversary of the date the Contract begins, by providing at least ninety (90) days

prior written notice, although, as set forth below, as to the Physician Contracts, this must be done in accordance with, among other things the MA Regulations.

66. In order to terminate a Contract, UHC is required to provide notice to the Provider by certified mail, return receipt requested, sent to the post office address provided to UHC.

## Termination Provisions in the UHCP New Jersey Provider Manual

67. UHC widely distributes provider manuals in various states, and there is one for New Jersey Providers under the UHCP.

68. The Contracts indicate that UHC will resolve all disputes with Providers "following the procedures set out in our Provider Manual."

69. According to the 2018 Manual published by UHC for New Jersey Providers relating to the UHCP, UHC may terminate a Provider's participation in the network for failure to comply with certain contractual obligations or quality management requirements. A copy of the section of the Manual relating to terminations of Providers is annexed hereto and incorporated herein as Exhibit "B". In addition, UHC may only immediately terminate a Provider for certain specified events. Plaintiffs are unaware of any failure on their part to comply with any contractual obligations under their Contracts and are unaware of any basis for UHC to immediately terminate their participation.

70. The Manual also indicates that UHC may initiate termination proceedings regarding a Provider's network participation for several reasons, including a failure to implement and comply with a corrective action plan, refusal to make medical records available, or failure to comply with and participate in the quality management program. In the case of termination for failure to comply with the quality management requirements, the Manual requires that a Medical Director send the Provider a certified letter notifying him/her of the intent to terminate his/her

network participation privileges. Plaintiffs are unaware of UHC "initiating any termination proceedings" against them and unaware of any basis for such proceedings to be initiated.

71. If UHC intends to initiate any proceedings, the Manual confirms that the notice of proposed action must include

- Notification that a professional review action has been recommended against the Provider

- The reasons for the proposed action and any supplemental materials

- Notification that the Provider may request a hearing within ten (10) business days from receipt of the notice.

72. The Manual then goes on to discuss the details of the hearing. Since Plaintiffs never received the notification referenced in the Manual, or the reasons for any proposed action, they have not requested a hearing.

## In Violation of the MA Regulations and the Manual, and in Breach of the Contracts, UHC Notifies Plaintiffs that they are being Dropped From the Plan

73. At various times beginning in or about March, 2019 Providers received letters from UHC indicating that UHC was terminating their Contracts prior to the expiration of the Contracts' terms. Most, if not all, of the letters were sent via regular mail even though the Contracts require notice by certified mail, return receipt requested, and the Manual requires certified mail under certain circumstances. Representative copies of those letters are annexed hereto and made a part hereof as one Exhibit "C."

74. Subsequently, in or about April, 2019, UHC withdrew those termination notices and sent new letters (the "**Termination Letters**") to Providers indicating that their Contracts would not be renewed at the end of their terms. Most, if not all, of the Termination letters were also sent only via regular mail. Representative copies of The Termination Letters are annexed hereto and made a part hereof as Exhibit "D."

75.    The Termination Letters sent to the Providers all state that:

> "[w]e (UHC) periodically assess our networks to help ensure they meet the needs of our members.  As a result, we sometimes have to make difficult decisions around care provider contracts. Unfortunately,   we've   decided   not   to   renew   your UnitedHealthcare Community Plan Agreement ..."

76.    The Termination Letters, however, note that termination from the Plan does not affect any other participation agreement the medical groups or doctors currently have with UHC, thereby suggesting that Providers are not being terminated based upon the quality of medical care they provide.

77.    Moreover, an "Appeal Process" notification form (**"Appeal Notification Form"**) prepared by UHC that accompanied the Termination Letters confirms that UHC is terminating these Providers "**without cause**".  A copy of a representative Appeal Notification Form is annexed hereto and made a part hereof as Exhibit "E".

78.    Terminating Providers from the Plan but not other UHC plans, however, violates the understanding Plaintiffs had with the UHC Companies that they were entering into an all-products agreement.

79.    An MAO, such as UHC, by law, must provide for its participating physicians and "the management and members of groups of physicians" reasonable procedures that include, among other things, the following:

(1) Written notice of rules of participation including...rules directly related to participation decisions.

(2) Written notice of material changes in participation rules before the changes are put into effect.

(3) Written notice of participation decisions that are adverse to physicians.

(4) A process for appealing adverse participation procedures, including the right of physicians to present information and their views on the decision.

(42 C.F.R. §422.202(a)(4).).

80.     Moreover, in the case of an MAO's termination or suspension of a

Provider, the process must conform to the MA Regulations in 42 C.F.R. §422.202(d),

which require, among other things, the following:

> 1.     written notice to the physician (i) concerning the reasons for the
> action including, if relevant, the standards and profiling data used to
> evaluate the physician and the numbers and mix of physicians needed by the
> MAO, and (ii) notice of the affected physician's right to appeal the action
> and the process and timing for requesting a hearing;
>
> 2.     that a majority of the hearing panel members are peers of the
> affected physician; and
>
> 3.     written notice to licensing or disciplinary bodies or to other
> appropriate authorities of the suspension or termination of a physician's
> contract because of deficiencies in the quality of care.

81.     The Termination Letters do not comply with the MA Regulations because

they failed, inter alia, to provide the reasons for the actions taken, to inform Providers

(if relevant) of the standards and profiling data used to evaluate them, and to advise

them of the numbers and mix of physicians needed by the Plan.

82.     The proposed terminations also violate the requirements of the Manual.

83.     The Termination Letters informed Providers that they may have the

opportunity to appeal the decision to terminate them from the Plan but, contrary to 42

C.F.R. §422.202, limited "[t]he scope of the appeal panel's review of [a Provider's]

appeal… to determining whether UHC acted according to the provisions of [the

Physician Contract]."

84.     The Appeal Notification Form confirms that an appeal from the decision

by UHC to terminate a Physician Contract is ruled upon by an appeal panel "appointed

by UnitedHealthcare …", but appeal panels appointed by UHC do not comply with 42

U.S.C. §422.202(d)(2) to the extent that the majority of the panel members are not peers of the affected physician.[1]

85.   The Providers all timely appealed UHC's decision to terminate them from the Plan but none of the Providers knew the reason(s) for the nonrenewal of the Contracts.

86.   Moreover, none of the Providers were given an opportunity to appear before any appeal panel "to present their information and views" and none knew what information may have been provided by UHC to any appeal panel.

87.   All of the Providers' appeals were denied or no determinations were ever received. A representative copy of the standard appeal denial form received by various Plaintiffs is annexed hereto and incorporated herein as Exhibit "F."

88.   The appeal denials do not indicate a reason for the terminations or the reasons for which the appeal panels decided to uphold the decisions.

### UHC Notifies Patients that Providers Are Being Dropped from the Plan and Provides False Information to Patients

89.   The Termination Letters informed Providers that UHC would be notifying Providers' Patients about Providers being terminated from the Plan, indicating that "[w]e'll communicate this change in your participation status to your ... patients ...".

90.   The effective dates of termination from the Plan for Providers are over the upcoming months but Defendants have sent, or are about to send, written notices to Plan participants who are Patients of these Providers, informing them of the Providers' upcoming terminations from the Plan.

---

[1]   At least one non-Physician, Plaintiff, Guetty Gabaud, a Nurse Practitioner, appealed her termination and it was ruled upon, and denied, by an appeal panel without reason.

91.     Patients recently contacted UHC to select Providers in the Plan and were informed that SMA will no longer be a Provider under the Plan.

92.     Recently, two Providers, Plaintiffs Aida Ramos, F.N.P. ("**Ramos**") and Bela Laschiver, N.P. ("**Laschiver**"), were informed that their contracts were being terminated before the expiration of their terms. Subsequently, they received another letter from UHC that their contracts would not be renewed upon their expiration date, on May 1, 2020 and June 7, 2020, respectively. Neither letter was sent via certified mail as required by their Contracts or the Manual.

93.     No reasons were given for UHC's action other then to state, as set forth above, that it resulted from UHC's assessment of its network to meet the needs of its members.

94.     Ramos and Laschiver both timely appealed UHC's decision, although they were unaware of UHC's reason(s) for not renewing their Contracts, but they never heard from UHC or the appeal panels concerning their appeals.

95.     Subsequently, Ramos was informed by two potential new patients that UHC refused to allow them to list Ramos as their Primary Care Provider even though, according to the Termination Letter, Ramos' Contract is remaining in place until May 1, 2020.

96.     Moreover, when Ramos went on-line to check her status listed in the UHCP directory, UHC indicated in the Directory that she is "Not Accepting Patients," which is false. The Directory further states that she "will be out-of-network at this location after May 1, 2020."

97.     Laschiver learned that UHC was also falsely advising patients that she is not accepting new patients even though her Contract runs through June 7, 2020.

98.     Defendants are sending letters to other Patients and/or are telling them similar things about these and other Providers.

99.     By letter, dated June 26, 2019, UHCP sent a letter to Alix Dagmar ("**Dagmar**"), a Patient of Plaintiff Svetlana Salerno, M.D. ("**Svetlana**"), advising Dagmar that Svetlana "will no longer be a doctor with the UHCP effective March 17, 2016." The effective date appears to be incorrect but obviously would lead to the confusion of the Patient. A copy of that letter is annexed hereto and incorporated herein as Exhibit "G".

100.    The letter further indicates that

> UHCCP wants to make sure that you have a doctor to go to if you need health care, so we have picked another UHCP doctor for you in our area. You can still see the doctor you have now until March 17, 2016. But, if you would like to change to your new PCP (Primary Care Physician) now, please call our Member Services ...

> Effective March 18, 2016, the new UHCP PCP we have picked for you is:

> Velma A. Frasier
> 444 Williams Street
> East Orange, NJ 07017
> (973) 675-1900

> If you would like another doctor instead of Velma A. Frasier, please call our Member Service Center ...

> Please ask your new doctor to get your medical information from your old PCP. You can do this when you visit your new PCP's office by signing a release form."

101.    Unless enjoined and restrained, the UHC Companies will misrepresent that Providers are not accepting new Patients and will otherwise discourage Patients from selecting their current Providers under the Plan.

102.    The open enrollment period for the Plan is October 15, 2019 to December 7, 2019.  That is the time during which Patients select their healthcare Providers for the coming year.    Unless Defendants are enjoined and restrained, Patients will select Providers other than Plaintiffs for the upcoming year.

## Providers' Termination from the Plan Will Cause Significant Harm to Providers and Significant Medical Harm to Patients

103.    The Providers have spent years and significant dollars developing and enhancing their good will and the good will of their medical practices by, among other things, forging important doctor-patient relationships with Plan participants.

104.    The Patient makeup of various medical groups who are Providers is as high as ninety percent (90%) MA patients and only ten (10%) Patients under commercial insurance plans.

105.    Providers are not being terminated due to the quality of medical care provided and, UHC has advised Providers that they are being terminated "without cause."    In fact, there is no legitimate basis for terminating the Providers.

106.    Under the MA Regulations, MA plans must disclose the Provider network when Patients enroll or renew enrollment.

107.    Should the terminations not be enjoined and restrained, thousands of Medicare and Medicaid beneficiaries throughout New Jersey will have been misled when they joined the Plan because they were under the impression from UHC's marketing materials that the Providers would be part of the Plan.

108.    Similarly, the open enrollment period for MA plans, when Patients can change plans or enroll directly with Medicare, is October 15 to December 7, and Patients

should be allowed to rely upon the Provider list as an accurate reflection of which Providers will be available to them during the Plan year.

109.    For the same reason, the UHC Companies should be enjoined and restrained prior to the open enrollment period (an thereafter) from informing Patients that Plaintiffs will not be Providers under the Plan or will not be accepting Patients.

