**MANDELBAUM SALSBURG P.C.**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
t. 973.243.7930
f. 973.736.4670
*Attorneys for Plaintiffs*



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALEXANDER SALERNO, M.D., on behalf of himself and all other healthcare providers similarly situated, SALERNO MEDICAL ASSOCIATES, LLP, SENIOR HEALTHCARE OUTREACH PROGRAM, INC., SVETLANA SALERNO, M.D., AMANDA MARINO, M.D., DIANA LARREA, D.O., ANDREA FODOR, N.P., GUETTY GABAUD, N.P., BELA LASCHIVER, N.P, AIDA RAMOS, F.N.P., MARYELLEN ROBERTS, N.P., RAKESH K. SAHNI, M.D., ELIZABETH D. EVANS, D.O., KUANG-YIAO HSIEH, M.D., JOHN H. RUNDBACK, M.D., KEVIN HERMAN, M.D., ROEL P. GALOPE, D.O, VICTORIA A. HOWELL, N.P., MARIELA PABON, R.D., NILAY R. SHAH, M.D., SM MEDICAL LLC, RAMEZ W. SAMUEL, M.D., MOUNIR ABDELSHAHID, M.D., CATALINA DELACRUZ, M.D., PEDIATRICS AND ADOLESCENT SAINT MARY CLINIC, LLC, and INAS WASSEF, M.D., | CIVIL ACTION No. _____ |
| Plaintiffs, | |
| v. | |

## PLAINTIFFS' BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE
## SEEKING TEMPORARY RESTRAINTS

UNITEDHEALTHCARE GROUP, INC.,
UNITEDHEALTHCARE INSURANCE
COMPANY, UNITED HEALTHCARE
COMMUNITY PLAN, AMERICHOICE, INC.,
AMERICHOICE OF NEW JERSEY, INC.,
RIVERSIDE MEDICAL GROUP, OPTUM,
INC., OPTUM CARE, INC. and JOHN DOES
1-20,

          Defendants

 

MANDELBAUM SALSBURG, P.C.
3 Becker Farm Road
Roseland, NJ 07068
Ph.: 973-736-4600
On the Brief:          Fax: 973-736-4670
Steven I. Adler, Esq.      *Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...........................................................................................................................i

TABLE OF AUTHORITIES.....................................................................................................................ii

PRELIMINARY STATEMENT................................................................................................................1

LEGAL ARGUMENT..............................................................................................................................9

I.      PLAINTIFFS EASILY SATISFY EACH OF THE CRITERIA
        NECESSARY FOR THE ISSUANCE OF TEMPORARY RESTRAINTS ...........9

        A. Plaintiffs Will Suffer Irreparable Harm if Temporary Restraints Are
           Not Imposed........................................................................................................10

        B. Plaintiffs' Claims Are Based Upon Well-Settled Rights...................................14

            1.  Declaratory Judgment ..................................................................................15

            2.  Breach of Contract .......................................................................................15

            3.  Breaches of the Implied Covenant of Good Faith and Fair Dealing.........16

            4.  Civil Conspiracy to Tortiously Refuse to Deal with Plaintiffs and
                to Tortiously Interfere with their Relationships with Patients...................17

            5.  Unfair Competition ......................................................................................19

        C. Plaintiffs Have a Likelihood of Success on the Merits.....................................20

        D. The Equities Favor Plaintiffs, their Patients and the Public ............................21

II.     THE ARBITRATAION CLAUSE IS UNENFORCEABLE AND,
        IN ANY EVENT, PLAINTIFFS ARE ENTITLED TO AN INJUNCTION
        IN AID OF ANY ARBITRATION PROCEEDING.............................................23

CONCLUSION.......................................................................................................................................24

4830-3121-4492_v_1

## TABLE OF AUTHORITIES

*Cases*

ACLU v. Black Horse Pike Reg'l Bd. of Edu., 84 F.3d 1471 n.2 (3d Cir. 1996) (en banc). ....... 10
American Civil Liberties Union v. Mukasey, 322 F.3d 240 (3d Cir. 2003) .................................. 10
Anthony v. Eleison Pharmaceuticals, LLC, 2015 N.J. Super. Unpub. LEXIS 2115
    (App. Div. Sept. 1, 2015) ...................................................................................................... 23
Apollo Techs. v. Centrosphere Indus., 805 F. Supp. 1157 (D.N.J. 1992) ..................................... 14
Atalese v. U.S. Legal Services Group, L.P., 2014 WL 4689318 (N.J. 2014) ................................ 23
Banco Popular N. Am. v. Gandi, 184 N.J. 161 (2005) .................................................................. 17
Barron v. Vision Serv. Plan, 575 F. Supp. 2d 825 (N.D. Ohio 2008) .......................................... 12
Bd. of Ed. of Union Beach v. N.J. Ed. Ass'n et al., 96 N.J. Super. 371 (Ch. Div. 1967) ............. 11
Blumenthal v. Merrill, Lynch et al., 910 F.2d 1049 (2d Cir. 1990) ............................................. 23
Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assoc., 182 N.J 210 (2005) . 17
Columbia Broadcasting Sys. V. Melody Recordings, 134 N.J. Super. 368 (App. Div. 1975) ..... 19
Crowe v. DeGioia, 90 N.J. 126 (1982) ................................................................................... 20, 21
Fairfield County Medical Association v. United Healthcare of New England,
    985 F. Supp. 2d 262 (D. Conn. 2013), aff'd, 13-4608 cv (2d Cir. Feb. 7, 2014) .............. passim
Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247 (3d Cir. 2007) ............. 16
Frederico v. Home Depot, 507 F. 3d 188 (3d Cir. 2007) ............................................................... 16
Harris v. Perl, 41 N.J. 455 (1964). ................................................................................................ 18
Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160 (3d Cir. 2001) ................................... 14
Humana Ins. Co. v. Tenet Health System, 2016 WL 5815907 (E.D. Cal. Oct. 4, 2016) ............. 13
Instant Air Freight Co. v. C. F. Air Freight, Inc., 882 F.2d 797 (3d Cir. 1989) ........................... 10
Laidlaw, Inc. v. Student Transp. of Am., Inc., 20 F. Supp. 2d 727 (D.N.J. 1998) ...................... 10
Louis Kamm, Inc. v. Flink, 113 N.J.L. 582 (E&A 1934) .............................................................. 18
Malaker Corp. Stockholders Protective Comm. V. First Jersey Nat'l Bank,
    163 N.J. Super. 463 (App. Div. 1978) .................................................................................... 17
Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55 (App. Div. 2004) ................................... 19
Marsellis v. Warner, 51 F. Supp. 2d 508 (D.N.J. 1999) ............................................................... 10
Medical Society of the State of New York v. UnitedHealthcare of New York, Inc.,
    2014 WL 581476 (E.D.N.Y. Jan. 6, 2014) .............................................................................. 8
Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337 (App. Div. 1993) .... 17
N.J. Optometric Ass'n v. Hillman-Kohan, 144 N.J. Super. 411 (Ch. Div. 1976) ........................ 19
Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.; 219 N.J. Super. 158 (App. Div. 1987) ...... 10
Naylor v. Harkins, 11 N.J. 435 (1953) .......................................................................................... 21
Outdoor Sports Corp. v. A.F. & L. Local 23131, 6 N.J. 217 (1951) ...................................... 11, 14
Peters v. Public Service Corp. of N.J., 132 N.J. Eq. 500 (Ch. 1942),
    aff'd o.b. 133 N.J. Eq. 283 (E.&A. 1943) ............................................................................. 21
Pickett v. Lloyd's, 131 N.J. 457 (1993) ......................................................................................... 17
Printing Mart v. Sharp Electronics, 116 N.J. 739 (1989) .............................................................. 18
R&B Appliance Parts, Inc. v. Amana Company, L.P., 258 F.3d 783 (8th Cir. 2001) ................... 16
Russo v. Nagel, 358 N.J. Super. 254 (App. Div. 2003) ................................................................. 18
S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371 (3d. Cir. 1992) ............................................... 11
Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396 (1997) .......................................................... 16
South Camden Citizens in Action v. N.J. Dept. of Env. Prot., 274 F.3d 771 (3d Cir. 2001) ....... 14

Sun Dial Corp. v. Rideout, 16 N.J. 252 (1954)............................................................................. 10
Sussex Commons Outlets, L.L.C. v. Chelsea Prop. Group, Inc.,
  2010 WL 3772543 (App. Div. 2010) ......................................................................................... 19
Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1 (1st Cir. 2006) ........................................ 16
United Board Carton Corp. v. Britting, 63 N.J. Super. 517 (Ch. Div. 1959) ............................... 11
University of Texas v. Carmenisch, 451 U.S. 390 (1981)............................................................. 14

## *Statutes*

28 U.S.C. §2201(a) ...................................................................................................................... 15

## *Regulations*

§422.202........................................................................................................................................ 4
42 C.F.R. §422.202(a).................................................................................................................... 3
42 C.F.R. §422.202(d) ................................................................................................................... 4

## *Other Authorities*

Restatement (Third) of Unfair Competition §1 comment g (1995) ............................................... 19

4830-3121-4492 v. 1

## PRELIMINARY STATEMENT[1]

Plaintiffs are inner-city medical groups and their physicians (The "**Physician-Providers**") and nurse practitioners (collectively, the "**Providers**") in locations such as Newark, East Orange, Irvington and Jersey City that provide needed healthcare primarily for the elderly, the economically disadvantaged and their children, the medically underserved population and people without the benefit of employer-funded healthcare coverage ("**Patients**").

Defendant United Healthcare Group, Inc. ("**UHCG**") is the largest healthcare company in the world. In 2018 UHCG's revenues were over $226 billion and it earned almost $12 billion. UHCG owns Defendant United Healthcare Insurance Company ("**UHC**") and Defendant United Healthcare Community Plan ("**UHCP**" or the "**Plan**"), a health insurance Plan that provides medical insurance coverage for both Medicare patients who generally do not have insurance from employers and Medicaid patients. UHCG and/or UHC contracts with the Government and, as to Medicaid, with the State of New Jersey, to provide this very important insurance to people who otherwise generally would be uninsured. The Government, through the centers for Medicare and Medicaid Services ("**CMS**"), reviews the Plan and its network of Providers, including Plaintiffs, to ensure that all applicable requirements for Patients are met, including availability and accessibility to healthcare, especially in medically underserved areas, as well as quality of medical care provided.

