**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ALEXANDER SALERNO, M.D., on behalf of himself and all other healthcare providers similarly situated, SALERNO MEDICAL ASSOCIATES, LLP, SENIOR HEALTHCARE OUTREACH PROGRAM, INC., SVETLANA SALERNO, M.D., AMANDA MARINO, M.D., DIANA LARREA, D.O., ANDREA FODOR, N.P., GUETTY GABAUD, N.P., BELA LASCHIVER, N.P, AIDA RAMOS, F.N.P., MARYELLEN ROBERTS, N.P., RAKESH K. SAHNI, M.D., ELIZABETH D. EVANS, D.O., KUANG-YIAO HSIEH, M.D., JOHN H. RUNDBACK, M.D., KEVIN HERMAN, M.D., ROEL P. GALOPE, D.O, VICTORIA A. HOWELL, N.P., MARIELA PABON, R.D., NILAY R. SHAH, M.D., SM MEDICAL LLC, RAMEZ W. SAMUEL, M.D., MOUNIR ABDELSHAHID, M.D., CATALINA DELACRUZ, M.D., PEDIATRICS AND ADOLESCENT SAINT MARY CLINIC, LLC, and INAS WASSEF, M.D. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 2:19-cv-18130 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| UNITEDHEALTHCARE GROUP, INC., UNITEDHEALTHCARE INSURANCE COMPANY, UNITEDHEALTHCARE COMMUNITY PLAN, AMERICHOICE, INC., AMERICHOICE OF NEW JERSEY, INC., RIVERSIDE MEDICAL GROUP, OPTUM, INC., OPTUM CARE, INC. and JOHN DOES 1-20, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' BRIEF OPPOSING PLAINTIFFS'**
**APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF**

Steven L. Penaro
D.N.J. ID # 030182009
**ALSTON & BIRD LLP**
90 Park Ave
New York, NY 10016
Tel: 212-210-9460
Fax: 212-922-3960
steve.penaro@alston.com

William H. Jordan
*Pro hac vice forthcoming*
Lee A. Deneen
*Pro hac vice forthcoming*
**ALSTON & BIRD LLP**
1201 W. Peachtree St., Suite 4900
Atlanta, GA 30309
Tel: 404.881.7000
Fax: 404.881.7777
bill.jordan@alston.com
lee.deneen@alston.com

Brian D. Boone
*Pro hac vice forthcoming*
**ALSTON & BIRD LLP**
Bank of America Plaza, Suite 4000
101 S. Tryon St.
Charlotte, NC 28280
Tel: 704.444.1000
Fax: 704.444.1111
brian.boone@alston.com

*Counsel for UnitedHealth Group Inc.,*
*UnitedHealthcare Insurance Company, UnitedHealthcare Community Plan, Inc.,*
*AmeriChoice of New Jersey, Inc., AmeriChoice Corp., Optum, Inc., Optum Care, Inc.,*
*and Riverside Medical Management, LLC[*]*

---

[*] The plaintiffs named UnitedHealthcare Group, Inc., AmeriChoice, Inc., and Riverside Medical Group as defendants, but those entities are not part of United's corporate family. We assume that the plaintiffs meant to name UnitedHealth Group Inc., AmeriChoice Corporation, and Riverside Medical Management, LLC.

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

I. THE COURT SHOULD ORDER THE PROVIDERS TO ARBITRATE THEIR
   CLAIMS, INCLUDING ANY CLAIMS FOR INJUNCTIVE RELIEF.................................6

   A.   The provider contracts leave questions of arbitrability for the arbitrator. ...................6

   B.   If this Court could decide questions of arbitrability, it would conclude that
        the arbitration agreement is enforceable and that it covers the Providers'
        claims. ................................................................................................................8

   C.   The Providers must arbitrate their claims against all defendants. ...............................11

   D.   The Providers are not entitled to an injunction in aid of arbitration. ...........................12

II. THE PROVIDERS ARE NOT ENTITLED TO TEMPORARY INJUNCTIVE
    RELIEF. .............................................................................................................12

    A.   The Providers have no likelihood of success on their claims. .........................................12

         1.   The Providers have not exhausted their contractual remedies. .....................12

         2.   The Medicare Act preempts the Providers' claims. ............................................13

         3.   The Providers have no private right of action to enforce Medicare
              regulations. ............................................................................................16

         4.   United complied with the Providers' contracts and with federal
              regulations. ............................................................................................17

              a.   United honored its contractual obligations. ...........................................17

              b.   United complied with its regulatory obligations. ....................................19

              c.   The Providers' tort claims fail for other reasons. ..................................21

    B.   The remaining injunctive-relief factors also weigh in United's favor. .........................23

         1.   The Providers have not shown irreparable harm by clear and
              convincing evidence...............................................................................23

         2.   The Providers are trying to prevent monetary harm. .......................................24

         3.   The Providers' requested relief will cause harm to plan members, not
              the other way around...............................................................................25

         4.   The equities favor United. .......................................................................25

CONCLUSION.......................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000) ........................................................................................24

*Ahmad v. Long Island Univ.*,
    18 F. Supp. 2d 245 (E.D.N.Y. 1998) ..........................................................................23

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ............................................................................................2, 16, 17

*Am. Express Co. v. Italian Colors*,
    570 U.S. 228 (2013) ......................................................................................................7

*Black Mt. Equities, Inc. v. Pac. Gold Corp.*,
    No. 12-cv-1285 (KM) (CLW), 2012 U.S. Dist. LEXIS 169295 (D.N.J. Nov. 27,
    2012) ...........................................................................................................................24

*Checker Cab of Phila. Inc. v. Uber Techs., Inc.*,
    643 F. App'x 229 (3d Cir. 2016) ...............................................................................24

*Chorosevic v. MetLife Choices*,
    600 F.3d 934 (8th Cir. 2010) ......................................................................................13

*Communs. Workers of Am. v. Alcatel-Lucent USA Inc.*,
    No. 15-cv-8143, 2015 U.S. Dist. LEXIS 159068 (D.N.J. Nov. 25, 2015) ...................1

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ......................................................................................................22

*CRA, Inc. v. Ozitus Int'l, Inc.*,
    No. 16-cv-5632, 2017 U.S. Dist. LEXIS 99453 (D.N.J. June 27, 2017) .............. 18, 22

*Derbin v. Access Wealth Mgmt., LLC*,
    No. 11-cv-812, 2011 U.S. Dist. LEXIS 115992 (D.N.J. Oct. 7, 2011) .......................11

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) ..................................................................................................7

*Fenoglio v. Augat, Inc.*,
    50 F. Supp. 2d 46 (D. Mass. 1999) ............................................................................18

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
    765 F.3d 205 (3d Cir. 2014) .....................................................................................6, 23

*Freedom Mortg. Corp. v. LoanCare, LLC*,
No. 16-cv-2569, 2018 U.S. Dist. LEXIS 203733 (D.N.J. Nov. 30, 2018) ........................................21

*Giacone v. Virtual OfficeWare, LLC*,
No. 13-cv-1558, 2014 U.S. Dist. LEXIS 172633 (W.D. Pa. Dec. 12, 2014) ...................................18

*Giesse v. HHS*,
522 F.3d 697 (6th Cir. 2008) ........................................22

*Gross v. Cormack*,
586 F. App'x 899 (3d Cir. 2014) ........................................16

*Haaland v. Presbyterian Health Plan*,
292 F. Supp. 3d 1222 (D.N.M. 2018) ........................................15

*Hepstall v. Humana Health Plan, Inc.*,
No. 18-cv-0163, 2018 U.S. Dist. LEXIS 200418 (S.D. Ala. Nov. 26, 2018) ...................................15

*Horowitz v. AT&T Inc.*,
No. 3:17-cv-4827-BRM-LHG, 2019 U.S. Dist. LEXIS 60 (D.N.J. Jan. 2, 2019) ...........................9

*Juice Entm't, LLC v. Live Nation Entm't, Inc.*,
No. 11-cv-7318, 2012 U.S. Dist. LEXIS 92114 (D.N.J. July 3, 2012) ........................................22

*KDDI Glob. LLC v. Fisk Telecom LLC*,
No. 17-cv-5445, 2017 U.S. Dist. LEXIS 188774, 2017 WL 5479512 (D.N.J. Nov.
15, 2017) ........................................6