110.    Upon information and belief, should the terminations not be enjoined and restrained, the UHC Companies, ACC, ACNJ and/or John Does 1-20 would deny access to quality and efficient healthcare to thousands of beneficiaries in violation of the MA Regulations, including §422.112(a)(1) which requires each MA Plan to "[m]aintain and monitor a network of appropriate providers that is supported by written agreements and is sufficient to provide adequate access to covered services to meet the needs of the population served."

111.    Similarly, Medicaid requires states, such as New Jersey, to monitor access for certain types of services provided under the Plan and to include network adequacy requirements.

112.    Under the Act, Medicaid Patients are entitled to quality medical care from enough available providers so that the care and services are available under the Plan at least to the extent that such care and services are available to the "general population in the geographic area."  Act, §1902 (a)(30)(A).

113.    Upon further information and belief, should the Provider terminations not be enjoined and restrained, the Plan will neither "meet Medicare access and availability requirements through direct contracting network providers consistent with the prevailing community pattern of health care delivery in the areas where the network is

being offered" as required by §422.112(a)(10) of the MA Regulations nor will it meet the equal access provision in the Act for Medicaid Patients.

114.   The Providers are essential to their communities, and Medicare and Medicaid beneficiaries have relied on them for years to provide high-quality, efficient medical care.

115.   The Providers have longstanding medical Provider-patient relationships with many of their Patients with emotional bonds of trust and, in many cases, are the only Providers furnishing these services in their geographic area and, unless enjoined and restrained, the UHC Companies, ACC, ACNJ and/or John Does 1-20 would cause many beneficiaries and children to go without proper medical services or result in the interference of long-term medical care plans.

116.   Primary Care Providers, based upon years of treatment results ("outcomes") and their professional medical judgment, have developed a group of Providers to whom they typically refer Patients. In fact, some of the Providers are broad based practices having both Primary Care Providers as well as specialists on staff with whom they often consult as well as to whom they often refer Patients who need expertise in particular areas of medicine.

117.   The Providers are, for the most part, Primary Care Providers, doctors of osteopathy and nurse practitioners who work with them in their medical groups; however, just recently certain specialists who also are Providers also received termination letters (this time via certified mail) as discussed more fully below.

118.   Based upon the Plan's decision to terminate Primary Care Providers, specialists, who have negotiated and entered into their own Physician Contracts with the Plan, whereby they negotiated their reimbursement rates expecting a certain Patient volume, can expect a reduction in

their Patient volume based upon the termination of Primary Care Providers who routinely refer Patients to them.

119. Moreover, the termination of a Primary Care Provider from the Plan can have a devastating impact on Patients who are covered by the Plan. For example, by terminating a Primary Care Provider, Patients may only remain with their primary doctor if they are willing to pay (without any reimbursement from the Plan) the doctor's charges because the Plan does not reimburse the Patient or pay for doctors who are out-of-network.

120. Because Plan participants are on Medicare and/or Medicaid, most Patients simply cannot afford to continue treatment with the doctors they have developed close physician-patient relationships if those doctors are no longer Providers under the Plan. This would result in Patients having to locate new Primary Care Providers, which often is difficult because these Patients generally reside in inner cities and do not have cars. Moreover, these Patients live in communities that are medically underserved and some likely will be so discouraged by UHC's changes that they do not seek covered preventive care.

121. Forcing Patients to change Primary Care Providers also has other, major repercussions. As noted above, Primary Care Providers have their "go to" specialists for referrals. If a Patient is forced to drop his or her Primary Care Provider it typically results in the Patient needing to see new specialists referred by their new Primary Care Provider.

122. The change of who is acting as the Primary Care Provider often may also result in a change in the medicines prescribed to a Patient even though the former Primary Care Provider and the Patient were satisfied with the results of the medications prescribed.

123. Even if a Patient tries to follow their Primary Care Provider who was terminated from the Plan to a different health insurance plan, Patients may suffer because each insurance carrier has a different panel of approved pharmaceuticals for treatment of their Patients. As a

result, and as illustrated below, Patients may not be able to continue taking the same medications they were on when with Plan, may be forced to start a different regimen or seek an exception from the new plan's prescription drug panel, and this could take weeks, if not longer, and result in Patients not being able to fill needed prescriptions during this appeal process.

124. Moreover, each insurance carrier has a different set of co-payments and deductibles for which Patients are responsible and, as a result, Patients under the federal poverty line could see a large increase in their deductibles and/or co-payments for prescription drugs.

125. By way of an example, SMA patient, Velyalia McIver ("**McIver**") is a Patient who treats with Salerno as her Primary Care Physician. Without Salerno's excellent care of her, which includes making himself available to her to personally address any questions or concerns she may have about her treatment, McIver, at her age, would be unable to remain active in her community.

126. Salerno, as McIver's Primary Care Physician, has referred McIver to various specialists also in the Plan, such as a heart specialist at St. Michael's Hospital in Newark and to other Physicians in-network under the Plan to treat McIver for such things as her sleep apnea.

127. While still a Patient in the Plan, McIver was prescribed sildenafil to treat her pulmonary hypertension. After receiving a letter from UHC informing McIver that SMA and its medical doctors and various nurse practitioners were being dropped by the Plan, she was forced to switch health insurance carriers from the Plan to Wellcare in order to continue to be treated by Salerno (although it resulted in McIver needing to be referred to different specialists who were in the Wellcare plan.)

128. Wellcare, however, did not authorize McIver's sildenafil and informed McIver that she must obtain a prescription for a different medication. As a result, McIver was forced to take a single pill of sildenafil per day instead of the recommended dosage of two pills while she pursued authorization from Wellcare for an exception.

24

129.   Therefore, should this Court not enjoin and restrain said Defendants from terminating the Providers, falsely advertising that these Providers are not accepting new Patients and from sending written communications to these Patients, Providers will suffer irreparable harm and injury to their medical practices, damage to their reputations and the Patients and public will be significantly harmed.

### The UHC Companies are Lining Their Own Pockets by Terminating Providers and Referring Patients to RMG, a Healthcare Provider Owned and Controlled by Them

130.   In or about 2016, RMG, a large medical group and healthcare Provider under the Plan, with about three hundred (300) doctors, was acquired by Optum Care, which, in turn, is owned by UHCG, a holding company that also owns UHC and UHCP.

131.   As a result, UHC has a vested interest in having Plan participants obtain medical services from RMG rather than the Providers or other healthcare providers in or outside the Plan.

132.   In or about June 2018, RMG sought to acquire Salerno and SMA, but they refused.

133.   Upon information and belief, RMG has conspired with other Defendants in a concerted effort to have Providers terminated from the Plan such that more Patients receive medical services from medical groups owned or controlled, in whole or in part, by UHC.

134.   Defendants are now wrongfully refusing to deal with the Providers and tortiously interfering with Providers' contractual relations and prospective economic advantage with their Patients.

135.   Moreover, by being on both sides, the UHC Companies can misrepresent the number of diagnoses and the severity of the medical conditions to inflate the risk

adjustment payments from the Government. In essence, it gives the UHC Companies almost unlimited control of Government medical funds.

136. Furthermore, the aforesaid conduct of Optum Care and/or Optum constitute, inter alia, a tortious interference with Providers' contractual relationships with UHC pursuant to the Contracts and with Providers' prospective economic advantage as a result of their being Providers under the Plan.

137. Should the UHC Companies not be enjoined and restrained from terminating Providers from the Plan and from notifying Providers' Patients that these Providers are no longer approved Providers under the Plan, the Providers will suffer immediate and irreparable harm and damage to their good will which will be difficult to quantify.

138. Plaintiffs have no adequate remedy at law.

## Class Action Allegations

139. Salerno brings this action on his own behalf and on behalf of the Class who during the relevant class period were notified by the UHC Companies that they will be removed from the Plan when their Contracts expire.

140. The Class seeks, inter alia, (a) a determination of their rights under the MA Regulations, the Contracts and the Manual, (b) a judgment declaring and adjudging that their rights under the MA Regulations, the Contracts and the Manual were violated and finding the arbitration clauses unenforceable, (c) injunctive relief enjoining and restraining the UHC Companies from (i) terminating and/or failing to renew their Contracts, (ii) notifying Patients that they were, or will be, terminated and/or that they are not, or will not be, participating Providers under the Plan, and (iii) removing

Providers' information from any of Defendants' marketing materials, and (d) an order compelling the UHC Companies to include their information in their Directories.

141.  The members of the Class are so numerous that joinder of all members is impractical.  Based upon (a) the 2019 Provider Directory for the Plan for North Jersey, which is over 2,000 pages and lists as many as twenty (20) Providers per page, (b) the Provider Director for the Plan for South Jersey, which is over 1,000 pages and also lists as many as twenty (20) Providers per page, and (c) the number of Providers listed as named Plaintiffs in this lawsuit, the Class likely will include hundreds, if not thousands, of Providers.

142.  Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class, including whether: (a) the UHC Companies breached the Contracts, the Manual and/or the implied covenant of good faith and fair dealing contained therein; (b) their rights under the MMA, the MA Regulations and the Manual were violated, including whether they were systematically denied written notice concerning the reasons for the non-renewal of their Contracts, the data, if any, used to evaluate them, a hearing panel of their peers and the numbers and mix of physicians needed by the Plan; (c) the arbitration clause in the Contracts is unenforceable; (c) they are entitled to injunctive relief enjoining and restraining the UHC Companies from (i) terminating and/or failing to renew their Contracts; (ii) notifying Patients that they were, or will be, terminated and/or that they are not, or will not be, participating Providers under the Plan and (iii) removing Providers' information from any of Defendants' marketing materials; and (e) the UHC Companies tortiously refused to deal with the Class and/or engaged in unfair competition.

143. The claims of the proposed class representatives are typical of the claims of the Class Members because, as a result of the conduct alleged herein, the UHC Companies breached their statutory, regulatory, Plan and/or contractual obligations to Salerno and the Class.

144. Salerno and the named Plaintiffs will fairly and adequately protect the interests of the members of the Class, have retained counsel experienced in Class and complex litigation and have no interest antagonistic to or in conflict with those of the Class.

145. The prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for the UHC Companies.

146. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them. Given the uniform policies and practices at issue, there will also be no difficulty in the management of this litigation as a Class action.

## Cause for Action
## (Declaratory Judgment and Injunctive Relief)

147. Plaintiffs repeat and reallege all of the foregoing allegations as if same were fully set forth herein at length.

148. As set forth above, the UHC Companies, ACC, ACNJ and/or John Does 1-20 unilaterally decided not to renew, or to terminate, the Contracts.

149. The termination of the Providers' services violates, inter alia, the MA Regulations, the MMA and the Manual because, among other things, the UHC Companies, ACC, ACNJ and/or John Does 1-20 did not provide any reasons for the decisions or, if relevant, the standards and profiling data used to evaluate the Providers and the numbers and mix of physicians needed by the Plan.

150. Moreover, the right to appeal these decisions was tainted because, among other things, and upon information and belief, the appeal panel members were not peers of the affected Providers.

151. The Termination Notices, by not providing any factual reasons for the non-renewal decisions, did not provide sufficient information for the Providers to adequately respond to or contest the terminations on appeal or otherwise.

152. Said Defendants have impaired and violated the procedural and substantive due process rights of the Providers to contest their terminations from the Plan.

153. The Providers contest the validity and enforceability of the deficient Termination Notices, most of which were not served via certified mail.

154. Based upon the foregoing, there is a justiciable controversy as to whether the Termination Notices comply with the MMA, the MA Regulations, the Contracts and the Manual.

155. As a direct and proximate result thereof, the Providers have been, or will be, damaged should this Court not enjoin and restrain said Defendants from terminating them.

156. As a further direct and proximate result thereof, the Patients have been, or will be, damaged should this Court not enjoin and restrain said Defendants from terminating the Providers.