Plaintiffs are Providers under the Plan. The Providers are credentialled by UHC and provide medical services in accordance with UHC's Provider manual so that UHC can

---

[1] The within statement of facts is based upon the Verified Complaint.

provide its customers with all of the services under the Plan. Upon being approved by UHC, Physician-Providers entered into the same written, form physician contract (the "**Physician Contract**") and other healthcare Providers entered into the same written, form practitioner contract (the "**Practitioner Contract**") with UHC. (The Physician Contract and the Practitioner Contract, collectively the "**Contracts**"). Pursuant to the Contracts, other than a co-pay or deductible, Providers cannot charge UHC's customers for the covered services provided for under the Plan. In exchange, UHC agrees to reimburse healthcare Providers for the medical services delivered that its customers' benefit contract covers, and the amounts paid by UHC are based upon the lesser of the Providers' billed charges or UHC's fee schedule. The Contracts also generally obligate Providers, such as Plaintiffs, to refer Patients only to other network physicians or Providers. Some of the Providers also have separate agreements with UHC pursuant to which they provide medical services under other UHC medical insurance plans, although that is a much smaller part of their practices.

The subject Plan is a Medicaid and Medicare Advantage ("**MA**") dual complete plan. This means it provides Medicare coverage (known as Medicare Part C)[2] and Medicaid coverage (via contracts UHC has with States) through these Providers. Because federal and state governments want to ensure that the elderly, the economically disadvantaged and the medically underserved populations receive accessible, quality healthcare, federal regulations (the "**MA Regulations**") are in place that govern the

---

[2] Medicare Part A covers hospitalization and Part B covers direct payments to providers for outpatient treatment.

2

provision of these services under the Contracts.[3]   For example, Medicaid recipients generally are entitled to select a doctor of their own choosing that are lawfully authorized to provide services and agree to accept a plan's terms and conditions.  Likewise, health insurance companies, like UHC, by law cannot terminate or suspend Physician-Providers from their plans without just cause.  This is also confirmed by the termination provisions relating to Providers in the New Jersey UHCP Provider Manual (the "**Manual**"), which are incorporated in the Contracts.

In or about March, 2019, UHC sent the same form letters to the Providers via regular mail informing them that the Contracts were being terminated by UHC prior to the expiration of their terms.  Evidently realizing that it lacked cause to terminate the Contracts early, in or about mid-April, 2019, also only via regular mail, UHC rescinded those letters and sent new termination letters ("**Termination Letters**") advising the Providers that UHC would not renew the Contracts upon their expiration dates.[4]   The Termination Letters all acknowledge that UHC was terminating the Providers "without cause."  Moreover, the Termination Letters give no reason for the terminations other than to state that

> We (UHC) periodically assess our networks to help ensure they meet the needs of our members.  As a result, we sometimes have to make difficult decisions around care provider contracts.  Unfortunately, we've decided not to renew your UHCCP Agreement ...

---

[3] 42 C.F.R. §422.202(a) applies to "individual physicians and management and members of groups of physicians ..."

[4] A few of the named Plaintiffs who did not receive the Termination Letters in April received certified letters terminating their Contracts in mid-July, 2019.  Only two of these Plaintiffs are not physicians.

By failing to give reason(s) to the physicians for the terminations, the Termination Letters violate the MA Regulations, the Contracts and the Manual. In particular, the MA Regulations require UHC to provide "written notice to the physician concerning the reasons for the action." See 42 C.F.R. §422.202(d). Moreover, the MA Regulations require UHC to disclose to the Physician-Provider "the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by the MA organization ..." Id. Here, UHC failed to comply with this section of the MA Regulations as well. The Manual also provides that if UHC intends to initiate any proceedings regarding a Provider's network participation, it must notify that a professional review action has been recommended against the Provider and provide the reasons for the proposed action. It should be undisputed that UHC failed to comply with its own Manual.

While the Termination Letters did inform the Providers that they may have the right to appeal the terminations, which the Providers have done, the appeals were "stabs in the dark" because the Providers had no information concerning why they are being terminated. Moreover, a majority of the appeal panel members must be peers of the affected physicians. The Providers do not know whether this was the case because they were not given an opportunity to appear before any panel. They also do not know what information, if any, UHC submitted to any of the panels. In addition, the Termination Letters informed Plaintiffs that the scope of the appeal panel's review of a Provider's appeal is limited to "determining whether UHC acted according to the provisions of the [Physician Contract]", but that limitation does not comply with §422.202 of the MA Regulations. In short, UHC denied the Physician-Providers their substantive and procedural due process rights mandated by the MA Regulations.[5]

---

[5] The Regulations require UHC to provide written notice to licensing or disciplinary bodies of the suspension or termination of a Physician Contract because of deficiencies in the quality of medical care provided. Again, because no reasons were given for the terminations, the Physician-Providers do not

4

What the Providers are aware of, however, is that UHC intends to notify all of their patients that the Providers are being terminated from the Plan. UHC informed the Providers of this fact in the Termination Letters. The Termination Letters state that "[w]e'll communicate this change in your participation status to your … patients …" Some of these notices have already been sent. These notices have had and will have a devastating impact on the Providers' medical practices and will damage these physicians' reputations. They each cater to the elderly and the economically challenged community and advising these Patients that the Providers are no longer in the Plan will cause these Patients to assume that they were terminated due to providing poor medical care. It will also cause Patients to change physicians since they cannot afford to pay for doctors not in the Plan network (the Plan does not pay for out-of-network doctors) or it will cause Patients to switch to other MA Plans that their doctor may be affiliated with. However, this will likely cause Patients problems related to specialists, their prescriptions and extra costs discussed below.

Plaintiffs are also aware that UHC is misleading Patients that some of the Providers are no longer accepting new patients. It is also informing Patients that the Providers will be dropped from the Plan and that they are being assigned new Providers.

Terminating Providers from the Plan will have a significant negative impact on the Patients and the public. As previously noted, the MA Regulations attempt to ensure that there is accessible medical coverage available in underserved areas. These Plaintiffs' medical practices see mainly Medicaid and Medicare patients. As much as ninety percent (90%) of some of these practices provide these services and constantly see new Patients because they are located in inner cities and have good reputations. Moreover, based upon the MA Regulations, these Patients have freedom

---

know whether UHC will be notifying these licensing or disciplinary bodies, although they are unaware of any reasons for UHC to do so. UHC seems to agree, having informed all of the Providers that they were terminated "without cause."

of choice within the Plan. In fact, MA Patients have different plans to choose from and specifically chose the Plan based upon the physicians in the Plan's network. By terminating the Providers, UHC is interfering with Plan participants' selection of them. It is also critically important to note that the open enrollment period under the Plan to choose a primary care physician or to change physicians is October 15, 2019 to December 7, 2019. If UHC is not enjoined and restrained from terminating the Providers, many Patients will not select the Providers or they will switch to different Providers, especially considering the false information being conveyed by UHC that they are not accepting new Patients or imminently will be removed from the Plan. This will have a devastating impact on the Providers' practices as UHC is one of the largest, if not the largest, MA organization.

In addition, Plaintiffs are mainly primary care doctors ("**Primary Care Physicians**"). They typically have relationships with specialists in the Plan to whom they send Patients. If a Primary Care Physician is terminated from the Plan, and a Patient remains in the Plan, they will likely be sent to different specialists. Moreover, if they follow their Primary Care Physician to a different plan, the Primary Care Physician will have to recommend different specialists who participate in the new plan. This will also likely impact the types of medicine that can be prescribed and will impact Patient's deductibles and co-pays.

It also appears that UHC is interfering with participants' selection of the Providers in order to steer these Patients to an extremely large medical provider, Defendant Riverside Medical Group ("**RMG**"), with some 85 offices in New Jersey that it owns. This financial motive does not constitute a lawful basis to terminate the Physician-Providers under the MA Regulations and, even if this wasn't the motivating factor for the termination decisions, UHC has no lawful basis to

6

terminate the Physician-Providers. If it did, one would assume that it would have informed them of any permissible reasons as the MA Regulations require.

In short, as set forth below, the Providers' claims, for a declaratory judgment, breach of contract, breach of the implied covenant of good faith and fair dealing, civil conspiracy, concerted refusal to deal, tortious interference with contract and with prospective economic advantage, and unfair competition all state well recognized claims and settled legal rights. The Providers will suffer irreparable harm to their reputations as well as the good will of their practices without injunctive relief, and also have a substantial likelihood of success on the merits with regard to their claims. There can be little, if any, doubt that UHC has failed to comply with the MA Regulations and has breached the Contracts, resulting in a tortious interference of Plaintiffs' contractual relations and prospective economic advantage with their Patient bases.

Balancing the equities also surely favors Plaintiffs. All they are seeking at this time is for the Court to maintain the status quo, allowing them on a temporary basis to remain in the Plan. There will be no harm to UHC should this temporary relief be granted, especially considering that it is not arguing Plaintiffs provide poor medical care or are inadequately providing medical care to their underserved communities. Finally, the impact on the public should UHC not be temporarily enjoined and restrained is obvious and would be substantial. Without access to these Providers, Patients may go without treatment either because they can't afford to remain with the Providers and pay them with their own funds and have no means to travel to other Providers, whether in or outside of the Plan's network. This would also impact what specialists they will, or will not, be able to see and what medicines can be prescribed to them. Many Patients have long-term care plans with the Providers which will be significantly interfered with unless temporary restraints are ordered.

7

Therefore, as set forth below, the Providers easily establish each of the prongs for a temporary restraining order. Moreover, all the Providers ask at this time is that the Court maintain the status quo to not only protect them and their practices, but also their indigent patients and children to make sure they receive the healthcare to which they are entitled by contract and under the law.

As set forth below, under the identical circumstances, another court provided the very relief that the Providers are requesting here. In Fairfield County Medical Association v. United Healthcare of New England, 985 F. Supp. 2d 262 (D. Conn. 2013), aff'd, 13-4608 cv (2d Cir. Feb. 7, 2014) (copy attached), the Court granted Providers a preliminary injunction, finding that the same facts established that United Healthcare had denied providers their substantive and procedural due process rights under the MA Regulations and breached their physician contracts. As a result, the Court enjoined United Healthcare from terminating the providers and ordered it to include them in all marketing materials and the Plan's directory, the identical relief the Providers seek herein.[6]

---

[6] A similar case was filed against UnitedHealthcare of New York, Inc. That case was stayed pending the decision concerning injunctive relief in Fairfield County Medical Association and settled thereafter. See Medical Society of the State of New York v. UnitedHealthcare of New York, Inc., 2014 WL 581476 (E.D.N.Y. Jan. 6, 2014).