*Kernahan v. Home Warranty Adm'r of Fla., Inc.*,
236 N.J. 301 (2019) ........................................9, 10

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
137 S. Ct. 1421 (2017) ........................................10

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019) ........................................7

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
562 F.3d 553 (3d Cir. 2009) ........................................24

*loanDepot.com v. CrossCountry Mortg., Inc.*,
No. 18-12091 (KM) (JBC), 2019 U.S. Dist. LEXIS 106518 (D.N.J. June 24, 2019) ..................6, 7

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ........................................23

*Meek-Horton v. Trover Solutions, Inc.*,
910 F. Supp. 2d 690 (S.D.N.Y. 2012) ........................................15

*Mega Brands America, Inc. v. Cerillo*,
  No. ESX-C-69-14, 2014 N.J. Super. Unpub. LEXIS 2990 (N.J. Sup. Ct. Dec. 5,
  2014)..................................................................................................................................23

*Mehler v. Terminix Intern. Co. L.P.*,
  205 F.3d 44 (2d Cir. 2000) ...............................................................................................8

*Morrison v. Health Plan of Nev., Inc.*,
  328 P.3d 1165 (Nev. 2014) .............................................................................................15

*Neal v. Asta Funding, Inc.*,
  No. 13-cv-6981, 2016 U.S. Dist. LEXIS 85163 (D.N.J. June 30, 2016) ...........................6

*Nguyn v. Wal-Mart*,
  No. 12-cv-1824 (KM) (MCA), 2013 U.S. Dist. LEXIS 88948 (D.N.J. June 25,
  2013)..................................................................................................................................22

*Pacificare of Nev. v. Rogers*,
  No. 55713, 2011 WL 6016079 (Nev. Oct. 27, 2011) .......................................................15

*Phillips v. Kaiser Found. Health Plan, Inc.*,
  No. C 11-02326, 2011 WL 3047475 (N.D. Cal. July 25, 2011) .......................................15

*Potts v. Rawlings Co., LLC*,
  897 F. Supp. 2d 185 (S.D.N.Y. 2012)..............................................................................13

*Precision Funding Grp., LLC v. Nat'l Fid. Mortg.*,
  No. 12-cv-5054 (RMB/JS), 2013 U.S. Dist. LEXIS 76609 (D.N.J. May 31, 2013) ........11

*Printing Mart-Morristown v. Sharp Elecs. Corp.*,
  116 N.J. 739 (1989) ................................................................................................... 21, 22

*Shady v. Tyson*,
  5 F. Supp. 2d 102 (E.D.N.Y. 1998) ..................................................................................23

*Shaw Group, Inc. v. Triplefine Int'l Corp.*,
  322 F.3d 115 (2d Cir. 2003) ..............................................................................................7

*Stolt-Nielsen SA v. Cleanese AG*,
  430 F.3d 567 (2d Cir. 2005)............................................................................................12

*Tarzia v. City of Stamford*,
  No. 3:10-cv-1583, 2010 WL 4683929 (D. Conn. Nov. 9, 2010) ......................................23

*Touche Ross & Co. v. Redington*,
  442 U.S. 560 (1979).........................................................................................................16

*Uhm v. Humana, Inc.*,
  620 F.3d 1134 (9th Cir. 2010) ...............................................................................14, 15, 16

**STATUTES**

42 U.S.C. § 1395w-22(j) ............................................................................................. 14, 16

42 U.S.C. § 1395w-26(b)(3) ..................................................................................... 2, 13, 14

42 U.S.C. § 1395y(b)(3)(A) ............................................................................................. 16

**OTHER AUTHORITIES**

42 C.F.R. § 422.111(e) ............................................................................................. 19, 21

42 C.F.R. § 422.202(a) ................................................................................................. 14

42 C.F.R. § 422.202(d) ............................................................................. 2, 6, 14, 16, 19, 20

42 C.F.R. § 422.402 ..................................................................................................... 13

CMS, Medicare Managed Care Manual, http://www.cms.gov/Regulations-and-
    Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-
    Items/CMS019326.html ................................................................................. 14, 19, 21

H.R. Rep. No. 108–391 (2003) (Conf. Rep.) .................................................................. 14

## INTRODUCTION

Seeking to curb consumer costs and strengthen its healthcare offerings, United notified the plaintiff Providers that it is exercising its contractual rights not to renew its Medicare Advantage and Medicaid contracts with them.[1] The Providers responded with this lawsuit. The unspoken premise underlying the lawsuit is that the Providers have a right to stay in United's Medicare and Medicaid networks forever (or at least for as long as they don't give United cause to terminate them). That is wrong. The Providers' contracts with United allow either party to non-renew the contract by giving 90 days' written notice before the contract's anniversary date. That is what United did. No law or contract prohibited it from doing so.

But the contracts prohibit this litigation. Each Provider's contract with United contains an arbitration clause requiring the Provider to submit "all disputes . . . to binding arbitration in accordance with the Commercial Dispute Procedures of the American Arbitration Association (see http://ww.adr.org)." Dkt. 1, Ex. A at 5–6. The Providers also agreed that an arbitrator (not a court) would decide questions of arbitrability, affirmed that they understood the contract's dispute-resolution mechanism, and waived their right to sue in a class action or other consolidated proceeding. *See id.* at 6 (agreeing to arbitrate their claims "on an individual basis" and that "no other dispute with any third party(ies) may be consolidated or joined with our dispute"); *see also id.* at 5 (incorporating AAA rules). This Court must send the Providers' claims—including any arguments about the arbitration agreement's validity—to arbitration.

Arbitration aside, the Court should also deny the Providers' application for injunctive relief because they have not shown a "likelihood of success" on those claims—for at least five reasons. *Cf. Communs. Workers of Am. v. Alcatel-Lucent USA Inc.*, No. 15-cv-8143, 2015 U.S. Dist. LEXIS 159068, at *5 (D.N.J. Nov. 25, 2015) (a temporary restraining order is "extraordinary relief" requiring a likelihood of success, among other things).

*First*, most of the Providers have not exhausted administrative remedies—as their contracts and Medicare Act regulations require.

---

[1] For simplicity's sake, we refer to all the defendants as "United."

1

*Second*, the Medicare Act preempts the Providers' claims. With limited exceptions not relevant here, the Medicare Act preempts all state laws that purport to regulate a Medicare Advantage plan, even if the state law is consistent with federal standards. *See* 42 U.S.C. § 1395w-26(b)(3). Congress and the Centers for Medicare & Medicaid Services (CMS) have established comprehensive regulatory standards governing a provider's removal from a Medicare Advantage network. The Medicare Act preempts the Providers' state-law claims relating to their Medicare Advantage contracts.

*Third*, the Medicare regulations that the Providers rely on do not create a cause of action permitting them to challenge their removal from a Medicare Advantage network. *See, e.g., Alexander v. Sandoval,* 532 U.S. 275, 286–87 (2001).  No federal statute confers on a healthcare provider the right to sue under federal law for their termination from a Medicare Advantage network.

*Fourth*, even if a federal statute allowed the Providers to challenge United's procedures for removing providers from its networks, the Providers' own exhibits confirm that United complied with federal law and with the provider contracts. The Providers argue that United's non-removal letters violate 42 C.F.R. § 422.202(d) and United's provider manual because United did not give a "reason" for removing the Providers, but United gave a reason by telling the Providers that it was invoking its contractual right to non-renew their contracts. That was all that the Medicare regulations and contracts required. A different subpart in § 422.202(d) authorizes Medicare organizations to terminate a provider "without cause" if they give 60 days' notice. *Id.* § 422.202(d)(4). The Providers ignore that provision.

*Fifth*, the Providers' tort claims also fail for other reasons:  The claims duplicate the Providers' contract claims, United did not intentionally interfere with the Providers' patient relationships, United's contractual rights justified any alleged interference, and the Providers have no due-process rights vis-à-vis a non-governmental actor like United.

* * *

Even if the Providers could show a likelihood of success on their claims (and they cannot), their application would fail because they won't suffer irreparable harm if the Court denies injunctive relief. At least two Providers have already been removed from the network; a TRO would not help

2

those Providers. And most of the remaining Providers' non-renewal dates are in November or later, which gives them plenty of time to demand arbitration (if they want). If it came to it, an arbitrator could award a provider emergency injunctive relief.