WHEREFORE, Plaintiffs demand judgment on this the First Count of the Verified Complaint against Defendants the UHC Companies, ACC, ACNJ and John Does 1-20 jointly, severally and/or in the alternative, as follows:

A. Declaring and adjudging the Termination Notices invalid and ineffective in terminating and/or not renewing Providers' right to participate as Providers under the Plan;

B. Declaring and adjudging that said Defendants must comply with the MA Regulations and the Manual prior to terminating or failing to renew any Contract and finding the arbitration clause on the Contracts unenforceable;

C. Enjoining and restraining said Defendants from terminating Providers' participation as Providers in the Plan and from notifying Patients that Providers are or will be terminated and/or that they are not, or will not be, participating as Providers under the Plan;

D. Enjoining and restraining said Defendants from removing Providers' information from any of Defendants' marketing materials and from notifying Patients that they are not accepting new patients under the Plan;

E. Compelling said Defendants to advertise and market the Providers like other Providers in the Plan, including listing the Providers in the 2020 directories for the Plan;

F. Damages;

G. Interest;

H.    Reasonable attorneys' fees;

I.    Costs of suit; and

J.    Such further relief as this Court deems just and equitable under the circumstances.

## SECOND COUNT
### (Breaches of Contract)

157.    Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

158.    The aforesaid conduct of the UHC Companies, ACC, ACNJ and/or John Does 1-20 violates, inter alia, the MMA, the MA Regulations, the Contracts and the Manual.

159.    The failure to send the Termination Letters via certified mail, return receipt requested, violated the express terms of the Contracts and the Manual.

160.    The aforesaid conduct of said Defendants also constitutes, inter alia, breaches of the Contracts, including the Guiding Principles contained therein, the Manual and the understanding that Providers were entering into an all-products agreement.

161.    As a direct and proximate result of said Defendants' breaches, the Providers have suffered, and will suffer, substantial damages.

WHEREFORE, Plaintiffs demand judgment on this the Second Count of the Verified Complaint against the UHC Companies, ACC, ACNJ and/or John Does 1-20, jointly, severally and/or in the alternative, as follows:

A.    Damages;

B.  Declaring and adjudging the Termination Notices invalid and ineffective in terminating and/or not renewing Providers' right to participate as Providers under the Plan;

C.  Declaring and adjudging that said Defendants must comply with the MA Regulations and the Manual prior to terminating or failing to renew any Contract;

D.  Enjoining and restraining said Defendants from terminating Providers' participation as Providers in the Plan and from notifying Patients that Providers are or will be terminated and/or that they are not, or will not be, participating as Providers under the Plan;

E.  Enjoining and restraining said Defendants from removing Providers' information from any of Defendants' marketing materials and from notifying Patients that they are not accepting new patients under the Plan;

F.  Compelling said Defendants to advertise and market the Providers like other Providers in the Plan, including listing the Providers in the 2020 directories for the Plan;

G.  Interest;

H.  Reasonable attorneys' fees;

I.  Costs of suit; and

J.  Such further relief as this Court deems just and equitable under the circumstances.

## THIRD COUNT
### (Breaches of the Implied Covenant of Good Faith and Fair Dealing)

162.   Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

163.   The aforesaid conduct of the UHC Companies, ACC, ACNJ and/or John Does 1-20 constitutes, inter alia, breaches of the covenant of good faith and fair dealing implied in the Contracts and the Manual.

164.   Moreover, terminating the Providers from the Plan, but not other UHC plans, violates, among other things, the implied covenant of good faith and fair dealing considering that Providers understood they were entering into an all-products agreement with said Defendants.

165.   As a direct and proximate result thereof, the Providers have suffered, and will suffer, substantial damages.

WHEREFORE, Plaintiffs demand judgment on this the Third Count of the Verified Complaint against the UHC Companies, ACNJ, ACC and/or John Does 1-20, jointly, severally and/or in the alternative, as follows:

A.   Damages;

B.   Declaring and adjudging the Termination Notices invalid and ineffective in terminating and/or not renewing Providers' right to participate as Providers under the Plan;

C.   Declaring and adjudging that said Defendants must comply with the MA Regulations and the Manual prior to terminating or failing to renew any Contract;

D.   Enjoining and restraining said Defendants from terminating Providers' participation in the Plan and from notifying Patients that Providers are or

will be terminated and/or that they are not, or will not be, participating as Providers under the Plan;

E.  Enjoining and restraining said Defendants from removing Providers' information from any of Defendants' marketing materials and from notifying Patients that they are not accepting new patients under the Plan;

F.  Compelling said Defendants to advertise and market the Providers like other Providers in the Plan, including listing the Providers in the 2020 directories for the Plan;

G.  Interest;

H.  Reasonable attorneys' fees;

I.  Costs of suit; and

J.  Such further relief as this Court deems just and equitable under the circumstances.

## FOURTH COUNT
### (Civil Conspiracy)

166.  Plaintiffs repeat and reallege all of the foregoing allegations as if same were fully set forth herein at length.

167.  Defendants have conspired, inter alia, to have the UHC Companies rufuse to deal with and to terminate the Providers from the Plan.

168.  Defendants have further conspired, inter alia, to tortiously interfere with the Providers' contractual relations with their Patients and with the Providers' prospective economic advantage with their Patients in order to, among other things, steer those Patients to RMG.

169. As a result thereof, the UHC Companies have terminated, or shortly will terminate, Providers from the Plan as of the expiration of their Contracts and have denied Providers' appeals to the appeal tribunals hand-chosen by the UHC Companies.

170. Should the UHC Companies not be enjoined and restrained from terminating Providers from the Plan and from notifying Patients of their pending terminations, the Providers will suffer immediate and irreparable harm as well as other damages that will be difficult to quantify.

171. As a direct and proximate result of Defendants' civil conspiracy, the Providers have suffered, and will continue to suffer, substantial damages.

172. The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of the Providers' rights.

WHEREFORE, Plaintiffs demand judgment on this the Fourth Count of the Verified Complaint against Defendants, jointly, severally and/or in the alternative, as follows:

A. Damages;

B. Punitive damages;

C. Declaring and adjudging the Termination Notices invalid and ineffective in terminating and/or not renewing Providers' right to participate as Providers under the Plan;

D. Declaring and adjudging that said Defendants must comply with the MA Regulations and the Manual prior to terminating or failing to renew any Contract;

E. Enjoining and restraining said Defendants from terminating Providers' participation in the Plan and from notifying Patients that Providers are or

will be terminated and/or that they are not, or will not be, participating as Providers under the Plan;

F.   Enjoining and restraining said Defendants from removing Providers' information from any of Defendants' marketing materials and from notifying Patients that they are not accepting new patients under the Plan;

G.   Compelling said Defendants to advertise and market Plaintiffs like other Providers in the Plan, including listing the Providers in the 2020 directories for the Plan;

H.   Interest;

I.   Reasonable attorneys' fees;

J.   Costs of suit; and

K.   Such further relief as this Court deems just and equitable under the circumstances.

## FIFTH COUNT
### (Tortious Refusal to Deal)

173.   Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

174.   The UHC Companies are tortiously refusing to deal with the Providers.

175.   Unless the UHC Companies are enjoined and restrained from terminating Providers from the Plan, the Providers will suffer irreparable harm and damage and many Patients will be denied healthcare services from Providers of their choice.

176.   The aforesaid conduct of the UHC Companies is willful, wanton, malicious and/or in reckless disregard of Plaintiffs' rights.

WHEREFORE, Plaintiffs demand judgment on this the Fifth Count of the Verified Complaint against Defendants jointly, severally and/or in the alternative, as follows:

A.  Damages;

B.  Punitive damages;

C.  Declaring and adjudging the Termination Notices invalid and ineffective in terminating and/or not renewing Providers' right to participate as Providers under the Plan;

D.  Declaring and adjudging that said Defendants must comply with the MA Regulations and the Manual prior to terminating or failing to renew any Contract;

E.  Enjoining and restraining said Defendants from terminating Providers' participation as Providers in the Plan and from notifying Patients that Providers are or will be terminated and/or that they are not, or will not be, participating as Providers under from the Plan;

F.  Enjoining and restraining said Defendants from removing Providers' information from any of Defendants' marketing materials and from notifying Patients that they are not accepting new patients under the Plan;

G.  Compelling said Defendants to advertise and market Plaintiffs like other Providers in the Plan, including listing the Providers in the 2020 directories for the Plan;

H.  Interest;

I.  Reasonable attorneys' fees;

J.  Costs of suit; and

K.     Such further relief as this Court deems just and equitable under the circumstances.

## SIXTH COUNT
### (Unfair Competition)

177.   Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

178.   The aforesaid conduct of the UHC Companies including, but not necessarily limited to, seeking to terminate Providers from the Plan and direct Patients to RMG, constitutes, inter alia, unfair competition and is otherwise wrongful.

179.   As a direct and proximate result thereof, the Providers have been or will be substantially damaged.

180.   The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of the Providers' rights.

WHEREFORE, Plaintiffs demand judgment on this the Sixth Count of the Verified Complaint against Defendants jointly, severally and/or in the alternative, as follows:

A.     Damages;

B.     Punitive damages;

C.     Declaring and adjudging the Termination Notices invalid and ineffective in terminating and/or not renewing Providers' right to participate as Providers under the Plan;

D.     Declaring and adjudging that the UHC Companies must comply with the MA Regulations and the Manual prior to terminating or failing to renew any Contract;

E.   Enjoining and restraining the UHC Companies from terminating Providers' participation as providers in the Plan and from notifying Patients that Providers are or will being terminated and/or that they are not, or will not be, participating as Providers under from the Plan;

F.   Enjoining and restraining the UHC Companies from removing Providers' information from any of Defendants' marketing materials and from notifying Patients that they are not accepting new patients under the Plan;

G.   Compelling the UHC Companies to advertise and market Plaintiffs like other Providers in the Plan, including listing the Providers in the 2020 directories for the Plan ;

H.   Interest;

I.   Reasonable attorneys' fees;

J.   Costs of suit; and

K.   Such further relief as this Court deems just and equitable under the circumstances.

## SEVENTH COUNT
## (Tortious Interference with Contract and Prospective Economic Advantage)

181.   Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

182.   Defendants are aware of Providers' contractual relations with their Patients and their prospective economic advantage with those Patients.

183.   The aforesaid conduct of Defendants constitutes, inter alia, a tortious interference with Providers' contractual relations with their Patients and with Providers' prospective economic advantage with those Patients.

184.   The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of the Providers' rights.

185.   As a direct and proximate result thereof, the Providers have suffered, and will suffer, substantial damages.

WHEREFORE, Plaintiffs demand judgment on this the Seventh Count of the Verified Complaint against Defendants, jointly, severally and/or in the alternative, as follows:

A.   Damages;

B.   Punitive damages;

C.   Declaring and adjudging the Termination Notices invalid and ineffective in terminating and/or not renewing Providers' right to participate as Providers under the Plan;

D.   Declaring and adjudging that the UHC Companies must comply with the MA Regulations and the Manual prior to terminating or failing to renew any Contract;

E.   Enjoining and restraining the UHC Companies from terminating Providers' participation as Providers in the Plan and from notifying Patients that Providers are or will be terminated and/or that they are not, or will not be, participating as Providers under the Plan;

F.   Enjoining and restraining the UHC Companies from removing Providers' information from any of Defendants' marketing materials and from notifying Patients that they are not accepting new patients under the Plan;

G.     Compelling the UHC Companies to advertise and market Plaintiffs like other Providers in the Plan, including listing the Providers in the 2020 directories for the Plan;

H.     Interest;

I.      Reasonable attorneys' fees;

J.     Costs of suit; and

K.     Such further relief as this Court deems just and equitable under the circumstances.

## EIGHTH COUNT
### (Tortious Interference with the Providers' Relationship with the UHC Companies, ACC, ACNJ and/or John Does 1-20)

186.   Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

187.   RMG, Optum Care and/or Optum are aware of the Providers' contractual relations with UHC Companies, ACC, ACNJ and/or John Does 1-20, and the prospective economic advantage of the Providers with the UHC Companies, ACC, ACNJ and/or John Does 1-20.