8

## LEGAL ARGUMENT

## I.     PLAINTIFFS EASILY SATISFY EACH OF THE CRITERIA NECESSARY FOR THE ISSUANCE OF TEMPORARY RESTRAINTS

As noted above, this case is virtually identical to Fairfield County Medical Association v. United Healthcare of New England, 985 F. Supp. 2d 262 (D. Conn. 2013) and this Court need look no further than that decision to grant Plaintiffs the temporary injunctive relief sought by this application. Such relief will simply maintain the status quo pending a fuller review of the facts.

Like here, in Fairfield County Medical Association, Plaintiff sought injunctive relief enjoining UHC from terminating approximately 2,200 doctors from UHC's MA Plan. It sought an order enjoining UHC from terminating them from UHC's network, from notifying its MA customers that physicians will be terminated and compelling UHC to market the affected physicians in its directories. Like here, in Fairfield County Medical Association, UHC described its removal of physicians from the MA plan as a "termination without cause." Plaintiff also raised the same claims as asserted herein, including violations of the MA Regulations, violations of the doctors' substantive and procedural rights to appeal the terminations, breach of the Physician Contract and breach of the implied covenant of good faith and fair dealing.[7]

The District Court in Fairfield County, after reviewing the facts, concluded that Plaintiff was entitled to maintain the status quo "to preserve the Court's ability to later render a meaningful final decision on the merits ..." Moreover, reviewing the elements necessary for injunctive relief, the Court found that restraints were appropriate and that "UHC's arbitration requirement did not

---

[7] One difference between this case and Fairfield County Medical Association is that in Fairfield County, Plaintiffs were asking for time for their affected members to undergo a full appeal, arbitration and review process prior to any termination, while here Plaintiffs submit that the arbitration clause in the Contracts is unenforceable. See Point II, infra.

9

preclude the court from issuing an injunction in aid of arbitration." As set forth below, and as in Fairfield County, Plaintiffs meet all of the elements necessary for injunctive relief and, therefore, Plaintiffs respectfully request that the same restraints as in Fairfield County be imposed herein to maintain the status quo.

A party is entitled to a temporary restraining order where it establishes (a) the relief is necessary to prevent irreparable harm; (b) the legal right underlying the claim is settled; (c) the applicant is reasonably likely to prevail ultimately on the merits; and (d) the balance of hardships to the parties favors the relief. American Civil Liberties Union v. Mukasey, 322 F.3d 240, 250 (3d Cir. 2003); ACLU v. Black Horse Pike Reg'l Bd. of Edu., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc). Harm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages. Marsellis v. Warner, 51 F. Supp. 2d 508, 528 (D.N.J. 1999); Instant Air Freight Co. v. C. F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). Plaintiffs easily satisfy each of the four prongs of the standard, warranting the entry of a temporary restraining order against the UHC Companies.

## A.    Plaintiffs Will Suffer Irreparable Harm if Temporary Restraints Are Not Imposed

Should this Court not temporarily restrain the UHC Companies from informing Plaintiffs' patients that Plaintiffs are being terminated from the Plan, Plaintiffs will suffer damage to their reputations as well as damage to the good will of their medical practices. This type of injury is regularly found to be irreparable, justifying injunctive relief. "The loss of good will ... and the interference with customer relations" form the basis for a finding of irreparable harm. Laidlaw, Inc. v. Student Transp. of Am., Inc., 20 F. Supp. 2d 727, 766 (D.N.J. 1998); see also Sun Dial Corp. v. Rideout, 16 N.J. 252, 259 (1954); Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.; 219 N.J. Super. 158, 162-63 (App. Div. 1987).

10

4830-3121-4492, v. 1

Harm is considered "irreparable" if it cannot be adequately addressed by money damages.

Ordinarily, the type of harm plaintiff seeks to avoid by way of injunctive relief is the kind of harm

that cannot be compensated with money damages due to the nature of the claimed injury and the

right affected. Outdoor Sports Corp. v. A.F. & L. Local 23131, 6 N.J. 217, 229-30 (1951); Bd. of

Ed. of Union Beach v. N.J. Ed. Ass'n et al., 96 N.J. Super. 371, 391 (Ch. Div. 1967). Losing

customers or patients has been found to be irreparable because damages are inadequate or not

readily calculable. As the Court held in United Board Carton Corp. v. Britting, 63 N.J. Super. 517,

533 (Ch. Div. 1959).

> "But, is the remedy by way of money damages adequate here? I think
> not. Any computation of money damages at this time cannot be made
> with any degree of reasonable certainty. Who can calculate the amount
> of future profits lost by reason of the wrongful taking away of plaintiff's
> customers? It is a well established rule that equity will intervene to grant
> equitable relief when the damages at law are inadequate, or not readily
> calculable."

Irreparable injury based on harm to good will is nothing new in this Circuit. "Grounds for

irreparable injury include loss of control of reputation, loss of trade, and loss of good will." S&R

Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 378 (3d. Cir. 1992).

In Fairfield County, the medical society alleged the same irreparable harm as Plaintiffs

claim herein, namely damage to the doctors' reputations ("... the concern that patients will see a

physician's removal from UHC's MA network as evidence of physician malpractice or

unscrupulousness"), harm to consumers ("... consumer confusion over whether or not a specific

physician will remain in-network and the impact of that information on a consumer's decision to

enroll in UHC's MA program"), damage to long-standing trust relationships between patients and

their physicians, and the potential hardship to patients ("in trying to identify new in-network

physicians resulting in a disruption of those patients' continuity of care and access to appropriate

11

physician-providers/specialists.") The Court in Fairfield County found these potential harms to be

irreparable, noting that

> [Several] district and circuit courts have found disruption of the
> physician-patient relationship can cause irreparable harm that
> justifies issuing preliminary injunctive relief, particularly when the
> patient belongs to a vulnerable class or may have a deep trust
> relationship with the physician because of the serious nature of a
> patient's illness or medical needs. Other district courts have found
> that dropping certain physicians from insurance plans, or altering
> elderly patients' access to specialists by terminating provider plans
> with those physicians, may cause irreparable harm and offend the
> public interest" (citations omitted).

The Court in Fairfield County also cited numerous cases holding that irreparable harm may

exist when there is a loss of good will, the movant might suffer reputational harm, face exclusion

from certain business opportunities, or face a significant threat to that party's business. All of

these harms are present here as well. The court in Barron v. Vision Serv. Plan, 575 F. Supp. 2d

825, 836 (N.D. Ohio 2008), recognized the reality of the situation faced by Plaintiffs herein.

> "It is unlikely that many patients would see a non-network [doctor]
> when they could see a network [doctor] for significantly less ...
>
> If [plaintiff], furthermore, were to prevail on his claim against [the
> insurers], it is unlikely that many of his former patients would return to
> him once he rejoined the network. In the meantime, most patients
> would have found other providers. Many, if not most, of the patients
> would probably not go through the additional effort of switching
> [doctors] for a second time in a short period. Even those who did
> consider returning might not as a result of the lawsuit's impact on
> [plaintiff's] reputation."

Plaintiffs' situation is potentially even more dire here, as the open enrollment period is set to begin

on October 15, 2019. Patients will be forced to decide whether to remain with Plaintiffs or choose

another Provider for the upcoming year. UHC has exacerbated the harm by misrepresenting that

some of the Providers are "not accepting patients" and by indicating the dates in the upcoming

months when Providers are ending their participation in the Plan.

12

Fairfield County also recognized why the irreparable harm is magnified here with the UHC

as the defendant.

> This harm is magnified because United is far and away the largest
> Medicare insurance provider in Connecticut. Loss of United Medicare
> insureds translates to both a larger loss of market share and broader
> reputational harm to affected doctors than would termination from a
> smaller plan.

In another, similar case involving significant uncertainty concerning medical coverage for

thousands of MA enrollees, the District Court in Humana Ins. Co. v. Tenet Health System, 2016

WL 5815907, at *3 (E.D. Cal. Oct. 4, 2016) found irreparable harm, holding that

> [i]f the status quo is not maintained, the 5,000 enrollees will be affected
> because the two hospitals (as of September 30) are no long(er) "in
> network," and it is possible that the enrollees may no longer be able to
> continue to receive care at the two hospitals. Also, the change of
> "network status" prior to 2017 would affect Plaintiffs' goodwill with its
> enrollees and, because the Medicare Open Enrollment Period begins on
> October 15, 2016, Plaintiffs' ability to solicit new enrollees and keep its
> existing enrollees … appears to be significantly compromised (citations
> omitted).

In fact, the District Court issued an ex parte temporary restraining order because of "the possible

effect on Plaintiffs' goodwill, the 5,000 current enrollees who would be affected by this status, and

the open enrollment period …" Id. at *4.

Moreover, here Plaintiffs are seeking nothing more than to maintain the status quo ante.

They have been under contract with UHC for years without any issues concerning the quality of

medical care rendered to Patients.   In fact, SMA has been lauded by UHC in a full page

announcement in the Newark Star Ledger and also received a large financial bonus based upon the

medical group's stellar performance in delivering health care to UHC's customers.   The relief

requested will not change anything.   It simply will enable this Court to maintain the status quo and

preserve the rights between the parties pending final disposition of their dispute.   University of

Texas v. Carmenisch, 451 U.S. 390, 395 (1981) (purpose of injunctive relief is "to preserve the relative positions of the parties until a trial on the merits can be held"). The "object of an interlocutory injunction is to prevent some threatening irreparable mischief which should be averted until opportunity is offered for a full and deliberate investigation of the case." Outdoor Sports Corp., Id., 6 N.J. at 230.

## B.     Plaintiffs' Claims Are Based Upon Well-Settled Rights

As made clear above, without the imposition of temporary restraints, Plaintiffs will suffer irreparable harm. See Point IA, supra.

In addition to irreparable harm, Plaintiffs must demonstrate that their claims are based on settled legal rights and that they have a reasonable likelihood of success on the merits. This standard is met where the moving party merely shows a "reasonable probability, not the certainty, of success on the merits." Apollo Techs. v. Centrosphere Indus., 805 F. Supp. 1157, 1191 (D.N.J. 1992); in accord, South Camden Citizens in Action v. N.J. Dept. of Env. Prot., 274 F.3d 771, 777 (3d Cir. 2001) (a party need only demonstrate "reasonable probability of eventual success in the litigation") (emphasis in original); Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001) ("For purposes of granting preliminary injunction on the basis of pendent State law claims it is sufficient that [Plaintiffs] be found likely to succeed on one of the common law claims.") Here, as set forth below, the Verified Complaint asserts various, straight-forward, widely recognized claims for a declaratory judgment (Count One), breaches of contract (Count Two), breaches of the implied covenant of good faith and fair dealing (Count Three), civil conspiracy (Count Four), tortious refusal to deal (Count Five), unfair competition (Count Six) and tortious interference with contract and with prospective economic advantage (Counts Seven and Eight).