In the meantime, United's plan members (who are not plaintiffs here) will not suffer any harm—at least not from United's actions. United has the largest provider network in New Jersey and has given plan members the contact information for new in-network providers. *See* Ex. A, Nielsen Decl. ¶ 3. Those providers will continue providing healthcare services to United's members. *Id.* United's decisions to end certain provider contracts will not jeopardize plan members' continuity of care.

But a temporary restraining order would. Open enrollment for the plan runs from October 15 until November 15. As it stands, a plan member who has in the past received healthcare services from a non-renewed Provider is on notice that the Provider will no longer participate in United's network as of a certain date. During open enrollment, that member can choose to re-enroll with United and select a new provider or can follow the non-renewed Provider to a new plan. But if the Court grants the Providers an injunction requiring United to temporarily unwind the non-renewal notices, plan members may choose to remain with United's plan on the false assumption that their Provider will remain in the network throughout the plan year. If this Court later dissolved the injunction and let the non-renewals take effect, the member would be left in a plan that did not include the removed Provider. If all that sounds confusing, it's because it is—and no doubt would be to plan members. A TRO would guarantee that sort of confusion.

## BACKGROUND

United offers health-plan benefits to members through employer-sponsored plans, individual plans, and (as relevant here) the Medicare Advantage and Medicaid programs. For many health-insurance plans under those programs, United provides benefits to both Medicare and Medicaid beneficiaries. *Cf.* Dkt. 1 ¶ 15. Participants in those plans (called "dual eligible" or "dual complete" plans) pay only a co-pay or deductible when they visit a healthcare provider in the plan's network. Dkt. 1-1 at 2. The providers receive payment from United, which in turn receives compensation from

the federal and state governments. The plan at issue here—a UnitedHealthcare Community Plan—is a dual-complete plan. Dkt. 1 ¶ 15.

The Providers are physicians and nurse practitioners who have participated in United's Medicare Advantage and Medicaid network. Each Provider has a contract or contracts with United that govern the terms of their relationship. Under those contracts, either party may choose not to renew the contract "effective on an anniversary of the date th[e] agreement begins" by giving 90 days' written notice. Dkt. 1, Ex. A at 5.

Earlier this year, United notified the Providers by certified mail that it had reviewed its Medicare Advantage and Medicaid network and that, based on that review, it had decided not to renew their contracts. *See, e.g.*, Dkt. 1, Ex. C (March 22, 2019 letter). For some of the Providers, United sent follow-up letters several weeks later modifying the effective non-renewal date for their contract—in most cases, pushing back the date to reflect the anniversary date for the contract. *Id.* at Ex. D (April 16, 2019 letter). In the letters that the Providers attached to the complaint, for instance, the first letter listed a non-renewal date of July 29, 2019, but the revised letter changed that date to November 19, 2019. *See id.* Exs. C, D. United also attached to those letters a document describing United's appeal process. *Id.*

Each Provider's contract with United contains a binding arbitration agreement in a section titled "[w]hat if we do not agree":

> We will resolve all disputes between us by following the dispute procedures set out in our Provider Manual. If either of us wishes to pursue the dispute beyond those procedures, they will submit the dispute to binding arbitration in accordance with the Commercial Dispute Procedures of the American Arbitration Association (see http://www.adr.org) within one year.

> We both expressly intend that any dispute between us be resolved on an individual basis so that no other dispute with any third party(ies) may be consolidated or joined with our dispute. We both agree that any arbitration ruling by an arbitrator allowing class action arbitration or requiring consolidated arbitration involving any third party(ies) would be contrary to our intent and would require immediate judicial review of such ruling. The arbitrator will not vary the terms of this agreement and will be bound by governing law. We both acknowledge that this agreement involves interstate commerce, and is governed by the Federal Arbitration Act, 9 USC 1 et seq. The arbitrator will not have authority to award punitive or exemplary damages against either of us, except in connection with a statutory claim that explicitly provides for such relief. Arbitration will be conducted in Essex County, NJ.

If a court allows any litigation of a dispute to go forward, we both waive rights to a trial by jury with respect to that litigation, and the judge will be the finder of fact. Any provision of this agreement that is invalid or unenforceable shall not affect the validity or enforceability of the remaining provisions of this agreement or the validity or enforceability of the offending provision in any other situation or in any other jurisdiction. This section of the agreement governs any dispute between us arising before or after execution of this agreement and this section shall survive and govern any termination of this agreement.

Dkt. 1, Ex. A at 5–6.

At the end of the contract in the "conclusion" section, the parties affirm again that they understood "the dispute resolution procedures described in the section of this agreement entitled 'What if we do not agree'" and that "**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION THAT MAY BE ENFORCED BY THE PARTIES**." Dkt. 1, Ex. A at 7 (emphasis in original).

Two weeks ago, the Providers spurned their arbitration agreements and filed a putative class-action against UnitedHealthcare Community Plan and related entities. Dkt. 1 at 1. The Providers also applied for a temporary restraining order to prohibit United from "terminating Providers' participation in the Plan" and from "notifying patients that Providers are or will be terminated," among other things. Dkt. 1-1.

Two days later, the Court ordered United to respond to the Providers' application by October 1. Dkt. 3. The Court scheduled a TRO hearing for October 4. *Id.*

## ARGUMENT

The Providers agreed to arbitrate "all disputes" with United, including any claims for injunctive relief and any arguments about the arbitration agreement's enforceability. The Court should hold them to those agreements. It should also decline to enter a TRO in aid of arbitration because most of the Providers' contracts will not face non-renewal until November or later and the AAA rules allow arbitrators to fashion interim or emergency relief.

Regardless, the Providers have not shown that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Ferring Pharm., Inc. v. Watson*

5

*Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). There is no likelihood of success because (1) the Providers have not exhausted their contractual remedies, (2) the Medicare Act preempts their state-law claims, (3) the Providers have no private right of action to enforce 42 C.F.R. § 422.202(d), (4) United complied with its provider contracts and with the regulation, and (5) the Providers' tort claims fail for multiple reasons.

Nor have the Providers shown irreparable harm. They may seek injunctive relief from the arbitrator—including on an expedited basis—and could have done so months ago if they had complied with their contracts. In any case, the Providers have not shown by clear and convincing evidence that their businesses would be destroyed without a restraining order. And though they try to dress up their harms as loss of patient goodwill, what they really seek is money damages.

## I.   THE COURT SHOULD ORDER THE PROVIDERS TO ARBITRATE THEIR CLAIMS, INCLUDING ANY CLAIMS FOR INJUNCTIVE RELIEF.

The Court should deny the Providers' application because the Providers agreed to arbitrate any disputes with United on an individual basis. They filed their complaint in the teeth of those agreements.

### A.   The provider contracts leave questions of arbitrability for the arbitrator.

Under the Federal Arbitration Act, questions of arbitrability are for the arbitrator in the first instance if the parties "clearly and unmistakably" delegate those questions to the arbitrator. *loanDepot.com v. CrossCountry Mortg., Inc.*, No. 18-12091 (KM) (JBC), 2019 U.S. Dist. LEXIS 106518, at *12–13 (D.N.J. June 24, 2019). That is what United and the Providers did by agreeing to submit "all disputes" to "binding arbitration in accordance with the Commercial Dispute Procedures of the American Arbitration Association (see http://www.adr.org)." Dkt. 1, Ex. A at 5. "This Court has held that by agreeing to arbitrate in accordance with AAA rules, the parties to [an arbitration agreement] clearly and unmistakably agreed to arbitrate the issue of arbitrability." *loanDepot.com*, 2019 U.S. Dist. LEXIS 106518, at *12–13; *see also Neal v. Asta Funding, Inc.*, No. 13-cv-6981, 2016 U.S. Dist. LEXIS 85163, 2016 WL 3566960, at *14 (D.N.J. June 30, 2016) (same); *KDDI Glob. LLC v. Fisk Telecom LLC*, No. 17-cv-5445, 2017 U.S. Dist. LEXIS 188774, 2017 WL 5479512, at *7 (D.N.J. Nov. 15,

2017) (incorporating the AAA Commercial Arbitration Rules "clearly and unequivocally requires an Arbitrator to decide the issue of arbitrability").