188.   RMG, Optum Care and/or Optum tortiously interfered with the Providers' contractual relations and prospective economic advantage with the UHC Companies, ACC, ACNJ and/or John Does 1-20.

189.   The aforesaid conduct of RMG, Optum Care and/or Optum was willful, wanton, malicious and/or in reckless disregard of the Providers' rights.

190.   As a direct and proximate result thereof, the Providers have suffered, and will suffer, substantial damages.

WHEREFORE, Plaintiffs demand judgment on this the Eighth Count of the Verified Complaint against RMG, Optum Care and Optum, jointly, severally and/or in the alternative, as follows:

A.   Damages;

B.   Punitive damages;

C.   Declaring and adjudging the Termination Notices invalid and ineffective in terminating and/or not renewing Providers' right to participate as Providers under the Plan;

D.   Declaring and adjudging that the UHC Companies must comply with the MA Regulations and the Manual prior to terminating or failing to renew any Contract;

E.   Enjoining and restraining the UHC Companies from terminating Providers' participation as Providers in the Plan and from notifying Patients that Providers are or will be terminated and/or that they are not, or will not be, participating as Providers under the Plan;

F.   Enjoining and restraining the UHC Companies from removing Providers' information from any of Defendants' marketing materials and from notifying Patients that they are not accepting new patients under the Plan;

G.   Compelling the UHC Companies to advertise and market Plaintiffs like other Providers in the Plan, including listing the Providers in the 2020 directories for the Plan;

H.   Interest;

I.   Reasonable attorneys' fees;

J.   Costs of suit; and

K.     Such further relief as this Court deems just and equitable under the

circumstances.

MANDELBAUM SALSBURG, P.C.
Attorneys for Plaintiffs

By: */s/ Steven I. Adler*

Dated: September 19, 2019                          STEVEN I. ADLER

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

MANDELBAUM SALSBURG, P.C.
Attorneys for Plaintiffs

By: */s/ Steven I. Adler*

Dated: September 19, 2019                          STEVEN I. ADLER

## VERIFICATION

*Alexander Salerna* being of full age, duly certifies as follows:

I am a plaintiff ("**Plaintiff**") in this action. I have read the foregoing Verified Complaint. Except for facts specifically alleged upon information and belief, I have personal knowledge of the facts set forth therein and I verify that they are true and correct to the best of my knowledge. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: September __, 2019

Alexander Salerno, M.D.

44

# EXHIBIT A

# PHYSICIAN CONTRACT

UnitedHealthcare Insurance Company is entering into this agreement with you. It is doing so on behalf of itself, AmeriChoice of New Jersey, Inc., and its other affiliates for certain products and services we offer our customers, all of which we describe in the attached Appendix 2.

This agreement applies to you and the services you provide in all of your practice arrangements and for all of your tax identification numbers, except that if your services are covered under an agreement between us and a medical group that you are part of, services that you provide through that medical group will be subject to that other agreement and not this agreement.

## What you will do

You need to be credentialed in accordance with our Credentialing Plan, as referenced in Appendix 1, for the duration of this agreement.

You must notify us in a timely manner about certain services you provide in accordance with our Provider Manual so that we can provide our customers with the services we have committed to provide. If you do not so notify us about these services, you will not be reimbursed for the services, and you may not charge our customer.

Within one year of the effective date of this agreement, you must conduct business with us entirely on an electronic basis to the extent that we are able to conduct business electronically (described in the Provider Manual), including but not limited to determining whether your patient is currently a customer, verifying the customer's benefit, and submitting your claim. We will communicate enhancements in our online resources functionality as they become available and will make information available to you as to which products are supported by United's online resources.

You must submit your claims within 180 days of the date of service. After we receive your claim, if we request additional information in order to process your claim, you must submit this additional information within 90 days of our request. If your claim or the additional information is not submitted within these timeframes, you will not be reimbursed for the services, and you may not charge our customer.

You will submit claims only for services performed by you or your staff. Pass through billing is not payable under this agreement and may not be billed to our customer. For laboratory services, you will only be reimbursed for the services that you are certified through the Clinical Laboratory Improvement Amendments (CLIA) to perform, and you must not bill our customers for laboratory services for which you are not certified.

You will submit claims that supply all applicable information. These claims are complete claims. Further information about complete claims is provided in our Provider Manual.

If you disagree with our payment determination on a claim, you may submit an appeal as described in our Provider Manual.

You will not charge our customers anything for the services you provide, if those services are covered services under their benefit contract, but the applicable co-pay, coinsurance or deductible amount. If the services you provide are denied or otherwise not paid due to your failure to notify us, to file a timely claim, to submit a complete claim, to respond to our request for information, or based on our

reimbursement policies and methodologies, you may not charge our customer. If the services you provide are denied for reason of not being medically necessary, you may not charge our customer unless our customer has, with knowledge of our determination of a lack of medical necessity, agreed in writing to be responsible for payment of those charges. If the services you provide are not covered under our customer's benefit contract, you may, of course, bill our customer directly. You will not require a customer to pay a "membership fee" or other fee in order to access you for covered services (except for co-payments, coinsurance and/or deductibles provided for under the customer's benefit contract) and will not discriminate against any customer based on the failure to pay such a fee.

Medically necessary or medical necessity; are services or supplies necessary to prevent, evaluate, diagnose, correct, prevent the worsening of, alleviate, ameliorate, or cure a physical or mental illness or condition; to maintain health; to prevent the onset of an illness, condition, or disability; to prevent or treat a condition that endangers life or causes suffering or pain or results in illness or infirmity; to prevent the deterioration of a condition; to promote the development or maintenance of maximal functioning capacity in performing daily activities, taking into account both the functional capacity of the individual and those functional capacities that are appropriate for individuals of the same age; to prevent or treat a condition that threatens to cause or aggravate a handicap or cause physical deformity or malfunction, and there is no other equally effective, more conservative or substantially less costly course of treatment available or suitable for the customer. The services provided, as well as the type of provider and setting, must be reflective of the level of services that can be safely provided, must be consistent with the diagnosis of the condition and appropriate to the specific medical needs of the customer and not solely for the convenience of the customer or provider of service and in accordance with standards of good medical practice and generally recognized by the medical scientific community as effective. Course of treatment may include mere observation or, where appropriate, no treatment at all. Experimental services or services generally regarded by the medical profession as unacceptable treatment are not medically necessary for purposes of this contract. Medically necessary services provided must be based on peer-reviewed publications, expert pediatric, psychiatric, and medical opinion, and medical/pediatric community acceptance.

In the case of pediatric customers, this definition shall apply with the additional criteria that the services, including those found to be needed by a child as a result of a comprehensive screening visit or an interperiodic encounter whether or not they are ordinarily covered services for all other Medicaid or CHIP Benefit Contract customers, are appropriate for the age and health status of the individual and that the service will aid the overall physical and mental growth and development of the individual and the service will assist in achieving or maintaining functional capacity.

You will cooperate with our reasonable requests to provide information that we need. We may need this information to perform our obligations under this agreement, under our programs and agreements with our customers, or as required by regulatory or accreditation agencies.

You will refer customers only to other network physicians and providers, except as permitted under our customer's benefit contract, or as otherwise authorized by us or the participating entity.

## What we will do

We or the other applicable participating entity will promptly adjudicate and pay your complete claim for services covered by our customer's benefit contract. If you submit claims that are not complete,

- You may be asked for additional information so that your claim may be adjudicated; or
- Your claim may be denied and you will be notified of the denial and the reason for it; or
- We may in our discretion attempt to complete the claim and have it paid by us or the other applicable participating entity based on the information that you gave in addition to the information we have.

If governing law requires us to pay interest or another penalty for a failure to pay your complete claim for covered services within a certain time frame, we will follow those requirements. The interest or other penalty required by law will be the only additional obligation for not satisfying in a timely manner a payment obligation to you. In addition, if we completed a claim of yours that was not complete, there shall be no interest or other late payment obligation to you even if we subsequently adjust the payment amount based on additional information that you provide.

The applicable participating entity will reimburse you for the services you deliver that our customer's benefit contract covers. The amount you receive will be based on the lesser of your billed charges or our fee schedule, which is described at Appendix 1 and is subject to the reimbursement (coding) policies and methodologies of us and the participating entities. Our reimbursement policies and methodologies are updated periodically and will be made available to you online or upon request. To request a copy of our reimbursement policies and methodologies, write to UnitedHealthcare, Network Contract Support, 780 Shiloh Road, MS-1.700, Plano, TX 75074. Your reimbursement is also subject to our rules concerning retroactive eligibility, subrogation and coordination of benefits (as described in the Provider Manual). We recognize CPT reporting guidelines as developed by the American Medical Association, as well as ICD diagnostic codes and hospital-based revenue codes. Following these guidelines does not imply a right to reimbursement for all services as coded or reported.

Ordinarily, fee amounts listed in the Payment Appendix(ices) are based upon primary fee sources. We reserve the right to use gap-fill fee sources where primary fee sources are not available.

We routinely update our fee schedule in response to additions, deletions and changes to CPT codes by the American Medical Association, price changes for immunizations and injectable medications, and in response to similar changes (additions and revisions) to other service coding and reporting conventions that are widely used in the health care industry, such as those maintained by the Centers for Medicare and Medicaid Services (for example, HCPCS). Ordinarily, our fee schedule is updated using similar methodologies for similar services. We will not generally attempt to communicate routine maintenance of this nature and will generally implement updates within 90 days from the date of publication.

We will give you 90 days written or electronic notice of non-routine fee schedule changes which will substantially alter the overall methodology or reimbursement level of the fee schedule. In the event such changes will reduce your overall reimbursement under this agreement, you may terminate this agreement by giving 60 days written notice to us, provided that the notice is given by you within 30 days after the notice of the fee schedule change.

If either of us believes that a claim has not been paid correctly, either of us may seek correction of the payment within a 12-month period following the date the claim was paid, except that overpayments as a result of abusive or fraudulent billing practices may be pursued by us beyond the 12-month time frame mentioned above. In the event of an overpayment, we will correct these errors by adjusting future claim payment and/or by billing you for the amount of the overpayment.

### How long our agreement lasts; how it gets amended; and how it can end

Assuming you are credentialed by us, and we execute this agreement, you will receive a copy from us with the effective date noted below the signature block. It continues until one of us terminates it.

We can amend this agreement or any of the appendices on 90 days written or electronic notice by sending you a copy of the amendment. Your signature is not required to make the amendment effective. However, if you do not wish to continue your participation with our network as changed by an

amendment that is not required by law or regulation but that includes a material adverse change to this agreement, then you may terminate this agreement on 60 days written notice to us so long as you send this termination notice within 30 days of your receipt of the amendment.

In addition, either you or we can terminate this agreement, effective on an anniversary of the date this agreement begins, by providing at least 90 days prior written notice. Either you or we can terminate this agreement at any time if the other party has materially breached this agreement, by providing 60 days written notice, except that if the breach is cured before our agreement ends, the agreement will continue.

Either of us can immediately terminate this agreement if the other becomes insolvent or has bankruptcy proceedings initiated.

Finally, we can immediately terminate this agreement if any governmental agency or authority (including Medicare or Medicaid) sanctions you, if you no longer have your license to practice medicine, if you no longer have hospital admitting privileges in any participating hospital, in accordance with the terms of our Credentialing Plan, or in the event of imminent, potential or actual harm to a customer.

We both agree that termination notices under this agreement must be sent by certified mail, return receipt requested, to UnitedHealthcare, Network Contract Support, 780 Shiloh Road, MS-1.700, Plano, TX 75074, or to the post office address you provided us. We both will treat termination notices as "received" on the third business day after they are sent.

## About data and confidentiality

We agree that your medical records do not belong to us. You agree the information contained in the claims you submit is ours. We both will protect the confidentiality of our customers' information in accordance with applicable state and federal laws, rules, and regulations.