14

## 1. Declaratory Judgment

28 U.S.C. §2201(a) authorizes courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." To maintain such an action, there must be an "actual controversy" between adverse parties.

First, it is beyond question that Plaintiffs have a significant interest in this lawsuit. The UHC Companies have already notified the named Providers that they are being removed as Providers under the Plan when their Contracts expire and that their Patients will be so informed. Additionally, these Providers are the parties Congress sought to protect when issuing the MA Regulations. Congress specifically enacted the MA Regulations so that these physicians could only be terminated with just cause such as if they deliver poor quality medical services or they are inaccessible to Patients in underserved geographic areas. Accordingly, it cannot be disputed that the Providers have significant interest in the litigation.

Second, Plaintiffs amply satisfy the requirement that there be a "justiciable controversy." Here, the MA Regulations and the Manual set a high bar concerning what is necessary for the UHC Companies to terminate a Provider. Moreover, the Providers allege that there was an understanding that they were entering into an all-services agreement and that there were express promises to treat them fairly in the Guiding Principles and promises to treat them fairly and in good faith implied in the Contracts. These claims, and the others in the Complaint, easily establish a justiciable controversy.

## 2. Breach of Contract.

To plead a claim for breach of contract, a plaintiff must allege that there was a contract between the parties, a breach of that contract, damages flowing therefrom and that the party stating the claim performed its own contractual obligations. Frederico v. Home Depot, 507 F. 3d 188,

4830-3121-4492, v. 1

203 (3d Cir. 2007). An enforceable bilateral agreement requires an offer, an acceptance, consideration and a meeting of the minds upon all of the essential terms of the agreement. Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 250 (3d Cir. 2007).

Here, the Contracts and Manual are enforceable agreements that the Providers claim the UHC Companies breached despite the Providers performing all of their contractual obligations. Moreover, the Providers claim that the Guiding Principles also set forth a binding contract wherein the UHC Companies promised to treat them fairly and that the UHC Companies breached that agreement. Without doubt, these are well settled claims.

Finally, the Contracts required notice of termination be sent via certified mail, return receipt requested which, for the majority of the Plaintiffs, they weren't. Similarly, the Manual requires notice by certified mail whenever there is a quality management issue. Plaintiffs were entitled to such notification and the failure to do so constitutes a clear breach of contract. R&B Appliance Parts, Inc. v. Amana Company, L.P., 258 F.3d 783 (8th Cir. 2001) (letter via certified mail, return receipt requested, was a condition precedent to terminating a distributorship agreement, referencing the universal rule that "cancellation without the consent of the other can be effected only by strict compliance with such terms and conditions as are contained within the agreement") (citations omitted); Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 10 (1st Cir. 2006) (inadequate notice sent where licensee was required to send notice by personal delivery or certified mail, return receipt requested).

### 3.    Breaches of the Implied Covenant of Good Faith and Fair Dealing.

In addition to the express terms of a contract, the law provides that every contract contains an implied covenant of good faith and fair dealing. In the seminal case of Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396 (1997), the New Jersey Supreme Court explained that "[a]ll contracts,

16

under New Jersey law, include an implied covenant that the parties to the contract will act in good faith." See also Pickett v. Lloyd's, 131 N.J. 457, 467 (1993).

A party to a contract must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract. Model Civil Jury Charge, 4.10 J; Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assoc., 182 N.J 210, 230-31 (2005).

Here, not only did the UHC Companies expressly agree to treat the Providers fairly in the Guiding Principles, it was implied in the Physician Contracts and Manual that the Providers would be treated fairly if the UHC Companies intended to terminate their participation as Providers under the Plan. They failed to do so, however, in a variety of ways, including not providing any reasons for the terminations, or supporting information required by the MA Regulations or the Manual and, upon information and belief, not providing appeal panels comprised of the physicians' peers. As with the declaratory judgment and breach of contract claims, the claims in Count Three for violations of the implied covenant of good faith are based upon well-settled rights.

## 4.    Civil Conspiracy to Tortiously Refuse to Deal with Plaintiffs and to Tortiously Interfere with their Relationships with Patients.

A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act. The principal element of the claim is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage. Banco Popular N. Am. V. Gandi, 184 N.J. 161, 177 (2005), citing Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993).

In order for there to be a civil conspiracy, there must have been an underlying unlawful act. Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank, 163 N.J. Super. 463, 491 (App. Div. 1978). Here, the Providers allege that the UHC Companies conspired with

17

each other and RMG, among other things, to tortiously refuse to deal with them, to have them terminated as Providers under the Plan and to tortiously interfere with the Providers' relationships with their Patients. These tort claims are all recognized in New Jersey and constitute the underlying unlawful acts.

The law protects those in the pursuit of their livelihood ... A person who unjustifiably interferes with the contract of another is guilty of a wrong. The protection of the law is not limited only to those contracts already made, but also protects a person's interest in a reasonable expectation of economic gain." N.J. Model Jury Charge 3.30B, see also Printing Mart v. Sharp Electronics, 116 N.J. 739, 749 (1989) ("An action for tortious interference with a prospective business relation protects the right 'to pursue one's business, calling or occupation free from undue influence or molestation'" (citing Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 586 (E&A 1934). Not only does New Jersey law protect a party's interest in a contract already made, "[t]he law protects also a [person's] interest in reasonable expectations of economic advantage." Harris v. Perl, 41 N.J. 455, 462 (1964).

The elements of a claim for tortious interference with a contract include (1) actual interference with a contract, (2) interference inflicted intentionally by a defendant not a party to that contract, (3) that interference was without justification, and (4) that the interference caused damage. Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003). The elements of a claim for tortious interference with prospective economic advantage include (1) some reasonable expectation of economic advantage, (2) Defendant's action was malicious in the sense that the harm was inflicted intentionally and without justification or excuse, (3) the interference caused loss or there was a reasonable probability that Plaintiff would have obtained the anticipated

18

economic benefit and (4) the injury caused the Plaintiff damage. Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 79-80 (App. Div. 2004).

Here, the Providers have contractual relations with their Patients. Services are provided in exchange for payment. By terminating Providers under the Plan, the UHC Companies are tortiously interfering with those contractual relations. The Providers also have a reasonable expectation that their longstanding Patients would continue to obtain healthcare from them but for the UHC Companies' actions. Likewise, to the extent RMG is pressuring the UHC Companies to refuse to deal with and terminate the Providers in order to secure the Providers' patients for itself, RMG is tortiously interfering with the Contracts between the Providers and the UHC Companies and the Providers' reasonable expectation that they would continue to derive economic benefit from remaining Providers under the Plan. Because all of these claims are based on well-settled law, the Providers are entitled to a temporary restraining order.

### 5.     **Unfair Competition.**

"[T]he essence of unfair competition is fair play." Columbia Broadcasting Sys. v. Melody Recordings, 134 N.J. Super. 368, 376 (App. Div. 1975). Unfair competition is achieved through "the misappropriation of one's property by another which has some sort of commercial or pecuniary value." N.J. Optometric Ass'n v. Hillman-Kohan, 144 N.J. Super. 411 (Ch. Div. 1976). "Thus, the purpose of the law regarding unfair competition is to promote higher ethical standards in the business world." Id. at 427. The common law tort of unfair competition historically has been considered a subspecies of the class of torts known as tortious interference with business or contractual relations. Sussex Commons Outlets, L.L.C. v. Chelsea Prop. Group, Inc., 2010 WL 3772543 (App. Div. 2010) (citing *See Restatement (Third) of Unfair Competition* §1 comment g (1995)).

4830-3121-4492, v. 1

Here, for the reasons set forth above concerning RMG's tortious interference with the Providers' contractual rights with the UHC Companies and with their Patients, as well as the Providers' prospective economic advantage with both, RMG has engaged in unfair competition. Like all of Providers' other claims, the unfair competition claim is based on a well-settled right.

## C.      **Plaintiffs Have a Likelihood of Success on the Merits**

As held in Crowe v. DeGioia, 90 N.J. 126, 132-33 (1982), to obtain temporary relief, the material facts must not be in dispute. Stated differently, a plaintiff must make a preliminary showing of a reasonable probability that the movant will be successful at trial. Id. at 133.

Here, the material facts are undisputed. Plaintiffs were told by the UHC Companies that they were being removed as Providers under the Plan and, in violation of the MA Regulations and Manual, were given no reason for that drastic decision. It is even more troubling considering some of the Plaintiffs participate in other UHC plans and they were not terminated there. This raises real questions as to the legitimacy of UHC's decision. Moreover, even if UHC decided to terminate Plaintiffs for legitimate reasons, such as poor healthcare outcomes for their Patients (which Plaintiffs absolutely deny and are unaware of), the MA Regulations and the Manual require supporting information to be provided to the Providers so that they can decide whether to appeal and address the allegations. It is undisputed, however, that such information was not given to them, interfering with their procedural and substantive due process rights. As a result, it is clear that material facts relating to Plaintiffs' terminations are not in dispute and that, at a minimum, Plaintiffs have a likelihood of success on the merits of their declaratory judgment, breach of contract and breach of the implied covenant of good faith and fair dealing claims. These undisputed facts also demonstrate that Plaintiffs have a substantial likelihood of success on the merits of their tortious interference claims.

4830-3121-4492, v. 1

In Fairfield County, the Court found that Plaintiffs had a substantial likelihood of success on the merits of their contract-based claims. Id. at 272. That UHC tried to terminate the providers by a plan amendment rather than at the expiration of the terms of the Contracts does not matter because of the multitude of violations of the MA Regulations and the Manual here by UHC. Moreover, in Fairfield County the Court noted that the amendment was, in fact, a termination of Plaintiffs' right to participate in the Plan. Id. at 273. Furthermore, the Court found that when UHC suspends or terminates such an agreement, it is required to provide the information mandated by the MA Regulations, which did not occur there "in apparent breach of both Medicare regulations and the physician contract provisions ..." Id. at 273.

Moreover, the requirement that Plaintiffs must demonstrate a likelihood of success is tempered by the principle that mere doubt as to the validity of the claim is not an adequate basis to refuse to maintain the status quo. Crowe, Id., 90 N.J. at 133. Naylor v. Harkins, 11 N.J. 435 (1953). Indeed, the point of temporary relief is to maintain the parties in substantially the same condition "when the final decree is entered as they were when the litigation began." Peters v. Public Service Corp. of N.J., 132 N.J. Eq. 500 (Ch. 1942), aff'd o.b. 133 N.J. Eq. 283 (E.&A. 1943). It cannot be disputed that this is all Plaintiffs are asking for at this time. They want to maintain the status quo as it has existed for many years for many of the Plaintiffs. Surely, requiring the parties to continue that relationship, even if only temporarily, will not prejudice Defendants and, at the same time, would protect the significant interests of Plaintiffs' Patients and the public at large as addressed below.