Even if the parties' incorporating the AAA rules were not enough to reserve questions of arbitrability for the arbitrator, the "all disputes" and "any dispute[s]" language in the arbitration agreement confirms that gateway issues of arbitrability are for the arbitrator. *See* Dkt. 1, Ex. A at 5–6; *see also Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) ("all disputes" language reserved questions of arbitrability for the arbitrator).

By delegating arbitrability issues to the arbitrator, the parties gave the arbitrator jurisdiction to decide "any objection with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim." *loanDepot.com*, 2019 U.S. Dist. LEXIS 106518, at *13–14 (quoting American Arbitration Association, *Commercial Arbitration and Mediation Rules*, Rule 7(a)). That includes the Providers' argument that the arbitration agreement is unenforceable under New Jersey law. Dkt. 1-1 at 23. "[W]hen an arbitration provision delegates the arbitrability question to the arbitrator, the court has no power to decide it." *loanDepot.com*, 2019 U.S. Dist. LEXIS 106518, at *18.

And when the Court compels arbitration, it must require the Providers to arbitrate on an individual basis, as the contracts require: "We both expressly intend that any dispute between us be resolved on an individual basis so that no other dispute with any third party(ies) may be consolidated or joined with our dispute." Dkt. 1, Ex. A at 5. The Providers also agreed that an arbitrator's allowing a class-action arbitration "would be contrary to our intent." *See id.* ("any arbitration ruling by an arbitrator allowing class action arbitration or requiring consolidated arbitration involving any third party(ies) would be contrary to our intent and would require immediate judicial review of such ruling"); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018) ("In the Federal Arbitration Act, Congress has instructed federal courts to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings."); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1419 (2019) ("Courts may not infer from an ambiguous agreement that parties have consented to arbitrate on a classwide basis."); *Am. Express Co. v. Italian Colors*, 570 U.S. 228, 233 (2013) (upholding class-

arbitration waiver against argument that "requiring [the plaintiffs] to litigate their claims individually—as they contracted to do—would contravene the policies of the antitrust laws").

**B.**     **If this Court could decide questions of arbitrability, it would conclude that the arbitration agreement is enforceable and that it covers the Providers' claims.**

If this Court could decide questions about the arbitrability of the Providers' claims, it would conclude that the claims are subject to arbitration and that the agreement is enforceable.

The Providers do not argue that their claims fall outside the arbitration agreements. For good reason: The arbitration agreement requires the Providers and United to submit "all disputes between [them]" to individual arbitration. Dkt. 1, Ex. A at 5. All means all. *See, e.g.*, *Mehler v. Terminix Intern. Co. L.P.*, 205 F.3d 44, 49 (2d Cir. 2000) (arbitration clause was "precisely the kind of broad arbitration clause that justifies a presumption of arbitrability" because it "provide[d] for arbitration of 'any controversy or claim between [the parties] arising out of or relating to' the Agreement").

Instead, the Providers argue that New Jersey law requires more specificity in arbitration agreements. Dkt. 1-1 at 23. Wrong. In their contracts, the parties spent more than 300 words explaining when the arbitration agreement applies ("[i]f either of us wishes to pursue the dispute beyond [the provider manual's] procedures"), what arbitration rules would govern the proceeding ("the Commercial Dispute Procedures of the American Arbitration Association"), where those rules may be found ("http://www.adr.org"), the effect of the arbitration ("binding"), whether multi-party or classwide arbitrations are allowed ("[w]e both expressly intend that any dispute between us be resolved on an individual basis"), whether the arbitrator may vary from the contract ("[t]he arbitrator will not vary the terms of this agreement and will be bound by governing law"), what law applies to the arbitration agreement ("this agreement involves interstate commerce, and is governed by the Federal Arbitration Act, 9 USC 1 et seq."), whether the arbitrator may award punitive or exemplary damages without statutory authorization ("[t]he arbitrator will not have authority to award punitive or exemplary damages"), where the arbitration will be held ("[a]rbitration will be conducted in Essex County, NJ."), and affirming that the arbitration agreement is comprehensive ("[t]his section of the

agreement governs any dispute between us arising before or after execution of this agreement and this section shall survive and govern any termination of this agreement."). That is enough specificity.

And the parties did not stop there. At the end of the contract, the parties reaffirmed that the arbitration agreement is "binding"—in bold font, all caps—and agreed that they understood "the dispute resolution procedures described in the section of this agreement entitled 'What if we do not agree.'" Dkt. 1, Ex. A at 7.

That agreement goes above and beyond what the law requires. "Under the FAA, agreements to arbitrate are valid, irrevocable, and enforceable, subject only to traditional contract principles." *Horowitz v. AT&T Inc.*, No. 3:17-cv-4827-BRM-LHG, 2019 U.S. Dist. LEXIS 60, at *12 (D.N.J. Jan. 2, 2019). In New Jersey, an arbitration agreement—like any other contract—"is enforceable if it is supported by consideration and it was knowingly and voluntarily entered into." *Id.* at *15; *see also Kernahan v. Home Warranty Adm'r of Fla., Inc.*, 236 N.J. 301, 318–19 (2019) (New Jersey has a "hospitable approach toward arbitration" that is "in synchronicity" with the FAA). The Providers' arbitration agreement satisfies that standard. After agreeing to arbitrate "all disputes" with United, the Providers agreed to provisions describing the rules for that arbitration, the governing law, the types of available relief, the binding nature of an arbitral award, and the exclusivity of arbitration as a dispute-resolution mechanism.[2] The agreement is enforceable.

The case that the Providers cite—*Atalese v. U.S. Legal Services Group, L.P.*—is not to the contrary. There, the New Jersey Supreme Court held that an arbitration agreement in a "consumer" contract is unenforceable if it is not "clear and unambiguous that a consumer is choosing to arbitrate disputes rather than resolve them in a court of law." 219 N.J. 430, 435 (2014); *see also id.* ("the clause, at least in some general and sufficiently broad way, must explain that the plaintiff is giving up her right to bring her claims in court or have a jury resolve the dispute."). The Supreme Court emphasized in a

---

[2] It is ironic that the Providers cite *Fairfield County Medical Association v. United Healthcare of New England* because the court there agreed that the arbitration agreement is enforceable. "The plain language of United's Physician Agreement requires that physicians . . . submit to binding, individual arbitration." 985 F. Supp. 2d 262, 269 (D. Conn. 2013).

later case that "[t]he consumer context of the contract mattered" to the *Atalese* holding. *See Kernahan*, 236 N.J. at 319; *see also id.* ("The [*Atalese*] decision repeatedly notes that it is addressing a form consumer contract, not a contract individually negotiated in any way; accordingly, basic statutory *consumer contract requirements* about plain language implicitly provided the backdrop to the contract under review.") (emphasis added); *Atalese*, 219 N.J. at 435 (considering whether the "average members of the public" would know "that arbitration is a substitute for the right to have one's claim adjudicated in a court of law"). The Providers are not consumers. They did not agree to a clickwrap contract. They are sophisticated physicians and nurse practitioners with graduate degrees who entered into a business relationship with United.

But even if the Providers were consumers (as *Atalese* understood the term), their arbitration agreements satisfy *Atalese* because the agreements clearly and unambiguously show that the parties intended to substitute arbitration for litigation. The parties agreed that if they "pursue [a] dispute beyond [the manual's] procedures, they will submit the dispute to binding arbitration in accordance with the Commercial Dispute Procedures of the American Arbitration Association." Dkt. 1, Ex. A at 5. They added a link to the AAA rules. *Id.* They disclaimed two forms of relief sometimes available in court (punitive damages and classwide resolution). *Id.* at 6. They agreed (twice) that the arbitration would be binding. *Id.* at 5, 7. And they agreed that they understood the contract's dispute-resolution mechanism. *Id.* at 7. *Atalese* requires no more.

If it did, it would violate the Federal Arbitration Act. The FAA preempts "any rule that covertly [discriminates against arbitration] by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017). In *Kindred Nursing*, for instance, the FAA preempted a Kentucky rule holding that an agent with power of attorney could not execute an arbitration agreement on his principal's behalf without a "clear statement" that the agent had authority to "waive his [principal's] fundamental constitutional rights to access the courts." *Id.* at 1425. "Such a rule is too tailor-made to arbitration agreements—subjecting them, by virtue of their defining trait, to uncommon barriers—to survive the FAA's edict against singling out those contracts for disfavored treatment." *Id.*

10

The same would hold true if *Atalese* required parties to invoke a magic incantation—something like "arbitration is a substitute for litigation"—in every arbitration agreement. That rule would single out arbitration contracts for disfavored treatment. But again, that is not what *Atalese* requires.