We are both prohibited from disclosing to third parties any fee schedule or rate information. There are three exceptions:

- You can disclose to our customer information relating to our payment methodology for a service the customer is considering (e.g., global fee, fee for service), but not specific rates (unless for purposes of benefit administration).

- We and the participating entities may use this information to administer our customers' benefit contracts and to pay your claims. We also may permit access to information by auditors and other consultants who need the information to perform their duties, subject to a confidentiality agreement.

- We both may produce this information in response to a court order, subpoena or regulatory requirement to do so, provided that we use reasonable efforts to seek to maintain confidential treatment for the information, or to a third party for an appropriate business purpose, provided that the disclosure is pursuant to a confidentiality agreement and the recipient of the disclosure is not a competitor of either of us.

## What if we do not agree

We will resolve all disputes between us by following the dispute procedures set out in our Provider Manual. If either of us wishes to pursue the dispute beyond those procedures, they will submit the dispute to binding arbitration in accordance with the Commercial Dispute Procedures of the American Arbitration Association (see http://www.adr.org) within one year.

We both expressly intend that any dispute between us be resolved on an individual basis so that no other dispute with any third party(ies) may be consolidated or joined with our dispute. We both agree that any arbitration ruling by an arbitrator allowing class action arbitration or requiring consolidated arbitration involving any third party(ies) would be contrary to our intent and would require immediate judicial review of such ruling. The arbitrator will not vary the terms of this agreement and will be bound by governing law. We both acknowledge that this agreement involves interstate commerce, and is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. The arbitrator will not have the authority to award punitive or exemplary damages against either of us, except in connection with a statutory claim that explicitly provides for such relief. Arbitration will be conducted in Essex County, NJ.

If a court allows any litigation of a dispute to go forward, we both waive rights to a trial by jury with respect to that litigation, and the judge will be the finder of fact. Any provision of this agreement that is invalid or unenforceable shall not affect the validity or enforceability of the remaining provisions of this agreement or the validity or enforceability of the offending provision in any other situation or in any other jurisdiction. This section of the agreement governs any dispute between us arising before or after execution of this agreement and this section shall survive and govern any termination of this agreement.

### What is our relationship to one another

You are an independent contractor. This means we do not have an employer-employee, principal-agent, partnership, joint venture, or similar arrangement. It also means that you make independent health care treatment decisions. We do not. We do not reserve any right to control those treatment decisions. It further means that each of us is responsible for the costs, damages, claims, and liabilities that result from our own acts.

You will look to the applicable participating entity for reimbursement for the products and services under our agreement. This means that we are not financially responsible for claims payment for groups that are self-funded or that are not affiliated with us.

We may assign this agreement to any entity that is an affiliate of UnitedHealthcare Insurance Company at the time of the assignment.

### This is it

This contract, the appendices and the items referenced in the attached Appendix 1, constitute our entire understanding. It replaces any other agreements or understandings with regard to the same subject matter - - oral or written - - that you have with us or any of our affiliates.

Federal law and the applicable law of the jurisdiction where you provide health care services govern our agreement. Such laws and the rules and regulations promulgated under them, when they are applicable, control and supersede our agreement. The Regulatory Appendix referenced in Appendix 1, and any attachment to it, is expressly incorporated to govern our agreement and is binding on both of us. In the event of any inconsistent or contrary language between the Regulatory Appendix (when it applies) and any other part of our agreement, including but not limited to appendices, amendments and exhibits, the Regulatory Appendix will control.

UnitedHealthcare
Confidential and Proprietary

**Conclusion**

If you agree with these terms, please execute both copies of the agreement below and return them to us. With your signature, you confirm you understand the contract, including the dispute resolution procedures described in the section of this agreement entitled "What if we do not agree", the appendices and the items referenced in the attached Appendix 1.

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION THAT MAY BE ENFORCED BY THE PARTIES.**

**AGREED BY:**

| Physician | Address to be used for giving notice under the agreement: |
|---|---|
| Signature: _Alexander Salerno_ | Street: 613 PARK AVE |
| Print Name: ALEXANDER SALERNO MD | City: EAST ORANGE |
| DBA (if applicable): SALERNO MEDICAL ASCS | State: NJ |
| Date: Oct 21, 2016 | Zip Code: 07017-1905 |
| E-Mail: | TIN: 223828480 |
| National Provider Identification (NPI) Number: | 1962476903 |

| UnitedHealthcare Insurance Company, on behalf of itself, AmeriChoice of New Jersey, Inc. and its other affiliates, as signed by its authorized representative: |
|---|
| Signature: |
| Print Name: |
| Date: |
| For office use only: GD-6111332 1088468 Month, day and year in which agreement is first effective: _____ |

UnitedHealthcare
Confidential and Proprietary

## Appendix 1

We include as part of our agreement the following additional materials that bind you and us:

| | |
|---|---|
| **Appendix 2** | **Definitions, Products and Services**<br>This appendix sets forth definitions for our "customer" and "participating entities" as well as lists the type of benefit contracts offered to our customers. |
| **Payment Appendix(ices)** | **Fee Information Document** includes: Fee Specifications Document, Fee Schedule Sample, and Additional Information About Your Fee Schedule. Further information about the fee schedule (such as additional fee samples) can be requested by writing to UnitedHealthcare, Network Contract Support, 780 Shiloh Road, MS-1.700, Plano, TX 75074 or through our website at www.uhccommunityplan.com. |
| **Appendix 3** | **Locations.** This document provides information about your office, billing, and mailing locations. Please remember that, as described on page 2, this agreement applies to all of your locations even if you do not list all of your current locations or if you add a location in the future. |
| **State Regulatory Requirements Appendix** | In some instances, states add requirements to our agreement that are set forth in this appendix. |
| **Medicare Regulatory Requirements Appendix** | (This appendix applies only if you are in our Medicare network.) Your participation in our network for customers with Medicare benefit contracts is subject to additional Medicare requirements set forth in this appendix. |
| **Medicaid and/or CHIP Regulatory Requirements Appendix** | (This appendix applies only if you are in our Medicaid and/or CHIP network.) Your participation in our network for customers with Medicaid or CHIP benefit contracts is subject to additional requirements set forth in this appendix. |
| **Provider Manual** | We have enclosed a copy of our Provider Manual. This guide governs the mechanics of our relationship. Our Provider Manual may be viewed by going to www.uhccommunityplan.com. We may make changes to the Administrative Manual or other administrative protocols upon 30 days electronic or written notice to you. |
| **Credentialing Plan** | To review our credentialing plan, visit United's online resources. This plan requires you to carry malpractice insurance in amounts with carriers and on terms and conditions that are customary for physicians like you in your community. To request access to, or a copy of, our credentialing plan, write to UnitedHealthcare, Network Contract Support, 780 Shiloh Road, MS-1.700, Plano, TX 75074. |

### Appendix 2
### Benefit Contract Descriptions

**Section 1.** United may allow access your services under this agreement for the benefit contract types described in each line item below, unless otherwise specified in section 2 of this Appendix 2:

-   New Jersey Medicaid and CHIP Benefit Contracts, and benefit contracts for the Uninsured.

---

**Section 2.** This Agreement will not apply to the benefit contract types other than those described in Section 1.

*Note: Excluding certain benefit contracts or programs from this agreement does not preclude the parties or their affiliates from having or entering into a separate agreement providing for your participation in a network for such benefit contracts or programs.*

**Section 3. Definitions:**

Note: United may adopt a different name for a particular benefit contract, and/or may modify information referenced in the definitions below regarding customer identification cards. If that happens, Section 1 or Section 2 of this Appendix will continue to apply to those benefit contracts as it did previously, and United will provide you with the updated information. Additionally, United may revise the definitions in this Section 3 to reflect changes in the names or roles of United's business units, provided that doing so does not change your participation status in benefit contracts impacted by that change, and further provided that United provides you with the updated information.

**MEDICARE:**
-   **Medicare Advantage Benefit Contracts** means benefit contracts sponsored, issued or administered by a Medicare Advantage organization as part of:
    i)      the Medicare Advantage program under Title XVIII, Part C of the Social Security Act, or
    ii)     the Medicare Advantage program together with the Prescription Drug program under Title XVIII, Part C and Part D, respectively, of the Social Security Act,
    as those program names may change from time to time.

-   **UnitedHealthcare Community Plan Medicare Advantage Benefit Contracts** means Medicare Advantage benefit contracts offered through the UnitedHealthcare Community Plan business unit. Those benefit contracts provide integrated care benefits for individuals eligible for both the state Medicaid program and the Medicare program (Parts A, B, C, and D).

**MEDICAID, CHIP AND OTHER STATE PROGRAMS:**

-   **Medicaid Benefit Contracts** means benefit contracts that offer coverage to beneficiaries of a program that is authorized by Title XIX of the federal Social Security Act, and jointly financed by the federal and state governments and administered by the state.

-   **New Jersey Medicaid Benefit Contracts** means Medicaid benefit contracts issued in New Jersey that include a reference to "NJ FamilyCare" on the valid identification card of any customer eligible for and enrolled in that benefit contracts.

- **Children's Health Insurance Program ("CHIP") Benefit Contracts** are benefit contracts under the program authorized by Title XXI of the federal Social Security Act that is jointly financed by the federal and state governments and administered by the state.

- **New Jersey CHIP Benefit Contracts** are CHIP benefit contracts issued in New Jersey that include a reference to "NJ FamilyCare" on the face of the valid identification card of any customer eligible for and enrolled in that benefit contracts.

- **New Jersey benefit contracts for the Uninsured** means benefit contracts issued in New Jersey that include a reference to "NJ FamilyCare" on the face of the valid identification card of any customer eligible for and enrolled in that benefit contracts.

**Payment Appendix – NJ Medicaid, CHIP, and benefit contracts for the Uninsured**

**NJ Medicaid, CHIP, and benefit contracts for the Uninsured Fee Information Document: NJ95446/95447**

The provisions of this Payment Appendix apply to covered services rendered by you to customers covered by New Jersey Medicaid Benefit Contracts, New Jersey CHIP Benefit Contracts, and benefit contracts for the Uninsured, as described in this agreement.

———

## Appendix 3 - LOCATIONS

NOTE: Please attach additional copies of this page if you need to list additional locations.
Please remember that, as described on page 2, this agreement applies to all of your locations even if you do not list all of your current locations or if you add a location in the future.

| Provider: ALEXANDER SALERNO MD |
| --- |

| Primary Service Location Address: | Address: 613 PARK AVE | | |
| --- | --- | --- | --- |
| | City: EAST ORANGE | State: NJ | Zip: 07017-1905 |
| | Tel #: 973 672 8573 | Fax #: 973 676 4099 | |
| Billing Address: | Address: | | |
| | City: | State: | Zip: |
| | Tel #: | Fax #: | |

| Additional Service Location Address: | Address: | | |
| --- | --- | --- | --- |
| | City: | State: | Zip: |
| | Tel #: | Fax #: | |
| Billing Address: | Address: | | |
| _____ Same as above | City: | State: | Zip: |
| | Tel #: | Fax #: | |

| Mailing Address: | Address: | | |
| --- | --- | --- | --- |
| | City: | State: | Zip: |
| | Tel #: | Fax #: | |

# EXHIBIT B

requests a response, along with any supporting documentation, within a specified period of time. A second opinion by a specialist may be requested, if deemed appropriate. Upon receipt of a response, a medical director assigns a severity level as follows:

0 – No quality issue identified; no adverse member outcome

1 – Quality issue identified; appears to have not contributed any harm or damage to the member

2 – Quality issue identified; appears to have contributed to non-permanent harm or damage to the member

3 – Quality issue identified; appears to have contributed to permanent harm or damage to the member (not recoverable), including death

If a quality concern is confirmed, the issue is presented to the Provider Advisory Committee (PAC) for peer review. The PAC will make a final determination regarding the quality concern, assign the final severity level, and make recommendations for further action to be taken by UnitedHealthcare. The Medical Director notifies the appropriate provider(s) of the decision in writing through certified mail. The letter includes a description of the quality concern and detailed action plan.