## D.     The Equities Favor Plaintiffs, their Patients and the Public

Finally, balancing the equities here leads to one conclusion:  temporary restraints are appropriate and, in fact, needed.

21

Without restraints, Plaintiffs' good will and reputations will be irreparably harmed, their Patients will be harmed, including the sacrosanct relationship between a Patient and his or her doctor, and the public will be harmed by interfering with their ability to obtain needed healthcare, especially in underserved areas. These Patients, many indigent, cannot afford to pay their Primary Care Physicians out of their own pockets because the Plan does not provide any benefit for patients to go out-of-network. Moreover, most Patients simply cannot hop in a car to locate other doctors in the Plan. And, finally, if they follow their Primary Care Physician to a different health insurance plan, that plan would likely require them to see different specialists and to switch medications (even if they are satisfied with whatever medicines they are taking now). In short, without being able to receive healthcare from Plaintiffs, many may go without needed healthcare at all or their care plan will be terribly compromised.

When dealing with this element for injunctive relief, the court in Fairfield County held that UHC offered no evidence of injury should the injunctive relief be granted, while the failure to grant injunctive relief would cause the physicians irreparable harm. Id. at 274, n.9. For the same reasons, balancing the equities favors Plaintiffs herein. None of the Providers are being terminated for cause and, therefore, allowing them at least temporarily to remain in the Plan will not harm UHC while refusing to impose restraints will harm Plaintiffs, Patients and the public at large.

22

## II.   THE ARBITRATION CLAUSE IS UNENFORCEABLE AND, IN ANY EVENT, PLAINTIFFS ARE ENTITLED TO AN INJUNCTION IN AID OF ANY ARBITRATION PROCEEDING

The arbitration clauses in the Contracts do not satisfy New Jersey law and, therefore, are unenforceable.  In any event, that issue is for another day as this Court has the right to issue injunctive relief in aid of any arbitration that may be ordered.

In Atalese v. U.S. Legal Services Group, L.P., 2014 WL 4689318 (N.J. 2014), the New Jersey Supreme Court held that an arbitration clause that waives the right to sue in court is unenforceable unless it states "its purpose clearly and unambiguously."  In Atalese, the Court found that the clause did not explain what an arbitration is, nor [did] it indicate how arbitration is different from a proceeding in a court of law."  Moreover, in Anthony v. Eleison Pharmaceuticals, LLC, 2015 N.J. Super. Unpub. LEXIS 2115 (App. Div. Sept. 1, 2015), the Appellate Division emphasized that express language waiving the right to a jury is a necessary component of an enforceable arbitration agreement.  Here, the arbitration clause in the Contracts is woefully deficient and should be found to be unenforceable, although this issue is for another day.

Regardless, however, of whether the arbitration clause in the Contracts ultimately will be enforceable, the law is clear that this Court can enter injunctive relief in aid of arbitration. Fairfield County Medical Association v. United Healthcare of New England, 985 F. Supp. 2d 262, 269 (D. Conn. 2013) ("United's arbitration requirement does not preclude this court from issuing an injunction in aid of arbitration.  The Federal Arbitration Act contemplates that federal courts may be required to review and enforce private agreements to arbitrate"), and this decision was affirmed on appeal.  Arbitration "can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute."  Blumenthal v. Merrill, Lynch et al., 910 F.2d 1049, 1053 (2d Cir. 1990).  Thus, "the issuance of an injunction to preserve

23

the status quo pending arbitration fulfills the court's obligation under the [Federal Arbitration Act] to enforce a valid agreement to arbitrate." Id. at 1054.

The circumstances here are a perfect example for why injunctive relief should be granted, even if the dispute is to be arbitrated. Absent immediate relief, there will be many dire consequences for elderly patients, including a disruption in their continuity of care that is vital to their health and well-being, as well as to their limited finances, as well as significant consequences to the Providers that cannot be remedied solely by monetary relief. For all of these reasons, and the reasons set forth above, a temporary restraining order should be issued.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their order to show cause and issue a temporary restraining order to preserve the status quo.

Respectfully submitted,

MANDELBAUM SALSBURG, P.C.

By: _____
Steven I. Adler, Esq.

Dated: 9/18/19

24

4830-3121-4492, v. 1



# MEDICAL ASS'N v. UNITED HEALTHCARE OF NEW ENGLAND

No. 3:13-cv-1621 (SRU).                                                                                    Email | Print | Comments (0)

View Case      Cited Cases      Citing Case

985 F.Supp.2d 262 (2013)

*FAIRFIELD COUNTY MEDICAL ASSOCIATION, et al., Plaintiffs, v. UNITED HEALTHCARE OF NEW ENGLAND, et al., Defendants.*

United States District Court, D. Connecticut.

December 5, 2013.

---

*Attorney(s) appearing for the Case*

*Roy W. Breitenbach*, Garfunkel Wild, P.C., Stamford, CT, for Plaintiffs.

*Brian D. Boone*, Alston & Bird LLP, Charlotte, NC, *Kyle G.A. Wallace*, *William H. Jordan*, Alston & Bird, LLP, Atlanta, GA, *Theodore J. Tucci*, Robinson & Cole, LLP, Hartford, CT, for Defendants.

---

## RULING AND ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

STEFAN R. UNDERHILL, District Judge.

On November 15, 2013, plaintiffs Fairfield County Medical Association and Hartford County Medical Association, Inc. [1] (collectively "the Associations"), submitted

[985 F.Supp.2d 265]

their emergency motion for a temporary restraining order and preliminary injunction seeking to enjoin defendants United Healthcare of New England, Inc., United Healthcare Insurance Company, Inc., United HealthCare Services, Inc., and Unitedhealth Group, Inc. (collectively "United"), from implementing the termination of approximately 2,200 physicians from United's Medicare Advantage program. The Associations request an order (1) enjoining United from terminating any of the affected physicians from United's Medicare Advantage network; (2) enjoining United from notifying its Medicare Advantage customers that certain physician members will be terminated from the Medicare Advantage Network as of February 1, 2014; and (3) compelling United to reinstate, advertise, and market the affected physicians in their 2014 directories for the Medicare Advantage Network. Pls.' Emerg. Mot. TRO 1-2 (doc. 13).

United responded to the Associations' motion, and I held oral argument on the merits of both interim remedies on December 3, 2013. Based upon a review of the entire record, the Associations' request for a preliminary injunction is GRANTED.

## I. Background

United is a health insurance provider that offers private coverage to elderly and disabled Medicare beneficiaries under the Medicare Part C [2] scheme provided in the Social Security Act, 42 U.S.C. §§ 1395w-21 *et seq.* Defs.' Mem. Opp'n TRO 5 (doc. 29). As the largest private Medicare insurer in Connecticut, United contracts with thousands of physicians to provide medical care for its Medicare Advantage [3] customers. Ashe Aff. ¶ 7 (doc. 29); Compl. ¶ 21 (doc. 1). The majority of Connecticut physicians who participate in United's Medicare Advantage plan do so through an "all products" agreement that governs physicians' service of customers across all of United's health insurance plans. Compl. ¶¶ 24-25. Although Medicare Advantage patients may visit "out-of-network" physicians without a referral, those patients often do so at a greater cost than if they utilized a United network physician. [4] Defs.' Mem. Opp'n TRO Ex. D, at 15 n.* ("'The benefit level for non-emergency services from out-of-network physicians and other providers

will generally be less than for services from network physicians and other providers.").

Around October 2 and October 31, 2013, United issued letters to more than 2,000 physicians in Connecticut notifying those physicians that they would be removed from United's Medicare Advantage Network, effective February 1, 2014. [5] Compl.

[985 F.Supp.2d 266]

¶ 5; Pls.' Mem. Supp. TRO 1 (doc. 20). United characterized these removals as an "amendment" to its contract with each provider. Compl. Ex. B, at 1 ("UnitedHealthcare is amending our Agreement ... to discontinue your participation in the Medicare Advantage network ... This Amendment does not require your signature."). [6] For purposes of triggering the terminated physicians' appeal rights, however, United described its removal of physicians from the Medicare Advantage plan as a "termination without cause." *Id.* at 2.

Shortly after issuance of the October 31, 2013 notices, the Associations filed this lawsuit, alleging United had denied the terminated physicians' substantive and procedural due process rights under the Medicare Act, 42 U.S.C. §§ 1305 *et seq.,* and United had breached the individual contracts with each terminated physician. Compl. ¶¶ 33-56 (doc. 1).

The Associations and United dispute the timing, adequacy of notice, and effective date of termination for physicians facing removal from the Medicare Advantage program. The Associations allege that United (1) unilaterally terminated service provider contracts with physicians enrolled in its Medicare Advantage program in October 2013, in violation of the Medicare Act, 42 U.S.C. §§ 1305 *et seq.;* (2) violated the substantive and procedural rights of affected physicians to appeal United's terminations; (3) failed to provide sufficient and proper notice to terminated physicians, rendering such notice invalid; and (4) breached the explicit terms of their contracts with physician providers, breached the implied covenant of good faith and fair dealing, and rendered its contracts with terminated physicians unenforceable through a failure to provide proper consideration. Compl. ¶¶ 33-56.

The parties primarily disagree about whether an insurance company providing Medicare Part C coverage may unilaterally remove, without cause or consent, any physician in its network. United asserts that it may amend its agreements with physicians to change a physician's participation in its different health plan products so long as it abides by the Medicare Act's regulations governing the notice and appeal rights of terminated physicians. Defs.' Mem. Opp'n TRO 6. The Associations argue that the plain language of United's Physician Contract and the language in United's termination notices should be characterized as terminations of the agreement, not as amendments, and that the terminations are subject to the timeline provided in the contracts' termination clause. Compl. ¶¶ 30, 34, 45-46.

The Physician Contract's amendment clause offers United broad discretion to unilaterally alter its agreements with physicians, allowing amendments to take place so long as United provides at least 90 days' notice. The effective date of an amendment is 90 days after a physician receives notice of the amendment and a copy of the amended agreement:

> We can amend this agreement or any of the appendices on 90 days written or electronic notice by sending you a copy of the amendment. Your signature is not required to make the amendment effective. However, if you do not wish to continue your participation with our network as changed by an amendment that is not required by law or regulation but that includes a material adverse change to this agreement, then you may terminate this agreement on 60 days written notice to us....