### C.   The Providers must arbitrate their claims against all defendants.

When the Court compels arbitration, it should order the Providers to arbitrate their claims against all defendants. UnitedHealthcare Insurance Company executed the Providers' contracts "on behalf of itself, AmeriChoice of New Jersey, Inc., and *its other affiliates*." Dkt. 1, Ex. A at 1 (emphasis added). All named defendants are United affiliates, so the arbitration agreement applies to all the Providers' claims against all defendants.

Even if the affiliates were not mentioned in the provider contracts, equitable estoppel would require the Providers to arbitrate their claims against all defendants. "New Jersey recognizes a non-signatory['s] right to compel arbitration based on the principle of equitable estoppel." *Derbin v. Access Wealth Mgmt., LLC*, No. 11-cv-812, 2011 U.S. Dist. LEXIS 115992, at *11 (D.N.J. Oct. 7, 2011). That principle applies "in at least two situations": "First, a non-signatory may compel arbitration when the issues to be litigated are inextricably intertwined with the arbitration agreement such that the claims asserted against the signatory and the non-signatory are identical. A non-signatory may also compel arbitration . . . where there is a requisite nexus of the claim to the contract together with [an] integral relationship between the non-signatory and the other contracting party." *Precision Funding Grp., LLC v. Nat'l Fid. Mortg.*, No. 12-cv-5054 (RMB/JS), 2013 U.S. Dist. LEXIS 76609, at *13–14 (D.N.J. May 31, 2013).

Both situations are present. The Providers' claims against the defendants—all United affiliates—are "inextricably intertwined" with the Providers' contracts. The claims all involve the same allegation that United had no right to non-renew the contracts. The second theory of equitable estoppel also applies for similar reasons: There is a strong nexus between the Providers' claims and their contracts, and the Providers have an "integral relationship" with all defendants, which include

the plan sponsor (UnitedHealthcare Community Plan) and the plan administrator (AmeriChoice of New Jersey).

### D. The Providers are not entitled to an injunction in aid of arbitration.

The Court should also deny the Providers' request for a temporary restraining order in aid of arbitration. *Cf.* Dkt. 1-1 at 23. Under the AAA rules, an arbitrator may grant emergency or other injunctive relief if appropriate. *See Stolt-Nielsen SA v. Cleanese AG*, 430 F.3d 567, 579 (2d Cir. 2005). The Providers could have started that process months ago instead of running to court.

Beyond that, the Providers argue that speculative harm to third-party "elderly patients" warrants an injunction in aid of arbitration (Dkt. 1-1 at 24), but the Providers do not have standing to make that argument. They have not raised claims on the patients' behalf.

And even beyond that, neither this Court nor an arbitrator can grant the Providers any kind of injunctive relief because they have no likelihood of success on the merits.

## II. THE PROVIDERS ARE NOT ENTITLED TO TEMPORARY INJUNCTIVE RELIEF.

Even if there were no arbitration agreement, the Providers would not be entitled to temporary injunctive relief because they have not shown a likelihood of success on the merits or that they will suffer irreparable harm without an injunction.

### A. The Providers have no likelihood of success on their claims.

The Providers' claims fail for many reasons: They failed to exhaust contractual remedies, the Medicare Act preempts their claims, they have no private right of action to enforce Medicare regulations, and United complied with the contracts and the law.

#### 1. The Providers have not exhausted their contractual remedies.

According to United's records, two-thirds of the physician-plaintiffs did not appeal United's non-renewal determination, so those Providers may not raise claims in this Court. Under the contract, an aggrieved provider may arbitrate a dispute only if the provider first "follow[s] the dispute procedures set out in our Provider Manual," which include submitting an appeal if the provider has a right to do so. Dkt. 1, Ex. A at 5; *see also id.* ("If either of us wishes to pursue the dispute beyond those

procedures, they will submit the dispute to binding arbitration . . . ."); *id.* Ex. E at 4 ("Failure to submit an appeal request within the required timeframe and in the manner described in this document will constitute a waiver of your opportunity to appeal. In the case of such a waiver, you are deemed to have accepted your removal from UnitedHealthcare's network."). Eleven of the fifteen individual physician-plaintiffs did not submit an appeal within 30 days of receiving their non-renewal notice. *See* Ex. A, Nielsen Decl. ¶ 8 (17 of 22 total plaintiffs did not appeal). They cannot pursue further relief now—whether through arbitration or otherwise. *See Chorosevic v. MetLife Choices,* 600 F.3d 934, 941 (8th Cir. 2010) (holding in ERISA context that "[w]here a claimant fails to pursue and exhaust administrative remedies that are clearly required under a particular ERISA plan, his claim for relief is barred"); *see also Potts v. Rawlings Co., LLC*, 897 F. Supp. 2d 185, 191, 194 (S.D.N.Y. 2012) (Medicare Advantage plan members alleging deceptive business practices were required to exhaust administrative remedies before suing United and other Medicare Advantage organizations: "the sole avenue for judicial review for all claims arising under the Medicare Act is through the exhaustion of administrative remedies").

### 2. The Medicare Act preempts the Providers' claims.

Even if there were no arbitration or exhaustion hurdles in the Providers' way, their claims fail because the Medicare Act preempts them.

The Medicare Act contains a preemption provision that applies to Medicare Advantage plans like United's: "The standards established under this part [Part C Medicare Advantage] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." 42 U.S.C. § 1395w-26(b)(3); *see also* 42 C.F.R. § 422.402. The statute applies if two conditions are satisfied—the government has established "standards" under the Medicare Act and the state law or regulation is "with respect to" an MA plan. Both are met here.

*First*, the Medicare Act and its implementing regulations establish "standards" governing a provider's removal from a Medicare Advantage network. Indeed, as the Providers recognize, the Act

and its regulations establish a scheme under which Medicare Advantage organizations must provide a contracted physician with prior notice of a termination or non-renewal and information about any right to appeal. *See* 42 U.S.C. § 1395w-22(j); 42 C.F.R. §§ 422.202(a), (d); *see also* Medicare Managed Care Manual, Ch. 6 at § 60.4, http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019326.html. Those are "standards" as Section 1395w-26(b)(3) uses the term. *See Uhm v. Humana, Inc.*, 620 F.3d 1134, 1149 n.20 (9th Cir. 2010) (concluding that, "at the narrowest cut, a 'standard' within the meaning of the preemption provision is a statutory provision or a regulation promulgated under the Act and published in the Code of Federal Regulations").

*Second*, the Providers' claims are "with respect to MA plans which are offered by MA organizations." The statute does not define "with respect to," but legislative history confirms that Congress intended to preempt all state laws or regulations that purport to regulate a Medicare Advantage plan, even if the law or regulation is consistent with federal standards:

> Prior to the 2003 amendments, the preemption clause provided that federal standards would supersede state law and regulations "with respect to" MA plans only "to the extent such law or regulation is inconsistent with such standards" and specified several "[s]tandards specifically superseded." 42 U.S.C. § 1395w–26(b)(3)(A) (2000). The 2003 amendments struck both that qualifying clause and the enumerated standards from the provision. *See* 42 U.S.C. § 1395w–26(b)(3)(A) (2003). The Conference Report accompanying the Act explains that, in striking the clause, Congress intended to broaden the preemptive effects of the Medicare statutory regime—
>
> The conference agreement clarifies that the MA program is a federal program operated under Federal rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency. There has been some confusion in recent court cases.

H.R. Rep. No. 108–391, at 557 (2003) (Conf. Rep.). "That passage indicates that Congress intended to expand the preemption provision beyond those state laws and regulations inconsistent with the enumerated standards."[3] *Uhm*, 620 F.3d at 1149–50; Medicare Managed Care Manual, Ch. 10 at § 30.1

---

[3] As CMS has explained and as experience confirms, common-law claims qualify as "state laws or regulations." *See* Medicare Managed Care Manual, Ch. 10 at § 30.2 ("All State standards, including those established through case law, are preempted to the extent that they would specifically regulate health plans (including MA plans), with the exceptions of State licensing and solvency laws.").