## Sanctions for Quality Concerns

In addition to the corrective action plan, UnitedHealthcare may impose provider sanctions, depending upon the severity level and frequency of the provider's confirmed quality problems and/or failure of the provider to implement the corrective action steps required by UnitedHealthcare.

The care provider's failure to implement the corrective action plan within 60 days may result in a 30-day closure of the care provider's panel to new members or other pertinent actions. Failure to implement the corrective action within the time period specified by UnitedHealthcare may result in issuance of a Notice of Termination.

As part of the corrective action and based on the frequency and severity of the identified quality issue, a Medical Director may require the provider to obtain additional education, including:

- CME courses pertaining to the identified problem
- Medical literature reading
- Charting conferences
- Self-examination courses

The care provider is given a specified period to complete the appropriate educational plan. Failure to do so may result in the issuance of a Notice of Termination.

Failure to comply with sanctions noted above could result in UnitedHealthcare notifying the appropriate federal, state, and licensing authorities of the care provider's actions.

## Termination and Appeal Process

UnitedHealthcare may terminate a care provider's participation in the network for failure to comply with certain contractual obligations or Quality Management requirements. Depending on the circumstances, termination may be immediate or allow for an appeals process.

UnitedHealthcare may not suspend or terminate a provider solely because the care provider:

- Acted as an advocate for a member in seeking appropriate, medically necessary health care services

- Filed a or appeal as permitted under the provider's agreement with UnitedHealthcare or any applicable law or regulation

- Expressed disagreement with UnitedHealthcare's decision to deny or limit benefits to a member or because provider assists such member to seek reconsideration of UnitedHealthcare's decision, or because provider discusses with a current, former, or prospective patient any aspect of such patient's medical condition, any proposed treatments, or treatment alternatives, whether or not covered by UnitedHealthcare, policy provisions of UnitedHealthcare, or provider's personal recommendation regarding selection of a health plan based on provider's personal knowledge of the health needs of such patient

- Engaged in medical communications, either explicit or implied, with a patient about medically necessary treatment options, or because provider practiced provider's profession in providing the most appropriate treatment required by provider's patients, and provided informed consent within the guidelines of the law, including possible positive and negative outcomes of the various treatment modalities

## Immediate Termination

UnitedHealthcare may immediately terminate a provider's participation in the network if one of the following events occurs:

- The care provider fails to maintain any of the licenses, certifications or accreditations required by the provider' agreement with UnitedHealthcare or by the Medicare and Medicaid programs

- The care provider is indicted, arrested for, or convicted of a felony or any criminal charge related to the practice of their profession

- The care provider becomes insolvent or voluntarily or involuntarily files for bankruptcy, assignment for the benefit of creditors, appointment of a receiver, or similar relief

- UnitedHealthcare determines that immediate termination of the provider's agreement with UnitedHealthcare is in the best medical interest of the members

- A state licensing board or other agency has made a determination that limits, impairs, or otherwise encumbers the care provider's ability to practice their profession

- The Centers for Medicare and Medicaid Services determines that the provider has not satisfactorily performed his/her obligations under the care provider's agreement with UnitedHealthcare

- There has been a determination of fraud against the care provider

- The care provider is terminated or suspended by the State of New Jersey Medicaid Program or the federal Medicare Program

In case of immediate termination, UnitedHealthcare will notify the care provider in the most expeditious manner and by certified letter.

## Termination for Failure to Comply With Quality Management Requirements

The Quality Management Committee, based upon recommendations made by the Provider Affairs Subcommittee, may suspend or terminate any health care provider's participation in the network.

UnitedHealthcare may initiate termination proceedings regarding a provider's network participation for several reasons, including failure to implement and comply with his/

her corrective action plan, refusal to make medical records available for examination, failure to submit recredentialing information, or failure to comply with and participate in the quality management program. In the case of termination for failure to comply with Quality Management requirements, a Medical Director will send the provider a certified letter notifying him/her of the intent to terminate his/her network participation privileges.

## Notice of Proposed Action

The notice of proposed action will contain the following information:

- Notification that a professional review action has been recommended against the provider

- The reasons for the proposed action and any supplemental materials.

- Notification that the provider may request a hearing within 10 business days from receipt of the notice; failure to request the hearing will make the termination notice final

## Notice of Hearing

- After receipt of a provider's request for hearing, a notice of hearing together with any supplemental materials will be served upon the provider.

- If a provider requests a hearing within 10 business days, UnitedHealthcare will notify the provider of the place, time and date of the hearing. The date of the hearing will be no later than 30 days after the request for a hearing, unless otherwise agreed to by the provider and UnitedHealthcare.

- UnitedHealthcare will include a list of the witnesses (if any) expected to testify at the hearing on behalf of the Quality Management Committee.

## Time of Filing a Response

- At least five business days prior to the hearing, the provider must file a written response to the Termination Notice.

- It must be filed with UnitedHealthcare to the person and address identified in the Termination Notice, and a copy served upon each attorney of record and upon each party not represented by an attorney.

- It must be in writing, the original being signed by the provider or their representative. The care provider's response must contain the provider's address, telephone number and, if made by an attorney or if the care

provider will make use of an attorney, the name and post office address and telephone number of the attorney .

- It must contain a separate and specific response to each and every particular of the Termination Notice or a denial of any knowledge or information thereof sufficient to form a belief

- Any allegation in the Termination Notice which is not denied, will be deemed admitted.

- If the care provider fails to respond to the Termination Notice, the Termination Notice will be deemed final

## Hearings:

### Appearances

- All parties to the proceeding may be present and must be allowed to present testimony in person or by counsel and call and question witnesses.

- If a respondent fails to appear at the duly noted time and place of the hearing and the hearing is not adjourned, irrespective of whether a response to the Termination Notice has been filed, the hearing must proceed on the evidence in support of the Termination Notice. Upon application, the hearing panel for good cause shown may reopen the proceeding, upon equitable terms and conditions.

- Prior to an order after hearing, a default entered upon a provider's failure to appear may be reopened, for good cause shown, upon written application to the hearing panel.

### Conducting Hearing

- The hearing will be held before a committee appointed by a Medical Director, consisting of at least three members, a majority of whom will be the provider's peers in the same discipline and the same or similar specialty.

- UnitedHealthcare may where a specific panel member is not available to participate in the hearing, prior to the commencement or completion of a hearing, substitute one panel member for another. The hearing must continue upon the record of the proceeding.

### Form and Content of Proof

The hearing panel, in conducting the hearing, should use any procedures consonant with fairness to elicit evidence concerning the issues before the panel. The following guidelines must govern:

- This is not an adversarial proceeding, but rather one of inquiry and clarification protected by the peer review privilege and thus confidential

- All witnesses will be sworn in at the commencement of the proceeding.

- With the permission of the hearing panel, parties will be allowed to ask clarifying questions throughout the testimony of any particular witness, thus saving hearing time and avoiding confusion on a particular subject of testimony.

- Hearsay evidence is fully admissible.

- The care provider will present evidence, testimonial and documentary first, followed by the evidence, testimonial and documentary, of UnitedHealthcare.

- UnitedHealthcare's representative will prepare a binder of evidentiary exhibits to be shared with the hearing panel at the time of the hearing; a copy of the binder will be sent to the provider or his/her representative prior to the hearing.

- Documentary evidence may be admitted without testamentary foundation, where reasonable.

- Witness information need not be introduced in the form of question and answer testimony.

- Information from witnesses may be introduced in the form of affidavits

- The parties have the right to call and question witnesses.

- A stenographic record will be taken of the proceedings.

- Written stipulations may be introduced in evidence if signed by the person sought to be bound thereby or by that person's attorney-at-law. Oral stipulations may be made on the record.

- Where reasonable and convenient, the hearing panel may permit the testimony of a witness to be taken by telephone, subject to the following conditions:

  – A person within the hearing room can testify that the voice of the witness is recognized, or identity can otherwise be established;

  – The hearing panel, reporter and respective attorneys can hear the questions and answers;

  – The witness is placed under oath and testifies that he, or she is not being coached by any other person.

© 2018 UnitedHealthcare

## Powers of the Hearing Panel

The hearing panel has the following powers to control the presentation of the evidence and the conduct of the hearing:

- To fully control the procedure of the hearing, subject to these rules, and to rule upon all motions and objections, and to issue a final determination affirming, modifying or reversing the Notice of Termination in whole or in part including but not limited to:

  - Uphold the suspension or termination

  - Reinstate the provider

  - Reinstate the provider subject to conditions set forth by UnitedHealthcare, which may include a corrective action plan

- To refuse to consider objections which unnecessarily prolong the presentation of the evidence;

- To foreclose the presentation of evidence that is cumulative, argumentative, or beyond the scope of the case;

- To place evidence in the record without an offer by a party;

- To call and to question witnesses;

- To have oaths administered by a notary public or stenographic reporter who is also a notary;

- To exclude non-party witnesses who have not yet testified from the hearing room;

- To direct the production of documents and other evidentiary matter;

- To propose stipulations of fact for the parties' consideration;

- To issue interim or tentative findings of fact at any point during the hearing process;

- To issue questions delimiting the issues for hearing;

- To direct further hearing sessions for the taking of additional evidence or for other purposes, upon the hearing panel's own finding that the record is incomplete or fails to provide the basis for an informed decision;

- To amend the Termination Notice to conform to the proof.

## Hearing Record

The record of the hearing may be taken by shorthand reporting, tape recording, or other reasonable method. The method chosen must be within the discretion and direction of UnitedHealthcare.

## Hearings

Hearings will be confidential in support of the peer review privilege which governs this proceeding. The hearing panel may exclude from the hearing room or from further participation in the proceeding any person who engages in improper conduct at the hearing. The hearing must be conducted with dignity and respect.

## Settlements

Where the parties agree to a settlement during the course of the hearing, they shall so stipulate on the record and the hearing will be closed on that basis.

## Oral Arguments and Briefs

The hearing panel may permit the parties or their attorneys, to argue orally within such time limits as the panel may determine. The parties are free to file pre-hearing or post-hearing letter briefs or memorandum. Any such letter brief or memorandum must be filed in triplicate for distribution to the hearing panel members, with proof of service upon all counsel in the proceeding and parties appearing without counsel.

## Continuations, Adjournments and Substitutions of Hearing Panel Members

UnitedHealthcare may postpone a scheduled hearing, or continue a hearing from day to day or adjourn it to a later date or to a different place, by announcement thereof at the hearing or by appropriate notice to all parties.

## Time frames for Hearing Panel Order

The hearing panel shall render a decision on the proposed action in a timely manner. Such decision shall include reinstatement of the provider by UnitedHealthcare, provisional reinstatement subject to conditions set forth by UnitedHealthcare or termination of the care provider. Such decision shall be provided in writing to the care provider.

A decision by the hearing panel to terminate a provider shall be effective not less than 30 days after the receipt by the provider of the hearing panel's decision. Notwithstanding the termination of a provider for cause or pursuant to a hearing, the provider shall continue to participate in the plan on an ongoing course of treatment for a transition period of up to 90 days, and post-partum care, subject to provider agreement.

In no event shall termination be effective earlier than 60 days from the receipt of the notice of termination.

© 2018 UnitedHealthcare

## Reinstatement in the UnitedHealthcare Provider Network

If a care provider has been suspended or terminated because of quality of care issues, they will not be eligible for reinstatement in the UnitedHealthcare network until they have developed and implemented an improvement action plan acceptable to UnitedHealthcare.

If a care provider has been suspended or terminated because they have been suspended or terminated from a government-sponsored health care program, they will not be eligible for reinstatement in the UnitedHealthcare network until they are eligible for participation in the government-sponsored health care program from which they were suspended or terminated.