Compl. Ex. A, at 4; Defs.' Mem. Opp'n TRO Ex. C, at 4.

The contract does not grant United the same discretion to terminate a physician without cause. In order to terminate an agreement without cause, United must provide written notice by certified mail to the terminated physician at least 90 days prior to the *anniversary date* of a physician's agreement by certified mail. Compl. Ex. A, at 4; Defs.' Mem. Opp'n TRO Ex. C, at 4 ("[Y]ou or we can terminate this agreement, effective on an anniversary of the date this agreement begins, by providing at least 90 days prior written notice.... We both agree that termination notices under this agreement must be sent by certified mail, return receipt requested."). The termination clause limits the effective date of a termination without cause to the anniversary date of United's agreement with the physician being terminated. Compl. Ex. A, at 4; Defs.' Mem. Opp'n TRO Ex. C, at 4. Finally, the Medicare Act's regulations require that United provide an appeals process by which physicians can challenge their terminations with or without cause. 42 C.F.R. § 422.202(d).

## II. Jurisdiction and Standing

United makes numerous arguments that this court lacks the authority to hear this case and that plaintiffs lack standing to bring these claims. Each of United's principal arguments is addressed below.

### A. Subject Matter Jurisdiction

This court has subject matter jurisdiction to hear this dispute under 28 U.S.C. sections 1331 and 1367. The Associations assert two causes of action. The first cause of action alleges that United has failed to comply with the procedural requirements of the Medicare Act, 42 U.S.C. §§ 1305 *et seq.* The second cause of action alleges broadly that United has taken actions that constitute a material breach of contract under Connecticut common law. At the same time, United's standard contract with physicians states that, because the agreement implicates interstate commerce, it is subject to federal jurisdiction. Compl. Ex. A, at 5; Defs.' Mem. Opp'n TRO Ex. C, at 5. The court exercises original jurisdiction over the federal questions presented under the Medicare Act, 28 U.S.C. § 1331, and it may exercise supplemental jurisdiction to hear the Associations' related state law claims, 28 U.S.C. § 1367.

United argues that, notwithstanding the fact that the Associations have brought claims based on federal law, federal question jurisdiction does not exist because the federal claims in this case lack merit. In short, United asserts that a federal district court must analyze whether federal claims will survive a motion to dismiss for failure to state a claim before it can exercise federal question jurisdiction. *See* Fed. R.Civ.P. 12(b)(6). That is simply not the law, and United provides no citation to suggest it is.

The "well-pleaded complaint" rule provides that a federal court has subject matter jurisdiction over a complaint that sets forth a federal claim on the face of the complaint. *Vaden v. Discover Bank,* 556 U.S. 49, 59-61, 129 S.Ct. 1262, 173 L.Ed.2d 206 (2009); *Rivet v. Regions Bank of La.,* 522 U.S. 470, 475-76, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998); *Merrell Dow Pharms. Inc. v. Thompson,* 478 U.S. 804, 808, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986); *Franchise Tax*

*Bd. v. Consti. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 9-10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Bell v. Hood*, 327 U.S. 678, 681-83, 66 S.Ct. 773, 90 L.Ed. 939 (1946). In the event that the court grants a motion to dismiss all federal

[985 F.Supp.2d 268]

claims, it must then decide whether to dismiss the pendent state law claims pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Although arguments that the federal claims that provide subject matter jurisdiction are meritless may affect a court's analysis of the decision whether to issue injunctive relief, a merits analysis is not a precondition to the exercise of federal jurisdiction.

## B. Standing and Ripeness

### 1. The Associations Have Standing to Bring This Action

Both associations have standing to bring this complaint under the Supreme Court's jurisprudence regarding associational standing. In *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court held that

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. 2434; *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir.1993).

The first prong of this test requires that the Associations' members have standing to bring this action as individuals. To establish individual standing, a terminated physician would have to demonstrate that (1) United's actions resulted in an "injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent"; (2) that there is a causal connection between United's actions and a physician's injury; and (3) that it is likely that the physician's harm can be redressed by law. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotations omitted); *Green I. Power Auth. v. Fed. Energy Regulatory Comm'n*, 577 F.3d 148, 159 (2d Cir.2009).

The Associations have demonstrated that their individual members would have standing to sue in their own right. Pinke Decl. (doc. 16); Hunt Decl. (doc. 17); Lapkin Decl. (doc. 18); Forgione-Rubino Decl. (doc. 19). Through affidavits, the Associations have provided information from affected members quantifying their future economic losses from termination, expressing concern over the potential harm to their reputations, and describing the impact of disruptions to their patient–physician relationships. In each of the declarations, the named physicians articulate specific, individual, tangible, and quantifiable harm that they have experienced or will experience as a result of United's termination decisions. Finally, the physicians have offered evidence to show that they had entered into Physician Contracts with United, that United may have breached these contracts by improperly terminating certain physicians, and that the Medicare Act and common law govern the interpretation and enforcement of these contracts. Additionally, the terminated physicians offer claims that are cognizable under the Medicare Act and under Connecticut's common law governing contracts. Both sources of law allow for the equitable remedies the physicians seek.

The second prong requires that this lawsuit further the purpose and mission of the Associations. Both Associations represent a wide array of physicians from multiple fields of medicine, in addition to medical students, interns, and residents. Compl. ¶¶ 1-2. Both Associations describe their

[985 F.Supp.2d 269]

missions as promoting and representing high-quality medical care, cultivating knowledge in the art and practice of medicine, working with the community to improve the health of all people, and developing sound public policy. *Id.* at ¶ 2. The Associations indicate that their mission-related interest in this litigation includes ensuring the continued success of all their (physician) members, as well as ensuring the vitality of the medical delivery system in their respective geographies. The Associations allege that, in addition to the direct harms its members experience from United's termination of its agreement with those members, the removal of over 2,000 physicians will increase the caseload of non-terminated physicians, resulting in strains on the system and potential overloading of non-terminated medical practices.

Finally, the Associations have raised cognizable legal rights and issues both under the regulations of the Medicare Act and under contract law for which equitable and legal remedies are available. United has asked me to impose new requirements to the Supreme Court's test for associational standing (Defs.' Mem. Opp'n TRO 8). I decline to do so. The Associations have met the established standard for asserting associational standing; no more is required of them.

### 2. The Terminated Physicians are not Required to Exhaust a Federal Administrative Process Before Bringing the Instant Action.

Neither the text of the Medicare Act, nor the Centers for Medicare and Medicaid Services' ("CMS") regulations, require that physicians exhaust any administrative processes prior to bringing an action to enforce a contract between a Medicare insurer and a physician/provider. Although Medicare has a sophisticated regime that requires administrative exhaustion for beneficiaries contesting claim coverage, CMS has not contemplated or issued regulations governing disputes between physicians and Medicare Plan C providers. 42 C.F.R. § 422.202(d). Because no administrative adjudication mechanism exists for the claims made in this case, plaintiffs have not failed to exhaust administrative remedies.

### 3. The Associations' Terminated Members Must Submit to Individual Arbitration.

The plain language of United's Physician Agreement requires that physicians avail themselves of the appeal process in United's Administrative Guide and then submit to binding, individual arbitration. Compl. Ex. A, at 5. [7] Nevertheless, United's arbitration requirement does not preclude this court from issuing an injunction in aid of arbitration. Ultimately the Associations are asking for time for their affected members to undergo a full appeal, arbitration, and review process prior to the termination of their Medicare Advantage provider agreements with United. The Federal Arbitration Act contemplates that federal courts may be required to review and enforce private agreements to arbitrate. 9 U.S.C. § 4; *Vaden*, 556 U.S. at 58, 60-61, 129

S.Ct. 1262.

[985 F.Supp.2d 270]

The Associations argue that the arbitration clause only governs disputes between United and its providers regarding reimbursement claims. The contract's plain language indicates that the dispute resolution section is meant broadly to control disputes regarding all sections of the contract. There are no contrary terms or limitations that suggest that the dispute resolution and arbitration sections are intended to be limited to disputes over claim coverage and payment. Thus, arbitration of the claims made here is required whether or not the status quo is preserved by injunction.

## C. Preemption

For the same reasons that the Associations and their members are not required to exhaust a federal administrative process with CMS when contesting their terminations, the Medicare Act does not preempt review of their terminations and their Physician Contracts. Although the Medicare Act explicitly preempts attempts by states to undermine or compete with Medicare as a health insurance scheme, it is silent on the issue of appeals regarding at-will termination or suspension of a physician without cause. 42 C.F.R. § 422.402 ("The standards established under this part supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) *with respect to the MA plans that are offered by MA organizations*." (emphasis added)).

Instead, the Medicare Act requires that states do not interfere with the scope, implementation, or performance of Medicare plans offered by private organizations. It does not, however, preempt courts from reviewing agreements between physicians/providers and private Medicare plan providers to enforce the procedural rights set forth in those agreements and in the Medicare regulations governing physician termination. 42 C.F.R. § 422.202(d). Instead, the Medicare Act's procedural requirements for terminations of physicians without cause from Plan C programs should be read as providing a baseline level of procedural protection for physicians. These provisions are complementary to United's contracts with individual physicians, and they do not supersede or displace stronger protections set forth in United's individual Physician Contracts.

## III. The Requests for Injunctive Relief

In the Second Circuit, the standard for issuance of a temporary restraining order ("TRO") is the same as the standard for a preliminary injunction. *UBS Fin. Servs. v. Junggren*, No. 11-cv-437(MRK), 2011 WL 1831587, *1 (D.Conn. Mar. 30, 2011), *citing Romag Fasteners, Inc. v. J.C. Penney, Inc.*, No. 07-cv-1667(JBA), 2007 WL 4225792, *2 (D.Conn. Nov. 28, 2007). "The fundamental purpose in granting preliminary injunctive relief has always been to preserve the court's ability to later render a meaningful final decision on the merits by preventing irreparable harm in the interim." *H & R Block E. Tax Servs., Inc. v. Brooks*, No. 00-cv-1332(JCH), 2000 WL 33124809, *2 (D.Conn. Oct. 12, 2000).

A preliminary injunction is appropriate if a litigant demonstrates: "(1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir. 1999); *see also Mullins v. City of N.Y.*, 626 F.3d 47, 52-53 (2d Cir.2010); *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir.2005); *Genesee Brewing Co. v.*

[985 F.Supp.2d 271]

*Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997).