(CMS: "The scope of Federal preemption is broad. MA standards set forth in 42 CFR 422 supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to MA plans . . . .).

Through their state claims, the Providers purport to duplicate or add to the federal "standards" governing provider terminations, so the Medicare Act preempts the claims. Many courts have reached the same conclusion under close facts. *See, e.g.*, *Uhm*, 620 F.3d at 1149 (Medicare Act preempted certain state-law consumer-protection claims against a Medicare Advantage organization stemming from its marketing of prescription drugs); *Hepstall v. Humana Health Plan, Inc.*, No. 18-cv-0163, 2018 U.S. Dist. LEXIS 200418, at \*20–22 (S.D. Ala. Nov. 26, 2018) (Medicare Act preempted various Alabama state-law claims against a Medicare Advantage organization); *Haaland v. Presbyterian Health Plan*, 292 F. Supp. 3d 1222, 1231 (D.N.M. 2018) (Medicare Act preempted claims under New Mexico's Wrongful Death Act against a Medicare Advantage organization); *Meek-Horton v. Trover Solutions, Inc.*, 910 F. Supp. 2d 690, 394–96 (S.D.N.Y. 2012) (Medicare Act preempted claims under New York's General Obligations Law § 5-335(a) against Medicare Advantage insurers); *Morrison v. Health Plan of Nev., Inc.*, 328 P.3d 1165 (Nev. 2014) (Medicare Act preempted Nevada common-law negligence claims against Medicare Advantage organization); *Pacificare of Nev. v. Rogers*, No. 55713, 2011 WL 6016079, at \*5 (Nev. Oct. 27, 2011) (Medicare Act preempted Nevada's unconscionability doctrine as applied to an arbitration clause in a Medicare Advantage contract); *Phillips v. Kaiser Found. Health Plan, Inc.*, No. C 11-02326, 2011 WL 3047475, at \*8–9 (N.D. Cal. July 25, 2011) (Medicare Act preempted California consumer-fraud claims against Medicare Advantage organization).

In holding otherwise, the *Fairfield County* court misapplied the law. According to the *Fairfield County* court, "the Medicare Act does not preempt review of [a physician's] termination[]" because "it is silent on the issue of appeals regarding at-will termination or suspension of a physician without cause." 985 F. Supp. 2d at 270. But one of the act's implementing regulations (42 C.F.R. § 422.202(d)(4)) in fact addresses termination without cause. *See id.* ("An MA organization and a contracting provider must provide at least 60 days written notice to each other before terminating the contract without cause."). And in any event, the court missed that the Medicare Act preempts state

15

laws even if they are consistent with the Act or its implementing regulations. *Cf. Uhm*, 620 F.3d at 1149–50.

### 3. The Providers have no private right of action to enforce Medicare regulations.

Preemption aside, many of the Providers' claims hinge on United's supposed non-compliance with a Medicare Advantage regulation (42 C.F.R. § 422.202(d)), but one searches the Providers' brief in vain for a federal statute allowing them to enforce that regulation. There isn't one. "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Sandoval*, 532 U.S. at 291; *see also id.* at 286–87 ("If Congress has not expressed its intent to create a private right of action to enforce a regulation, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."); *Gross v. Cormack*, 586 F. App'x 899, 901 (3d Cir. 2014) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals."); *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 577 n.18 (1979) ("[T]he language of the statute and not the rules must control"). No Medicare statute gives providers the right to sue a Medicare Advantage organization over a non-renewal, so this Court should not create that right *ex nihilo*.

Congress knows how to create a Medicare cause of action when it wants to. In 42 U.S.C. § 1395y(b)(3)(A), for instance, Congress "established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement)." The Providers cannot invoke that statute because it applies to only certain types of payment or reimbursement disputes concerning a primary payer. It does not extend to non-payment disputes between providers and Medicare Advantage organizations, which are secondary payers under Medicare.

Nor does the statute governing a provider's removal from a Medicare Advantage network (42 U.S.C. § 1395w-22(j)) evince any congressional intent to grant a cause of action to non-renewed providers. That statute describes a Medicare Advantage organization's obligation to establish notice

and appeals procedures for removing network providers, but nothing in the statute suggests that Congress intended to give providers authority to police the organization's compliance with regulatory obligations through private litigation. *See Sandoval*, 532 U.S. at 287 ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.").

### 4. United complied with the Providers' contracts and with federal regulations.

In any case, the Providers' claims for declaratory judgment, breach of contract, breach of the implied covenant of good faith and fair dealing, tortious refusal to deal, tortious interference with contract, and unfair competition fail because United has done nothing wrong under the provider contracts or under federal law.

#### a. *United honored its contractual obligations.*

The Providers seem to think that they have a right to participate in United's network forever. They do not. According to their contracts, "either you or we can terminate this agreement, effective on an anniversary of the date this agreement begins, by providing at least 90 days prior written notice." Dkt. 1, Ex. A at 5. United did so by non-renewing the Providers' contracts more than 90 days before the contracts' anniversary dates.

With the contract's language against them, the Providers look for support in a 2018 Care Provider Manual that the contracts incorporate by reference. *See* Dkt. 1, Ex. A at 8 ("We have enclosed a copy of our Provider Manual. . . ."). According to the Providers, a section in that manual—describing cases in which United terminates a physician over quality concerns—somehow governs their contract's nonrenewal. It doesn't. The chapter that the Providers cite is called "Quality Management Program." Ex. A, Nielsen Decl., Ex. 1 at 96. In that chapter, United explains that it "may terminate a care provider's participation in the network for failure to comply with certain contractual obligations or Quality Management requirements," describes conduct that would not warrant a quality-control termination, and describes the appeal process for a quality-control termination. *Id.* at 98–100.

That chapter does not silently erase United's right—set out in the provider contract—to non-renew the contract by giving 90 days' written notice before the contract's anniversary. The manual's quality-control chapter is about for-cause terminations—which may happen at any point in the year under the contract—not non-renewals effective on an anniversary date. Dkt. 1, Ex. A at 5. United distinguished between quality-control terminations and non-renewals in the same chapter. *See* Ex. A, Nielsen Decl., Ex. 1 at 101 ("Expired contracts are not terminations. Non-renewals for lapsed contracts also do not constitute terminations."). United had a right to non-renew the Providers' contracts.

Nor does the implied covenant of good faith and fair dealing trump that right. The Providers argue that United did not treat them "fairly" by "not providing any reasons for the terminations" (Dkt. 1-1 at 17), but they cannot demand a for-cause termination when they agreed that either party could non-renew the contract without cause. Regardless, United gave the Providers a reason by telling them that it was exercising its right to non-renew their contracts after assessing its network "to help ensure [that it] meet[s] the needs of [its] members." Dkt. 1, Ex. D at 1. And in any event, the Providers' implied-covenant claim also fails because it depends on the same facts as their breach-of-contract claim. "[A] plaintiff's claim of breach of the implied covenant of good faith and fair dealing fails where the . . . allegations supporting plaintiff's claim are identical to the breach of contract claim." *CRA, Inc. v. Ozitus Int'l, Inc.*, No. 16-cv-5632 (JBS/AMD), 2017 U.S. Dist. LEXIS 99453, at *19–20 (D.N.J. June 27, 2017).

The Providers also betray the weakness of their contract claim by arguing that United sent the non-renewal letters by regular mail instead of certified mail. That is false. *See* Ex. A, Nielsen Decl. ¶ 9. But even if true, that supposed breach is not material and caused no damages to the Providers. *See, e.g. Giacone v. Virtual OfficeWare, LLC*, No. 13-cv-1558, 2014 U.S. Dist. LEXIS 172633, at *44 (W.D. Pa. Dec. 12, 2014) (plaintiff's sending contractual notice by regular mail instead of certified was not a material breach because "there is no legitimate contention that Defendants did not receive actual notice of Plaintiff's termination"); *Fenoglio v. Augat, Inc.*, 50 F. Supp. 2d 46, 54 (D. Mass. 1999) (same). They concede that they received the letters. Dkt. 1-1 at 8.

b.      *United complied with its regulatory obligations.*

The Providers also argue that 42 C.F.R. § 422.202(d)(1) displaces their contract's non-renewal clause, but the provision does nothing of the sort. The regulation says that

> An MA organization that suspends or terminates an agreement under which the physician provides services to MA plan enrollees must give the affected individual written notice of the following: (i) The reasons for the action, including, if relevant, the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by the MA organization. (ii) The affected physician's right to appeal the action and the process and timing for requesting a hearing.