Expired contracts are not terminations. Non-renewals for lapsed contracts also do not constitute terminations. For contracts without expiration dates, non-renewal on January 1st after the contract has been in effect for a year or more shall not constitute a termination.

## Provider Participation in Quality Management

UnitedHealthcare has a Quality Management Committee (QMC) through which participating providers give UnitedHealthcare advice and expert counsel in medical policy, quality management, and quality improvement. A Medical Director chairs the QMC, which meets on a regular basis and has oversight responsibility for issues affecting health services delivery. The QMC is composed of participating providers and UnitedHealthcare management staff and reports its recommendations and actions to the UnitedHealthcare Board of Directors.

The Quality Management Committee has five standing subcommittees:

- Provider Affairs Advisory Committee reviews and recommends action on topics concerning credentialing and recredentialing of providers and facilities, peer review activities, and performance of all participating providers.
- Community Advisory Committee provides an avenue for member and consumer advocate involvement in the overall quality program including member education, satisfaction and customer service.

- Health Care Quality Utilization Management Subcommittee reviews statistics on utilization, provides feedback on Utilization Management and Care Management policies and procedures, and makes recommendations on clinical standards and protocols for medical care.
- Dental Affairs Advisory Committee reviews all policies and procedures related to the clinical management and utilization of dental services. This subcommittee also oversees peer review and credentialing related to the dental network.
- Service Quality Improvement Subcommittee reviews timely tracking, trending and resolution of member administrative grievances. This subcommittee oversees member and practitioner intervention for quality improvement activities as needed.

The UnitedHealthcare Medical Technology Assessment Committee (MTAC) is a corporate-wide committee that periodically assesses new technology for potential inclusion in UnitedHealthcare's benefits packages. The committee reports to the QMC at least on a quarterly basis.

# EXHIBIT C

 UnitedHealthcare®
**Community Plan**

1311 W. President George Bush Hwy.   Richardson, TX 75080

March 22, 2019

Senior Healthcare Outreach Program
Attn: Alexander Salerno, MD
613 Park Ave
East Orange NJ 07017-1905

**Re: Your UnitedHealthcare Community Plan Contract, on Behalf of AmeriChoice of New Jersey, Inc. and its Affiliates, Won't be Renewed and Will End on July 29, 2019.**

Dear Alexander Salerno, MD:

We periodically assess our networks to help ensure they meet the needs of our members. As a result, we sometimes have to make difficult decisions around care provider contracts. Unfortunately, we've decided not to renew your UnitedHealthcare Community Plan Agreement. This means your contract will end on July 29, 2019.

**Important Points**
- Your UnitedHealthcare Community Plan Agreement includes Medicaid, Children's Health Insurance Program (CHIP) and Dual Complete Medicare Advantage benefit contract types.
- We're sending this letter to you in accordance with the terms of your Agreement.
- This change doesn't affect any other Participation Agreements you currently have with UnitedHealthcare.
- We'll communicate this change in your participation status to your UnitedHealthcare New Jersey Community Plan Medicaid, CHIP and Dual Complete Medicare Advantage patients in accordance with any laws that may apply.

**Appeal Rights**
**You may have the opportunity to appeal. To understand your appeal rights, please refer to the enclosed Appeal Process document.** The scope of the appeal panel's review of your appeal is limited to determining whether UnitedHealthcare acted according to the provisions of your Agreement. The panel will only consider information that is relevant to the scope of the panel's review of your appeal.

**We're Here to Help**
We understand that this change may be of concern to you. We're ready to answer your questions and hear your concerns. We also want to help your patients, who are New Jersey Community Plan Medicaid, CHIP and Dual Complete Medicare Advantage members, access necessary care within their plan's network.

If you have questions or wish to provide information that can help us make this process easier for you or your patients, please call 888-362-3368, 9 a.m. – 6 p.m. ET. Thank you for the service you've provided our New Jersey Community Plan Medicaid, CHIP and Dual Complete Medicare Advantage members.

Sincerely,

Michele Nielsen

Michele Nielsen
Vice President, Network Management

Enclosure

Doc#: PCA-1-015117-03132019_03142019

© 2018 UnitedHealthCare Services, Inc.

# EXHIBIT D



**UnitedHealthcare®**
**Community Plan**

1311 W. President George Bush Hwy.   Richardson, TX 75080

April 16, 2019

Senior Healthcare Outreach Program
Attn: Alexander Salerno, MD
613 Park Ave
East Orange NJ 07017-1905

*Important Correction to Previous Letter - New Contract Ending Date*

**Re: Your UnitedHealthcare Community Plan Contract, on Behalf of AmeriChoice of New Jersey, Inc. and its Affiliates, Won't be Renewed and Will End on Nov. 19, 2019.**

Dear Alexander Salerno, MD:

We periodically assess our networks to help ensure they meet the needs of our members. As a result, we sometimes have to make difficult decisions around care provider contracts. Unfortunately, we've decided not to renew your UnitedHealthcare Community Plan Agreement. This means your contract will end on Nov. 19, 2019.

**Important Points**
- Your UnitedHealthcare Community Plan Agreement includes Medicaid, Children's Health Insurance Program (CHIP) and Dual Complete Medicare Advantage benefit contract types.
- We're sending this letter to you in accordance with the terms of your Agreement.
- This change doesn't affect any other Participation Agreements you currently have with UnitedHealthcare.
- We'll communicate this change in your participation status to your UnitedHealthcare New Jersey Community Plan Medicaid, CHIP and Dual Complete Medicare Advantage patients in accordance with any laws that may apply.

**Appeal Rights**
**You may have the opportunity to appeal. To understand your appeal rights, please refer to the enclosed Appeal Process document.** The scope of the appeal panel's review of your appeal is limited to determining whether UnitedHealthcare acted according to the provisions of your Agreement. The panel will only consider information that is relevant to the scope of the panel's review of your appeal.

**We're Here to Help**
We understand that this change may be of concern to you. We're ready to answer your questions and hear your concerns. We also want to help your patients, who are New Jersey Community Plan Medicaid, CHIP and Dual Complete Medicare Advantage members, access necessary care within their plan's network.

If you have questions or wish to provide information that can help us make this process easier for you or your patients, please call 888-362-3368, 9 a.m. – 6 p.m. ET. Thank you for the service you've provided our New Jersey Community Plan Medicaid, CHIP and Dual Complete Medicare Advantage members.

Sincerely,

Michele Nielsen
Vice President, Network Management

Enclosure

Doc#: PCA-1-015117-03132019_03142019

© 2018 United HealthCare Services, Inc.

# EXHIBIT E

 UnitedHealthcare®

## Appeal Process

<u>Who May Appeal</u>

You may request an appeal before a panel appointed by UnitedHealthcare as described in this document if:

1. You were removed from UnitedHealthcare's network by way of **termination without cause** and:
* You were removed from UnitedHealthcare's network maintained for any Medicare Advantage benefit plan. **This opportunity to appeal applies to physicians only;**
* You were removed from UnitedHealthcare's network maintained for any Medicaid, CHIP or any other state program ("Medicaid or other State Program") benefit plans in any of the following states:
  * **Delaware**
  * **Florida**
  * **Maryland**
  * **Massachusetts**
  * **Pennsylvania**
  * **New Jersey:** You do not have an opportunity to appeal in a case involving imminent harm to patient care, a determination of fraud, or a final disciplinary action by a state licensing board or other governmental agency that impairs your ability to practice. This opportunity to appeal does **not** apply to hospitals or any other facility.
  * **New York:** This opportunity to appeal does **not** apply to hospitals or any other facility.
  * **Texas:** You do not have an opportunity to appeal in a case involving imminent harm to a patient's health, an action by a state medical or other physician licensing board or other government agency that effectively impairs your ability to practice medicine, or fraud or malfeasance.

<u>Or</u>

* You were removed from UnitedHealthcare's network maintained for any **commercial** benefit plan in any of the following states:
  * **California:** You only have the opportunity to appeal if UnitedHealthcare has substantial market power and your removal from UnitedHealthcare's network would significantly impair your ability to practice in a particular geographic area. This opportunity to appeal applies to physicians only.
  * **Delaware**
  * **Maine**
  * **Missouri:** This opportunity to appeal does **not** apply to hospitals or any other facility.
  * **New Jersey:** This opportunity to appeal **only** applies to (a) physicians, physician assistants, dentists, podiatrists and any other health care professional licensed pursuant to Title 45, and (b) hospitals and other facilities licensed pursuant to Title 26.
  * **New York:** This opportunity to appeal **only** applies to physicians, physician assistants, dentists, podiatrists and any other health care professional licensed, registered or certified pursuant to Title 8 of the New York Education Law.
  * **Rhode Island:** This opportunity to appeal does **not** apply to hospitals or any other facility.
  * **Texas**
  * **Vermont**

1

2. You were removed from UnitedHealthcare's network by way of **nonrenewal** of your participation agreement and:

* You were removed from UnitedHealthcare's network maintained for any Medicare Advantage benefit plan. **This opportunity to appeal applies to physicians only.**
* You were removed from UnitedHealthcare's network maintained for any Medicaid, CHIP or any other state program ("Medicaid or other State Program") benefit plan in any of the following states:
    * **Massachusetts**
    * **Texas**
* You were removed from UnitedHealthcare's network maintained for any commercial benefit plan in any of the following states:
    * **Delaware**
    * **Maine**
    * **Texas**
    * **Vermont**

You also have the opportunity to appeal your removal from UnitedHealthcare's network if this opportunity is granted to you under the terms of your participation agreement.

Please note the following: A **termination without cause** is <u>not</u> based on a provision in the participation agreement that specifies a particular cause that is needed in order to terminate the agreement. By way of example, a termination without cause is based on a provision in the participation agreement that reads along the lines of, "either you or we can terminate this agreement by providing at least 90 days' prior written notice." A termination without cause is not, for instance, a nonrenewal or a termination of a physician's participation status for material breach or termination of a physician's participation status for failure to comply with UnitedHealthcare's Credentialing Plan, loss of licensure, or a sanction imposed by any governmental agency or authority, including Medicare or Medicaid. A **nonrenewal** is an action taken by UnitedHealthcare to not renew your participation agreement. By way of example, a nonrenewal is based on a provision in the participation agreement that reads along the lines of, "either you or we can terminate this agreement, effective on an anniversary of the date this agreement begins, by providing at least 90 days' prior written notice."

### Scope of the Appeal Panel's Review
**The scope of the appeal panel's review of your appeal is limited to determining whether UnitedHealthcare acted in accordance with the provisions of your participation agreement. The appeal panel will only consider information that is relevant to the scope of the appeal panel's review of your appeal.**

### How to Request an Appeal
Except as indicated below, if you would like to appeal, you must request an appeal within 30 calendar days after the date of the attached notice.

* **Maryland** - If you are removed from the network maintained for Maryland Medicaid or other State Program benefit plans you must request an appeal or object to your removal from the network within 90 business days after the date of the attached notice.
* **New Jersey** - If you are removed from the network maintained for commercial benefit plans in New Jersey or New Jersey Medicaid or other State Program benefits plans, you must request an appeal within 10 calendar days after the date of the attached notice.
* **Texas** - If you are removed from the network maintained for Texas Medicaid or other State Program benefits plans, you must request an appeal within 60 calendar days after the date of the attached notice.

2

In order to request an appeal, you must complete the attached **Appeal Submission Form** and submit the form, along with a copy of the attached notice to UnitedHealthcare at the address below. If you have any information that is relevant to the scope of the appeal panel's review and you would like the appeal panel to consider that information, **you must provide the relevant information in your appeal request.** Please note that you are not required to submit information for the appeal panel's consideration. If you decide to submit relevant information, we will make available to panel members copies of the relevant information you submit.

Your appeal request is deemed to have been given on the date in which UnitedHealthcare receives your appeal request at the address below.