When ruling on an application for a preliminary injunction or TRO, the courts have taken into account the following four factors: (1) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted; (2) the balance between the movant's alleged harm and the harm that granting the injunction would inflict on the opposing party; (3) the probability that the plaintiff will succeed on the merits; and (4) whether a permanent injunction would disserve the public interest. *eBay v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); *Minn. Mining & Mfg. Co. v. Francavilla*, 191 F.Supp.2d 270, 277 (D.Conn.2002).

## A. Irreparable Harm

The Associations identify three categories of harm that they believe are irreparable and impossible to fully compensate with damages. The first harm is reputational, and it turns on the concern that patients will see a physician's removal from United's Medicare Advantage network as evidence of physician malpractice or unscrupulousness. The second harm is broadly related to consumer protection and focuses on consumer confusion over whether or not a specific physician will remain in-network and the impact of that information on a consumer's decision to enroll in United's Medicare Advantage program. The third harm focuses on (1) damage to long-standing trust relationships between patients and their physicians; and (2) the potential hardship for patients who require continuous care (e.g., patients with cancer, heart disease, diabetes) will experience in trying to identify new in-network physicians, resulting in a disruption of those patients' continuity of care and access to appropriate physician-providers/specialists. Based on the information in the record, I find that the Associations have met their burden of demonstrating that they will suffer harm that is imminent and cannot be adequately compensated through damages.

The Second Circuit has not ruled directly on whether disruption of the physician-patient relationship rises to a level in which equitable relief is appropriate. *Med. Soc'y of N.Y. v. Toia*, 560 F.2d 535 (2d Cir.1977) (declining to address the issue of harm to the physician-patient relationship due to other standing considerations). Nevertheless, several district and circuit courts have found that disruption of the physician-patient relationship can cause irreparable harm that justifies issuing preliminary injunctive relief, particularly when the patient belongs to a vulnerable class or may have a deep trust relationship with the physician because of the serious nature of the patient's illness or medical needs. *Schisler v. Heckler*, 574 F.Supp. 1538, 1552-53 (W.D.N.Y. 1983); *see also Roudachevski v. All-Amer. Care Ctrs., Inc.*, 648 F.3d 701, 706-07 (8th Cir.2011). Other district courts have also found that dropping certain physicians from insurance plans, or altering elderly patients' access to specialists by terminating provider plans with those physicians, may cause irreparable harm and offend the public interest. *See, e.g., Barron v. Vision Serv. Plan*, 575 F.Supp.2d 825, 835-36 (N.D.Ohio 2008).

Moreover, courts have found that irreparable harm may exist when the moving party could suffer a loss of goodwill, suffer reputational harm, face exclusion from certain business opportunities, or face a significant threat to that party's business. *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d

1197, 1205 (2d Cir.1970) (threat to business); *Kogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784 (8th Cir.

[985 F.Supp.2d 272]

2010) (loss of goodwill); *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir.2001) (loss of reputation and business opportunity); *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047 (5th Cir.1997) (loss of reputation); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir.1994) (permanent loss of customers due to the loss of goodwill); *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 867 (8th Cir.1977) (same).

Here, the Associations' members who are subject to the termination notices will suffer (1) disruption of their relationships with their Medicare Advantage patients, (2) loss of goodwill and reputational harm, and (3) a resulting loss of ability to compete in the market for provision of Medicare services. The disruption of physician-patient relationships results from the high cost of medical care in this country and the structure of health insurance reimbursement plans that distinguish between in-network and out-of-network service providers. The terminated providers' patients could continue their existing relationships with the affected physicians only if they are able and willing to pay substantially greater sums to obtain those medical services. As another court has noted:

> It is unlikely that many patients would see a non-network [doctor] when they could see a network [doctor] for significantly less....
>
> If [plaintiff], furthermore, were to prevail on his claim against [the insurer], it is unlikely that many of his former patients would return to him once he rejoined the network. In the meantime, most patients would have found other providers. Many, if not most, of these patients would probably not go through the additional effort of switching [doctors] for a second time in a short period. Even those who did consider returning might not as a result of the lawsuit's impact on [plaintiff's] reputation.

*Barron*, 575 F.Supp.2d at 836.

The patients who received notices that their doctor(s) had been terminated from the Medicare Advantage Plan will naturally worry that the termination resulted from the doctor's poor professional performance or standing. Such harm is irreparable.

Finally, the combination of (1) the reduction in the number of patients who can receive in-network services from an affected provider, and (2) the reputational harm that attends termination from a plan, will result in an irreparable loss in the ability to compete in the market for Medicare services. This harm is magnified because United is far and away the largest Medicare insurance provider in Connecticut. Loss of United's Medicare insureds translates to both a larger loss of market share and a broader reputational harm to affected doctors than would termination from a smaller plan.

## B. *Likelihood of Success on the Merits*

The Associations have demonstrated a likelihood of success on the merits of their contract-based claims. United's argument that it has a unilateral right to terminate participating physicians from participation in the Medicare Advantage plan by "amendment" of that plan is not supported by the language of the contract or the parties' experience under it.

United and the participating physicians entered into a contract that consists of a general network participation agreement plus a series of appendices and other materials. [8] That contractual structure allows

[985 F.Supp.2d 273]

the parties to set forth in the Physician Contract the basic obligations to each other that are independent of participation in a specific plan; e.g., maintaining medical credentials, submitting claims only for services rendered, promptly adjudicating claims for covered services, terminating the agreement, and arbitrating disputes. The plans that a particular doctor participates in are listed in Appendix 2, and specific plan-related terms are set forth in other appendices. Defs.' Mem. Opp'n TRO Ex. C, at 10 (doc. 29). The terms of the agreement between participating doctors and United with respect to the Medicare Advantage plan are set forth in the Medicare Advantage Regulatory Requirements Appendix ("Medicare Appendix"). *Id.* at 20. With limited exceptions, in the event of a conflict between the Physician Contract and the Medicare Appendix, "the provisions of [the Medicare] Appendix shall control." *Id.* (Medicare App'x § 1).

United's "amendment" to Appendix 2, which removed the Medicare Advantage plan from the list of plans in which particular physicians participated, had the effect of terminating those physicians from the network plan through which United provided Medicare benefits. The "amendment" terminated all rights the physician had under the Medicare Appendix; i.e., the agreement governing the physician's participation in the Medicare Advantage plan. The fact that a particular physician continued to participate in other United plans that do not provide Medicare benefits does not transform that termination into something less than a termination of participation in a Medicare services plan. Medicare regulations require that a Medicare Advantage insurer operating a "coordinated care plan or network MSA [medical savings account] plan providing benefits through contracting providers" meet certain requirements. 42 C.F.R. § 422.4. Thus, when United "suspends or terminates an agreement under which the physician provides services to MA [Medicare Advantage] plan enrollees," 42 C.F.R. § 422.202(d)(1), it is required to provide written notice of the "reasons for the action, including, if relevant, the standards and profiling data used to evaluate the physician and the number and mix of physicians needed by the MA organization." *Id.* § 422.202(d)(1)(i). That did not occur here, in apparent breach of both Medicare regulations and the Physician Contract provisions regarding termination ("either you or we can terminate this agreement, effective on an anniversary of the date this agreement begins, by providing at least 90 days prior written notice."). 42 C.F.R. § 422.202(d); Compl. Ex. A, at 5; Defs.' Mem. Opp'n TRO Ex. C, at 5.

At oral argument, United suggested that it routinely amends Appendix 2 without the consent of participating physicians as a way of removing physicians from participation in a particular plan. If true, that assertion would support United's interpretation of its rights under the agreement by demonstrating how the parties themselves had interpreted the agreement in practice. I therefore requested that United provide evidence or affidavits showing that in Connecticut it had used the amendment of Appendix 2 to unilaterally remove a physician from participation in its Medicare Advantage plan without cause and without the physician's consent. The evidence provided in response to my request does not support United's assertion. Although United apparently has *added* Connecticut physicians to a plan by amendment, Hayhurst

[985 F.Supp.2d 274]

Suppl. Decl. ¶ 5 (doc. 43), it has not terminated Connecticut physicians in that way.

Accordingly, I conclude that, at a minimum, the plaintiffs are likely to prevail on their breach of contract claims. [9]

## IV. Conclusion

For the foregoing reasons, the Associations have met their burden of proving irreparable harm and a likelihood of success on the merits that United breached the terms of its Physician Contract with the Associations' member physicians. Therefore, a preliminary injunction to prevent the removal of affected physicians from United's Medicare Advantage network in violation of United's Physician Contract is necessary pending determination of the merits of the Associations' claims. [10] Accordingly, the motion for preliminary injunction (doc. 13) is GRANTED.

## *PRELIMINARY INJUNCTION ORDER*

Pursuant to Rule 65 of the Federal Rules of Civil Procedure:

IT IS ORDERED that the defendants, United Healthcare of New England, Inc., United Healthcare Insurance Company, Inc., United HealthCare Services, Inc., and Unitedhealth Group, Inc., and their agents, officers, directors, trustees, employees, and anyone acting in concert with them who receives actual notice of this order, are hereby restrained, enjoined, and prohibited from:

(a) terminating any of the Associations' physician-members from United's Medicare Advantage network;

(b) notifying their Medicare Advantage customers/insureds that certain providers will be terminated from the Medicare Advantage Network as of February 1, 2014; and

(c) removing or failing to advertise/market the Associations' affected physicians in United's 2014 directories for the Medicare Advantage Network.

This order shall not prevent the termination or non-renewal of a physician-member from United's Medicare Advantage network following United's compliance with the effective termination date, appeal, and arbitration provisions governing terminations without cause, as set forth on page 5 ("What if we do not agree") of its Physician Contract.

Within forty-eight (48) hours of the entry of this Order, the plaintiffs, Fairfield County Medical Association and Hartford County Medical Association, Inc., shall provide a list of their members to United to permit United to comply with this order.

[985 F.Supp.2d 275]

The Associations are not required to give a security pursuant to Rule 65(c).

The preliminary injunction shall remain in effect until a ruling on the merits of the Associations' claims or a further order of this court.

It is so ordered.

## FootNotes

1. Plaintiffs are membership organizations that assert associational standing to represent the concerns of their affected members. Compl. ¶ 1.