According to the Providers, the "reasons for the action" language in that provision prohibits United from terminating or non-renewing providers without cause. Dkt. 1-1 at 3–4. But another provision in § 422.202(d)—subpart (d)(4)—refutes that interpretation. That provision authorizes Medicare Advantage organizations to terminate providers without cause: "An MA organization and a contracting provider must provide at least 60 days written notice to each other before terminating the contract without cause." 42 C.F.R. § 422.202(d)(4). In that way, the provision confirms that Medicare Advantage organizations may satisfy § 422.202(d)(1)'s "reason for the action" requirement by telling a provider that it is being non-renewed or terminated without cause. *See also* 42 C.F.R. § 422.111(e) (organization must "provide written notice of a termination of a contracted provider at least 30 calendar days before the termination effective date to all enrollees who are patients seen on a regular basis by the provider whose contract is terminating, *irrespective of whether the termination was for cause or without cause*.") (emphasis added); Medicare Managed Care Manual, Ch. 4 at § 110.1.2.1 ("MAOs have considerable discretion to select the providers with whom to contract in order to build high-performing, cost effective provider networks. They are able to make changes to these networks at any time during the contract year. . . ."); *id.* ("CMS recognizes that significant *no-cause network changes* may occur during the contract year.") (emphasis added).

Which is what United did. Dkt. 1, Ex. D at 1. And if United needed to offer more reason than that, it told the Providers that it had decided to non-renew their contracts because it had "assess[ed]

[its] networks to help ensure they meet the needs of [its] members."[4] *Id.* Nothing else needed to be said. And § 422.202(d)(1)'s "reason for the action" requirement does not apply to the seven plaintiffs who are nurse practitioners. It applies only to physicians. *See id.* (titled "Notice to physician"); *id.* ("An MA organization that suspends or terminates an agreement under which the physician provides services to MA plan enrollees must give the affected individual written notice of the following . . . .").

The Providers also argue that § 422.202(d)(1) required United to "disclose to the Physician-Provider the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by the MA organization." Dkt. 1-1 at 4. That is wrong. United had to give that information only "if relevant" to a physician's termination. *Id.* § 422.202(d)(1)(i). The information wasn't relevant because United exercised its contractual right to non-renew the contracts. And again, § 422.202(d)(4) allows without-cause terminations on 60 days' notice.

The Providers also speculate that United might not have followed the regulation's instruction—again, for physicians' appeals only—that a "majority of the hearing panel members [must be] peers of the affected physician." § 422.202(d)(2). They cite no evidence supporting that speculation.

Nor do the Providers point to any regulation or contract supporting their argument that they were entitled to know what information the panel considered. *Cf.* Dkt. 1-1 at 4. At any rate, the Providers might have learned more information about the panel's composition or the information that the panel considered if the Providers had requested a hearing, which the appeals policy allowed the physician-plaintiffs to do. *See* Dkt. 1, Ex. E at 3 ("If you are eligible for a hearing, as indicated above, and you would like the appeal panel to conduct a hearing, you must specify in your appeal request that you are requesting a hearing. . . . If you do not specify in your appeal request that you are requesting

---

[4] United also complied with § 422.202(d)(1)(ii) by telling the physician-plaintiffs about their right to appeal the decision, by explaining how and when to request an appeal, and by telling them about their opportunity to "request that the appeal panel conduct a hearing in lieu of a review of relevant information." Dkt. 1-1, Ex. D; *id.* Ex. E at 2–3.

a hearing, the appeal panel will review any relevant information available to it and you will have no further opportunity to appeal . . . ."). Nothing in the Providers' brief suggests that they did.

The Providers also fault United for notifying their patients about the non-renewals, but federal regulations required that notice. *See* 42 C.F.R. § 422.111(e) ("The MA organization must make a good faith effort to provide written notice of a termination of a contracted provider at least 30 calendar days before the termination effective date to all enrollees who are patients seen on a regular basis by the provider whose contract is terminating, irrespective of whether the termination was for cause or without cause."); Medicare Managed Care Manual, Ch. 3 at § 110.1.2.3 ("CMS expects that when an MAO has 60 days advance notice that a contract with a provider will be terminated . . . the MAO should notify affected enrollees at least 30 days in advance of the contract termination but preferably more than 30 days in advance."). CMS also recommends that a Medicare Act organization include in the notice the "[n]ames and phone numbers of in-network providers that enrollees may access for continued care" (*id.*), which is what United did. *See* Dkt. 1, Ex. G.

> c.    *The Providers' tort claims fail for other reasons.*

Most of the Provider' tort claims fall with their non-renewal arguments, but the claims also fail for other reasons.

The Providers' tortious-inference claim against United—based on United's purportedly interfering with the Providers' patient relationships—fails for at least three reasons. *First*, United is not a stranger to the Providers' relationship with United's own plan members. *See Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 752 (1989) ("[I]t is fundamental to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship."). *Second*, the tortious-interference claim is "inextricably intertwined" with the Providers' breach-of-contract claim. *See Freedom Mortg. Corp. v. LoanCare, LLC*, No. 16-cv-2569, 2018 U.S. Dist. LEXIS 203733, at *7–8 (D.N.J. Nov. 30, 2018) (dismissing tortious-interference claim under Rule 12(c) where "the cause of action for tortious interference is inextricably intertwined with the breach of contract claim"). *Third*, United did not

intentionally interfere with the Providers' patient relationships or do so without "justification." It had a contractual right to non-renew the Providers' contracts. *See Printing Mart-Morristown*, 116 N.J. at 751 (plaintiff must demonstrate that the "interference was done with 'malice,' which means "that the harm was inflicted intentionally and without justification or excuse"); *Nguyn v. Wal-Mart*, No. 12-cv-1824 (KM) (MCA), 2013 U.S. Dist. LEXIS 88948, at \*21–23 (D.N.J. June 25, 2013) (dismissing tortious-interference claim because the plaintiff failed to allege that the defendant acted with "malice," *i.e.*, "without justification").

The Court should also ignore the Providers' speculation that defendant Riverside Medical Management might have pressured United to terminate the contracts. *See, e.g.*, Dkt. 1-1 at 19. That unfounded speculation does not count for anything.

The Providers' unfair-competition claim also fails for lack of evidence—and for lack of a cause of action. "There is no distinct cause of action for unfair competition. It is a general rubric which subsumes various other causes of action." *Juice Entm't, LLC v. Live Nation Entm't, Inc.*, No. 11-cv-7318, 2012 U.S. Dist. LEXIS 92114, at \*12 (D.N.J. July 3, 2012). On top of that, the unfair-competition claim fails because it is duplicative of the contract claim. *See CRA*, 2017 U.S. Dist. LEXIS 99453, at \*30 ("where the factual basis for the unfair competition claim is the same as for the tortious interference Count, . . . the Court is persuaded that the better course is to dismiss the unfair competition claim as duplicative").

The Providers also argue that United has violated their "due process" rights by not renewing their agreements and by supposedly not giving them enough information about the appeal. *E.g.*, Dkt. 1-1 at 20. But United is a non-governmental actor, so it cannot violate the Providers' due-process rights. That would be true even if United acted under color of federal law (which it didn't). *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (refusing to extend *Bivens'* limited holding "to confer a right of action for damages against private entities acting under color of federal law"). And no court has recognized a *Bivens* claim in the Medicare context. *See, e.g.*, *Giesse v. HHS*, 522 F.3d 697, 707–08 (6th Cir. 2008) (refusing to recognize a *Bivens* claim in the Medicare context).

**B.    The remaining injunctive-relief factors also weigh in United's favor.**

The Court should also deny the Providers' application because they have not shown that they will suffer irreparable harm without temporary injunctive relief, that the equities favor them, or that the public interest requires an injunction. *Cf. Ferring*, 765 F.3d at 210 (standard for preliminary injunctive relief).