**UnitedHealthcare**
**Attn: Provider Contract Appeals**
**P.O. Box 31376**
**Salt Lake City, UT 84131-0376**

When the Appeal Will Be Conducted

Except as indicated below, the appeal panel will review any relevant information submitted to the panel within 30 calendar days after the date UnitedHealthcare receives your request for an appeal.

- **Medicare Advantage** - If you <u>only</u> have an opportunity to appeal based on your removal from the network maintained for Medicare Advantage benefit plans, you may present to the appeal panel your views of the decision to remove you from the network. The appeal panel aims to review relevant information within 60 calendar days after the date UnitedHealthcare receives your request for an appeal at the address above.
- **Opportunity to Appeal Under Your Participation Agreement** - If you <u>only</u> have an opportunity to appeal under the terms of your participation agreement based on your removal from the network, <u>or</u> you only have an opportunity to appeal under the terms of your participation agreement <u>and</u> based on your removal from the network maintained for Medicare Advantage benefit plans, the appeal panel aims to review relevant information within 60 calendar days after the date UnitedHealthcare receives your request for an appeal at the address above.

If you have an opportunity to appeal as indicated above, you may request that the appeal panel conduct a hearing in lieu of a review of relevant information **only if:**

- UnitedHealthcare has removed you from its network maintained for **Medicare Advantage** benefit plans;
- UnitedHealthcare has removed you from its network maintained for **Medicaid or other State Program** benefit plans in the following states: **Delaware; Florida; Massachusetts; New Jersey; New York; Pennsylvania;**
- UnitedHealthcare has removed you from its network maintained for **commercial** benefit plans in the following states: **California; Maine; Missouri; New Jersey; or New York;** or
- UnitedHealthcare has removed you from its network <u>and</u> the terms of your participation agreement specifically indicate that you may request a hearing based on your removal from the network.

If you are eligible for a hearing, as indicated above, and you would like the appeal panel to conduct a hearing, you must specify in your appeal request that you are requesting a hearing. The hearing will be held within the same timeframe as your review would have been held (see the timeframes set forth above). If you do not specify in your appeal request that you are requesting a hearing, the appeal panel will review any relevant information available to it and you will have no further opportunity to appeal unless this opportunity is granted under applicable law or the terms of your participation agreement.

3

UnitedHealthcare will inform you of the date and time of your hearing. Your hearing will be conducted via a conference call and your presence during the call is required. UnitedHealthcare will provide you with information for the conference call. If you fail to call into the hearing within 10 minutes after the scheduled time or fail to call into the hearing at all at the time that UnitedHealthcare schedules for you, the appeal panel will conduct a review of any relevant information that is available to the appeal panel and you will have no further opportunity to appeal unless this opportunity is granted under applicable law or the terms of your participation agreement.

Failure to submit an appeal request within the required timeframe and in the manner described in this document will constitute a waiver of your opportunity to appeal. In the case of such a waiver, you are deemed to have accepted your removal from UnitedHealthcare's network.

Once the appeal panel conducts the appeal, you have no further opportunity to appeal unless this opportunity is granted to you under applicable law or the terms of your participation agreement.

### When You Will Be Notified of the Decision Regarding Your Appeal
Except as indicated below, you will be notified in writing of the decision regarding your appeal within 30 calendar days after the date in which the appeal panel reviews the relevant information submitted or conducts your hearing (if a hearing was conducted) or you will be notified in writing of the decision within a shorter timeframe if required by applicable law.

- **Medicare Advantage** - If you only have an opportunity to appeal based on your removal from the network maintained for Medicare Advantage benefit plans, UnitedHealthcare aims to notify you of the decision before the effective date of your removal from the network.
- **Opportunity to Appeal Under Your Participation Agreement** - If you only have an opportunity to appeal under the terms of your participation agreement based on your removal from the network, or you only have an opportunity to appeal under the terms of your participation agreement and based on your removal from the network maintained for Medicare Advantage benefit plans, UnitedHealthcare aims to notify you of the decision before the effective date of your removal from the network.
- **Texas** - If you are removed from the network maintained for commercial benefit plans in Texas or Texas Medicaid or other State Program benefit plans, UnitedHealthcare will provide you the appeal panel's recommendation, if any, upon request. If you are removed from the network maintained for commercial benefit plans in Texas, upon request, UnitedHealthcare will provide you a written explanation of its decision regarding your appeal if UnitedHealthcare's decision is contrary to the appeal panel's recommendation. The appeal panel's recommendation must be considered but is not binding on UnitedHealthcare.

### EXPEDITED APPEAL.
On request, UnitedHealthcare will make an expedited appeal available to you. You must indicate in your appeal request whether you are requesting an expedited appeal. You must request an expedited appeal in accordance with the terms set forth in the "How to Request an Appeal" section above within 10 business days after the date of the attached notice and include in your appeal request relevant information you would like the appeal panel to consider, if any. If you have requested an expedited appeal, please note that an expedited review of relevant information will be conducted. Expedited hearings are not available.

If you request an expedited appeal, a decision regarding your appeal will be provided to you within 30 calendar days after the date in which UnitedHealthcare receives your appeal request.

Once the appeal panel reviews any relevant information for your expedited appeal, you have no further opportunity to appeal unless this opportunity is given to you under applicable law or the terms of your participation agreement.

4

**If You Are Dissatisfied with the Decision Regarding Your Appeal**

If you are dissatisfied with the decision regarding your appeal, you may contact your network management representative. If you do not know who your contact is, information is available at UnitedHealthcareOnline.com > Contact Us > Network Contacts. You may also request a second level appeal if such opportunity is granted to you under the terms of your participation agreement or you are removed from the network maintained for (1) Florida Medicaid or other State Program benefit plans, or (2) Maryland Medicaid or other State Program benefit plans. Otherwise, you may exercise any rights available to you under the terms of your participation agreement. In the event of a conflict or inconsistency between your participation agreement and this document, the provisions of your participation agreement will control unless applicable law dictates otherwise.

# EXHIBIT F


**UnitedHealthcare**
PO Box 31376, Salt Lake City, UT 84131-0376

MAY 3 0 REC'D

May 22, 2019

GUETTY GABAUD
613 PARK AVE FL 1
EAST ORANGE NJ 07017-1905

**PERSONAL AND CONFIDENTIAL**

**Re: Z1422100001 - Appeal Opportunity Exhausted**

Dear Guetty Gabaud:

This letter acknowledges receipt of your request for an additional appeal of UnitedHealthcare's decision to remove you from participating in one or more UnitedHealthcare networks referenced in the notice that was provided regarding your removal from the network(s).

An appeal panel conducted your review on April 19, 2019. The decision was made to uphold UnitedHealthcare's decision to remove you from participating in one or more UnitedHealthcare networks.

**At this point, all opportunities to appeal have been exhausted. Consequently, your request for an additional appeal is denied. You may exercise any rights available under the terms of the provider participation agreement.**

If you have any questions or concerns, please contact your UnitedHealthcare Network Management Representative. Thank you.

Sincerely,

Sonja A.
Central Escalation Unit

# EXHIBIT G

**UnitedHealthcare**
Community Plan
Hot Springs AR 71903-3367



178IMBIMPLANBW0003001-02876-01
DAGMAR ALIX
431 N 11TH ST FL 2
NEWARK NJ 07107-1803

**Questions?**
We're here to help.
Toll-Free **1-800-941-4647**
TTY **711**, 8 a.m. – 6 p.m. ET
Monday – Friday

June 26, 2019

Dear UnitedHealthcare Community Plan Member,

Your Primary Care Provider (PCP), SVETLANA N. SALERNO, will no longer be a doctor with UnitedHealthcare Community Plan effective 3/17/2016. UnitedHealthcare Community Plan wants to make sure that you have a doctor to go to if you need health care, so we have picked another UnitedHealthcare Community Plan doctor for you in your area. You can still see the doctor you have now until 3/17/2016. But, if you would like to change to your new PCP now, please call our Member Services at **1-800-941-4647**, TTY **711** and we will be happy to help you. Our Customer Care Professionals are available to help you 8 a.m. – 6 p.m. ET Monday – Friday.

Effective 3/18/2016, the new UnitedHealthcare Community Plan PCP we have picked for you is:

> **VELMA A. FRASIER**
> **444 WILLIAMS ST**
> **EAST ORANGE, NJ 07017**
> **9736751900**

If you would like another doctor instead of VELMA A. FRASIER, please call our Member Service Center and we will be happy to help you.

Please ask your new doctor to get your medical information from your old PCP. You can do this when you visit your new PCP's office by signing a release form.

When your PCP changes, you will receive a new UnitedHealthcare Community Plan ID card with the name of your new doctor. If you have any questions, or you do not receive your card, please call our Member Services at **1-800-941-4647**, TTY **711**; we are always here to help you.  You may use this letter as proof of your enrollment in UnitedHealthcare Community Plan if your new ID card does not arrive on time.  You should still use your current ID card until the effective date for your new doctor.

Sincerely,

UnitedHealthcare Community Plan
Enrollment Department



DAGMAR ALIX
431 N 11TH ST FL 2
NEWARK NJ 07107-1803

**¿Tiene preguntas?**
Estamos aquí para ayudarle.
Número gratuito **1-800-941-4647**
TTY **711**, 8 a.m. – 6 p.m. ET de
lunes a viernes

June 26, 2019

Estimado(a) Miembro de UnitedHealthcare Community Plan:

Su Proveedor de atención primaria (PCP por su siglas en inglés), SVETLANA N. SALERNO, ya no será un médico con UnitedHealthcare Community Plan a partir del 3/17/2016. UnitedHealthcare Community Plan quiere asegurarse de que usted tenga un médico a quién acudir si necesita atención médica, así que hemos elegido otro médico de UnitedHealthcare Community Plan para usted en su área. Puede seguir viendo al médico que tiene ahora hasta el 3/17/2016. Pero, si le gustaría cambiar a su nuevo PCP ahora, llame a nuestro Centro de Servicios para los Miembros al **1-800-941-4647** o TTY **711** y nos complacerá ayudarle. Nuestros Profesionales de atención al cliente están disponibles para ayudarle 8 a.m. – 6 p.m. ET de lunes a viernes.

A partir del 3/18/2016, el nuevo PCP de UnitedHealthcare Community Plan que hemos elegido para usted es:

**VELMA A. FRASIER**
**444 WILLIAMS ST**
**EAST ORANGE, NJ 07017**
**9736751900**

Si le gustaría tener otro médico en lugar de VELMA A. FRASIER, llame a nuestro Centro de

Servicios para los Miembros y nos complacerá ayudarle.

Pida a su nuevo médico que obtenga su información médica de su PCP anterior. Usted puede hacer esto cuando visite el consultorio de su nuevo PCP firmando un formulario de divulgación.

Cuando su PCP cambie, usted recibirá una nueva tarjeta de identificación de UnitedHealthcare Community Plan con el nombre de su nuevo médico. Si tiene preguntas, o no recibe su tarjeta, llame a nuestro Centro de Servicio al Cliente al **1-800-941-4647** o TTY **711**; siempre estamos aquí para ayudarle.  Puede usar esta carta como prueba de su inscripción en UnitedHealthcare Community Plan si su nueva tarjeta de identificación no llega a tiempo.  Usted debe seguir usando su tarjeta de identificación actual hasta la fecha de entrada en vigencia de su nuevo médico.

Atentamente,

UnitedHealthcare Community Plan
Departamento de Afiliación



# ▌ UnitedHealthcare

United Healthcare does not discriminate on the basis of race, color, national origin, sex, age or disability in health programs and activities.

We provide free services to help you communicate with us, such as letters in other languages or large print. You can also ask for an interpreter. To ask for help, please call the toll-free member phone number listed on your health plan member ID card, TTY 711, Monday through Friday, 8:00 a.m. to 6:00 p.m. EST.

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al **1-800-941-4647, TTY 711**.

请注意：如果您使用繁体中文，您可以免费获得语言援助服务。请致电 **1-800-941-4647, TTY 711**