2. In its enacting legislation and regulations, this program is also referred to as "Medicare + Choice." 42 U.S.C. §§ 1395w-21 *et seq.*

3. United and CMS refer to Medicare Plan C programs as "Medicare Advantage." Defs.' Mem. Opp'n TRO Ex. D, at 15-16. Within the Medicare Advantage program, customers may choose to enroll in several different coverage plans. *Id.*

4. For certain Medicare Advantage plans, such as the Medicare Advantage PO and PPO plans, United offers partial coverage for non-emergency services obtained from out-of-network providers, and patients pay the difference in cost. Defs.' Mem. Opp'n TRO Ex. D, at 25. Patients enrolled in lower-cost plans, such as United's Medicare Advantage HMO, must notify United in advance of their intention to obtain non-emergency, out-of-network services, and they must also pay for the full cost of those services. *Id.* at 26.

5. United initially sent its termination notices by regular mail around October 2, 2013. Pls.' Mem. Supp. TRO 1 n. 1 (doc. 20); Defs.' Mem. Opp'n TRO ¶ 4. On October 31, 2013, United rescinded and reissued its termination notices by certified mail. Pls.' Mem. Supp. TRO 1 n. 1. The parties agree that the October 2 and October 31 letters are substantively identical. *Id.;* Defs.' Mem. Opp'n TRO ¶ 4.

6. United refers to these agreements as "Physician Contracts." Defs.' Mem. Opp'n TRO Ex. C, at 2 (doc. 29).

7. We will resolve all disputes between us by following the dispute procedures set out in our Administrative Guide. If either of us wishes to pursue the dispute beyond those procedures, they will submit the dispute to binding arbitration ... within one year. We both expressly intend that any dispute between us be resolved on an individual basis so that no other dispute with any third party(ies) may be consolidated or joined with our dispute... Arbitration will be conducted in Hartford County, CT.

Physician Contract, at 5.

8. As noted above, United refers to its network participation agreement as a "Physician Contract," Defs.' Mem. Opp'n TRO Ex. C, at 2 (doc. 29), and it also uses the term "network participation agreement" in its Medicare Advantage Appendix. *Id.* at 20.

9. Having found that the Associations are likely to prevail on the merits of their contract claims, I need not balance the respective hardships in this case. Nonetheless, in the alternative, I find that a balancing of hardships also would favor the Associations. In order to balance hardships, the court "must

balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 9–10, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *N.Y. Progress & Protection PAC v. Walsh,* 733 F.3d 483, 488–89 (2d Cir.2013). United has not offered evidence of injury from the granting of a preliminary injunction, and instead, has discussed the costs it may incur attempting to arbitrate appeals from terminated physicians under its Physician Contract. The failure to grant injunctive relief, in contrast, would cause the Associations' members irreparable harm.

10. The request for entry of a TRO is denied as moot.

---

## Comment

Your Name

Your Email

Comments

Submit

1000 Characters Remaining

*Leagle.com reserves the right to edit or remove comments but is under no obligation to do so, or to explain individual moderation decisions.*

13-4608-cv
Fairfield Cnty. Med. Ass'n v. United Healthcare of New England, Inc.

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 7th day of February, two thousand fourteen.

PRESENT: AMALYA L. KEARSE,
              REENA RAGGI,
                      *Circuit Judges*,
              EDWARD R. KORMAN,
                      *District Judge.*[*]

-----------------------------------------------------------------------

FAIRFIELD COUNTY MEDICAL ASSOCIATION and HARTFORD COUNTY MEDICAL ASSOCIATION, INC.,

                      *Plaintiffs-Appellees*,

v.                                                          No. 13-4608-cv

UNITED HEALTHCARE OF NEW ENGLAND, INC., UNITED HEALTHCARE INSURANCE COMPANY, INC., UNITED HEATHCARE SERVICES, INC., and UNITEDHEALTH GROUP, INC.,
                      *Defendants-Appellants.*

-----------------------------------------------------------------------

_____

[*] The Hon. Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

1

APPEARING FOR APPELLANTS:     CATHERINE E. STETSON (David M. Ginn, Hogan Lovells US LLP, Washington, D.C.; Steven M. Edwards, Hogan Lovells US LLP, New York, New York; Theodore J. Tucci, Robinson & Cole LLP, Hartford, Connecticut; William H. Jordan, Kyle G.A. Wallace, Brian D. Boone, Alston & Bird LLP, Atlanta, Georgia; John F. Cambria, Alston & Bird LLP, New York, New York, *on the brief*), Hogan Lovells US LLP, Washington, D.C.

APPEARING FOR APPELLEES:     ROY W. BREITENBACH (Jason Y. Hsi, *on the brief*), Garfunkel Wild, P.C., Great Neck, New York.

FOR AMICI CURIAE AMICI
ASSOCIATIONS:     Edith M. Kallas, Joe R. Whatley, Jr., Ilze C. Thielmann, Whatley Kallas, LLP, New York, New York.

FOR AMICUS CURIAE
AMERICA'S HEALTH
INSURANCE PLANS:     Robert A. Long, Caroline M. Brown, David M. Zionts, Covington & Burling LLP, Washington, D.C.; Joseph M. Miller, Michael S. Spector, America's Health Insurance Plans, Washington, D.C.

FOR AMICI CURIAE
STATE OF CONNECTICUT
AND THE OFFICE OF THE
HEALTHCARE ADVOCATE:     Robert W. Clark, Assistant Attorney General, *for* George Jepsen, Attorney General for the State of Connecticut, Hartford, Connecticut.

FOR AMICUS CURIAE
UNITED STATES SENATOR
RICHARD BLUMENTHAL:     Sean K. McElligott, William M. Bloss, Koskoff Koskoff & Bieder, P.C., Bridgeport, Connecticut.

2

Appeal from an order of the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the preliminary injunction entered on December 5, 2013, is AFFIRMED AS MODIFIED.

Defendants appeal from a grant of a preliminary injunction halting the removal of plaintiffs' physician members from defendants' Medicare Advantage network, arguing, among other things, that (1) the district court lacked federal subject matter jurisdiction over the case, and (2) plaintiffs do not have associational standing.[1]  In reviewing the preliminary injunction for an abuse of discretion, see WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 278 (2d Cir. 2012), we assume the parties' familiarity with the facts and the record of prior proceedings.

1.    Federal Subject Matter Jurisdiction

A cause of action "arises under" federal law and thus confers subject matter jurisdiction pursuant to 28 U.S.C. § 1331 "when the plaintiff's 'well-pleaded complaint' raises an issue of federal law." New York v. Shinnecock Indian Nation, 686 F.3d 133, 138 (2d Cir. 2012). One exception to the "well-pleaded complaint" rule is "when the claim is so insubstantial, implausible, foreclosed by prior decisions of the Supreme Court,

---

[1] Defendants also moved for a stay pending appeal.  Because we decide defendants' appeal, the motion to stay is denied as moot.

3

or otherwise completely devoid of merit as not to involve a federal controversy." Southern New England Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 133 (2d Cir. 2010) (internal quotation marks and alterations omitted).

Here, plaintiffs assert two causes of action, one alleging violations of the federal regulations implementing the Medicare Act, see 42 C.F.R. § 422.202, and one for breach of contract under Connecticut law. Plaintiffs' complaint thus includes a claim that "arises under" federal law sufficient to invoke federal subject matter jurisdiction and to support the district court's discretionary exercise of supplemental jurisdiction over the state claim. See 28 U.S.C. § 1367; Carver v. Nassau Cnty. Interim Fin. Auth., 730 F.3d 150, 154 (2d Cir. 2013) (reviewing "decision to assert supplemental jurisdiction over a state law claim under an abuse-of-discretion standard").

In urging otherwise, defendants maintain that plaintiffs' federal claim is so insubstantial as to divest the court of subject matter jurisdiction. But a federal claim "is not 'insubstantial' merely because it might ultimately be unsuccessful on its merits." Southern New England Tel. Co. v. Global NAPs Inc., 624 F.3d at 133. Rather, "[o]nce a federal court has determined that a plaintiff's jurisdiction-conferring claims are not insubstantial on their face, 'no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter.'" In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d 134, 150 (2d Cir. 2003) (quoting Baker v. Carr, 369 U.S. 186, 199 (1962)).

4

Accordingly, because plaintiffs' federal cause of action is not facially insubstantial, the district court properly exercised subject matter jurisdiction over the suit.

2.      Associational Standing

An organizational plaintiff has "associational standing" to assert claims on behalf of its members if "(a) [the organization's] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977); accord Alliance for Open Society Int'l, Inc., v. U.S. Agency for Int'l Dev., 651 F.3d 218, 228 (2d Cir. 2011).   Defendants challenge plaintiffs' ability to satisfy the second and third prongs.   We are not persuaded.

The district court properly declined to conclude that the second prong was not met on the basis, urged by defendants, that the litigation would not serve the interests of a majority of plaintiffs' members.   Defendants put forth no evidence that any members disapprove of the instant suit.   Indeed, if defendants could remove some of plaintiffs' members from the Medicare Advantage network in alleged violation of federal regulations and contractual obligations, then plaintiffs' other members might reasonably support this litigation to avoid similarly being removed in the future.

In light of our modification of the injunction, as set forth below, plaintiffs also satisfied the third Hunt prong.   This prudential requirement operates typically to preclude

5

suits for damages because those cases require individualized inquiries. See, e.g., Warth v. Seldin, 422 U.S. 490, 515–16 (1975); cf. Bano v. Union Carbide Corp., 361 F.3d 696, 714 (2d Cir. 2004) (rejecting argument that "association automatically satisfies the third prong of the Hunt test simply by requesting equitable relief rather than damages"). That is not this case. Here, plaintiffs' members are apparently subject to identical contracts, and participation of the individual physicians is not necessary because the preliminary injunction, as we hereinafter modify it, will only aid their arbitration obligations.

Thus, plaintiffs have associational standing to pursue the instant suit.

3.   Modification of Preliminary Injunction

In addition to enjoining defendants from removing any of plaintiffs' physician members, the district court also provided that "[t]he preliminary injunction shall remain in effect until a ruling on the merits of the [plaintiffs'] claims or a further order of this court." Fairfield Cnty. Med. Ass'n v. United Healthcare of New England, Inc., --- F. Supp. 2d ---, 2013 WL 6334092, at *10 (D. Conn. Dec. 5, 2013).

Based upon counsel's concessions at oral argument, this provision is hereby modified to state as follows:

> The Associations' physician-members subject to removal from United's Medicare Advantage network shall have a reasonable time, not exceeding 30 days from February 7, 2014, to challenge their removal by initiating arbitration proceedings in which they may seek emergency or injunctive relief from an arbitrator. After this period, the preliminary injunction shall expire.

6

We have considered defendants' remaining arguments and conclude that they do not warrant reversal of the preliminary injunction except to the extent that it is modified in this order. We therefore AFFIRM AS MODIFIED the preliminary injunction of the district court.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, Clerk of Court