**1.    The Providers have not shown irreparable harm by clear and  convincing evidence.**

The Providers will not suffer irreparable harm if the Court denies their application. Two of the Providers have already been removed from the network. Ex. A, Nielsen Decl. ¶ 6. And many of the remaining Providers' contracts do not face non-renewal until November 2019 or later (*id.*), so those Providers have time to exhaust their contractual remedies (if still available) and pursue any arbitration. In the meantime, the Providers are also free to ask an arbitrator for emergency injunctive relief. There is no need for the "extraordinary and drastic" remedy of a temporary injunction. *Mazurek v. Armstrong*, 520 U.S. 968, 971 (1997).

Many of the Providers received non-renewal letters in March and April 2019 (Dkt. 1, Exs. C, D), so they could have filed arbitrations months ago. Instead, they waited until four weeks before the open-enrollment period to file suit and then used their own delay as a reason for emergency relief. The Providers should not benefit from their own delay. That is especially so because after accepting service, United offered to give any plaintiff-provider (whose non-renewal date has not already passed) 30 days to file any individual arbitration demand and seek emergency relief from the arbitrator. The Providers refused the offer.

Timing aside, the Providers have not shown what the law requires for irreparable harm— "clear and convincing evidence that [the Providers'] business has been or imminently will be 'destroyed.'" *Mega Brands America, Inc. v. Cerillo*, No. ESX-C-69-14, 2014 N.J. Super. Unpub. LEXIS 2990, *49–50 (N.J. Sup. Ct. Dec. 5, 2014); *see also Tarzia v. City of Stamford*, No. 3:10-cv-1583, 2010 WL 4683929, at *4 (D. Conn. Nov. 9, 2010) ("a general concern over potential damage to one's professional reputation does not arise to the level of irreparable harm."); *Ahmad v. Long Island Univ.*,

18 F. Supp. 2d 245, 248–49 (E.D.N.Y. 1998) ("[T]he plaintiff must quite literally find himself being forced into the streets or facing the specter of bankruptcy before a court can enter a finding of irreparable harm" based on reputational injury); *Shady v. Tyson*, 5 F. Supp. 2d 102, 109 (E.D.N.Y. 1998) (rejecting argument by physician that nonrenewal of faculty appointment would cause irreparable harm to his professional reputation). The Providers argue that they "will suffer damage to their reputations as well as damage to the good will of their medical practices" without an injunction (Dkt. 1-1 at 10), but those supposed harms flow from a non-renewal clause that they agreed to, not any wrongful conduct on United's part. And those alleged "harms" would happen anytime a network contract terminates, which means that the harms cannot be irreparable unless the Providers have a right to stay in United's networks forever.

The Providers' speculation about a potential blow to their practices' goodwill, reputation, or patient base is not clear and convincing evidence that their business will be destroyed. *Cf. Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) ("the risk of irreparable harm must not be speculative"). Network contracts terminate all the time without destroying the provider's business.

### 2.       The Providers are trying to prevent monetary harm.

The Providers also have not shown that money damages would be inadequate. "[A]n injury measured in solely monetary terms cannot constitute irreparable harm." *Checker Cab of Phila. Inc. v. Uber Techs., Inc.*, 643 F. App'x 229, 232 (3d Cir. 2016) (quoting *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009)); *see also Black Mt. Equities, Inc. v. Pac. Gold Corp.*, No. 12-cv-1285 (KM) (CLW), 2012 U.S. Dist. LEXIS 169295, at *29 (D.N.J. Nov. 27, 2012) ("Harm is considered 'irreparable' if it is not redressable by money damages at a later date, in the ordinary course of litigation.") (citation omitted). The Providers argue that plan members will switch to other providers who have not been removed from the network (Dkt. 1-1 at 12–13), but even if that speculative injury comes to pass, it is a wallet injury and quantifiable. Money damages could compensate that alleged harm.

### 3. The Providers' requested relief will cause harm to plan members, not the other way around.

Nor can the Providers show irreparable harm by pointing to alleged harms to plan members. *Cf.* Dkt. 1-1 at 22 (arguing that "[p]atients will be harmed, including the sacrosanct relationship between a Patient and his or her doctor"); *id.* ("speculating that "without being able to receive healthcare from Plaintiffs, many may go without needed healthcare at all or their care plan will be terribly compromised"). The Providers have not raised claims on those members' behalf, so any alleged harms to those members do not support the Providers' application. But even if the Court could consider those alleged harms, the Providers have things backwards: Far from preventing member harm or confusion, a temporary injunction would create confusion by creating doubt about a provider's status vis-à-vis United's Medicare Advantage and Medicaid network. Plan members may sign up for United's plan thinking that their provider will remain in-network only to find out—after United prevails in the litigation or arbitration—that the provider is no longer able to service Medicare Advantage or Medicaid members on United plans.

The Providers are also wrong that their non-renewal will disrupt their patients' continuity of care. *Cf.* Dkt. 1-1 at 22. United has given each plan member the name and address of another in-network provider near their former provider and has told the members that they may choose another provider if they call United. *See, e.g.*, Dkt. 1, Ex. G at 1. Those physicians provide the same healthcare services as the Providers. Ex. A, Nielsen Decl. ¶ 3. And there isn't a shortage of them near the plan members: United will continue to have the largest network in New Jersey, with 1,457 providers in Essex County alone. *Id.* Regardless, if United's non-renewals raised any serious issues about patient care, then CMS stands ready to address them by enforcing the statutory and regulatory standards that govern United's participation in Medicare Advantage. *See* Managed Care Manual, Ch. 4 at § 110.

### 4. The equities favor United.

If the Court denies the Providers' application, then United's plan members will have access to other local providers in the network. But the Court's granting the Providers' application would deprive United of its right to determine the size and composition of its provider network in a way that

25

promotes efficient and effective healthcare services. The Court should not deny United its right to calibrate its network in the manner that best serves patient needs.

## **CONCLUSION**

The Court should deny the Providers' application for a temporary restraining order, and having done that, should order that the Providers must arbitrate their claims.

Respectfully submitted on October 1, 2019.

/s/ Steven L. Penaro
Steven L. Penaro
D.N.J. ID # 030182009
**ALSTON & BIRD LLP**
90 Park Ave
New York, NY 10016
Tel: 212-210-9460
Fax: 212-922-3960
steve.penaro@alston.com

William H. Jordan
*Pro hac vice forthcoming*
Lee A. Deneen
*Pro hac vice forthcoming*
**ALSTON & BIRD LLP**
1201 W. Peachtree St., Suite 4900
Atlanta, GA 30309
Tel: 404.881.7000
Fax: 404.881.7777
bill.jordan@alston.com
lee.deneen@alston.com

Brian D. Boone
*Pro hac vice forthcoming*
**ALSTON & BIRD LLP**
Bank of America Plaza, Suite 4000
101 S. Tryon St.
Charlotte, NC 28280
Tel: 704.444.1000
Fax: 704.444.1111
brian.boone@alston.com

*Counsel for UnitedHealth Group Inc.,*
*UnitedHealthcare Insurance Company, UnitedHealthcare Community Plan,*
*AmeriChoice of New Jersey, Inc., AmeriChoice Corp., Optum, Inc., Optum Care, Inc.,*
*and Riverside Medical Management, LLC*

26

## <u>CERTIFICATION UNDER LOCAL RULE 11.2</u>

In accordance with Local Rule 11.2, I certify that to the best of my knowledge, the within matter in controversy is not the subject of any other action pending in any court, or of a pending arbitration or administrative proceeding.

Respectfully submitted on October 1, 2019.

/s/ Steve Penaro
Steven L. Penaro
D.N.J. ID # 030182009
**ALSTON & BIRD LLP**
90 Park Ave
New York, NY 10016
Tel: 212-210-9460
Fax: 212-922-3960
steve.Penaro@alston.com

*Counsel for UnitedHealth Group Inc.,*
*UnitedHealthcare Insurance Company, UnitedHealthcare*
*Community Plan, AmeriChoice of New Jersey, Inc.,*
*AmeriChoice Corp., Optum, Inc., Optum Care, Inc.,*
*and Riverside Medical Management, LLC*

1

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 1, 2019, I electronically filed this brief with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of the filing to the following attorneys of record.

Steven I. Adler
MANDELBAUM SALSBURG, P.C.
3 Becker Farm Rd.
Roseland, N.J. 07068

/s/ Steve Penaro
Steven L. Penaro
**ALSTON & BIRD LLP**